UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL ACTION NO. 6:18-CR-30-GFVT-HAI

UNITED STATES OF AMERICA                                                    PLAINTIFF

vs.       MEMORANDUM ON UNRESOLVED OBJECTIONS TO
          PRESENTENCE REPORT AND SENTENCING

KIMBERLY JONES                                                              DEFENDANT

\* \* \* \* \* \* \* \* \* \*

The Defendant, Kimberly Jones, has objected to several portions of the United States Probation Office's ("USPO") Presentence Investigative Report ("PSR"). The United States sets forth its position on the disputed portions of the PSR below and also sets forth its position on the appropriate sentence under the United States Sentencing Guidelines ("U.S.S.G.") and 18 U.S.C. § 3553(a).

## I.   Unresolved Objections to the PSR

The advisory Sentencing Guidelines range serves as the "starting point and initial benchmark" for the Court's sentencing analysis. *United States v. Bolds*, 511 F.3d 568, 579-80 (6th Cir. 2007) (citation omitted). As such, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. King*, 553 Fed. Appx. 518, 520 (6th Cir. 2014) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).

1

In calculating the appropriate Guidelines range, the Court considers as relevant conduct the acts of the defendant, as well as the acts "willfully caused by the defendant" and "all harm that resulted from the acts and omissions." U.S.S.G. § 1B1.3. Relevant conduct is defined to include "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). The Guidelines define a "common scheme or plan" as any other offense substantially connected "by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." *Id*. § 1B1.3 cmt. n.9(A). Relevant conduct may include "'uncharged crimes, crimes where charges have been dismissed, and crimes for which the defendant has been acquitted.'" *United States v. Rios*, 830 F.3d 403, 440 (6th Cir. 2016) (citing *United States v. Redmond*, 667 F.3d 863, 875 (7th Cir. 2012).

Although the initial "burden is on the government to prove, by a preponderance of the evidence, that a particular sentencing enhancement applies," *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003), "[w]hen a defendant fails to produce any evidence to contradict the facts set forth in the PSR, a district court is entitled to rely on those facts when sentencing the defendant." *United States v. Geerken*, 506 F.3d 461, 467 (6th Cir. 2007).[1]

---

[1] "A defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth. Instead, beyond such a bare denial, he must produce some evidence that calls the reliability or correctness of the alleged facts into question. If a defendant meets this burden of production, the government must then convince the court that the PSR's facts are actually true. But the defendant gets no free ride: he must produce more than a bare denial, or the judge may rely entirely on the PSR." *United States v. Lang*, 333 F.3d 678 (6th Cir. 2003).

2

Here, there are several unresolved objections to the PSR that impact Jones' advisory Guidelines range, including: (1) the drug quantity calculation under U.S.S.G. § 2D1.1; (2) a two-level enhancement under U.S.S.G. § 2D1.1(b)(12) for maintaining a premises for the purpose of distributing a controlled substance; (3) a two-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice; and (4) a two-level enhancement under U.S.S.G. § 3B1.3 for abuse of a position of trust or special skill. For the reasons that follow, the United States believes the PSR correctly applies the Guidelines on each point.

### A.     The PSR Correctly Calculates a Conservative Drug Quantity

"The Sentencing Guidelines instruct sentencing courts to calculate a defendant's base offense level from the total quantity of drugs attributable to him [or her]." *United States v. Thompson*, 588 F. App'x 449, 452 (6th Cir. 2014) (citing U.S.S.G. § 2D1.1(c)). "A drug quantity need only be established by a preponderance of the evidence, and an estimate will suffice so long as it errs on the side of caution and likely underestimates the quantity of drugs actually attributable to the defendant." *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008); *see also United States v. Huffman*, 529 F. App'x. 426, 428–29 (6th Cir. 2013) ("A district court is allowed to estimate the quantity so long as the court can conclude that it is more likely than not that the defendant is actually responsible for an amount greater than or equal to the amount for which she is held legally responsible.").

In this case, the jury convicted Jones of unlawfully filling two prescriptions (Counts 5 and 6) and unlawfully "loaning" controlled substances on five occasions (Counts 31-35), but acquitted on the remaining counts. Although the USPO could have included the acquitted conduct (as well as a great deal of unchanged conduct) in its analysis, *see Rios*,

3

830 F.3d at 440, it took a conservative approach and included only the following: (1) the other Schedule II controlled substances Jones and her pharmacy dispensed to patient Leslie Meadows (the patient identified in Counts 5 and 6); and (2) the controlled substances Jones and her pharmacy "loaned" to certain customers.[2]

In calculating the drug quantity attributable to Jones, the USPO recognized that the two prescriptions Jones filled for Leslie Meadows on March 2, 2017, were just the last in a long string of problematic prescriptions that Meadows filled at Kim's Hometown Pharmacy. Accordingly, the USPO also included the other Schedule II controlled substances dispensed to Meadows from January 26, 2010 forward. But the USPO excluded the prescriptions filled for the other 13 patients identified in the Superseding Indictment (as well as a number of other problematic prescriptions). The USPO recognized there was detailed proof showing the problems with each of those patients' prescriptions, particularly those prescriptions issued after the DEA's warnings to Jones in August 2017, but excluded these quantities to "err on the side of caution." *See* PSR at ¶ 21.

Despite this conservative approach, Jones objects to the PSR's inclusion of *any* prescriptions beyond the two identified in Counts 5 and 6. [Objections at 2-4.] In short, Jones argues that the United States has not sufficiently proven by a preponderance that she dispensed any other prescriptions outside the scope of professional practice and not for a

---

[2] Jones does not appear to dispute the "loaned" quantities that are included in the PSR. Accordingly, the United States does not address the loaned pills here, but will be ready to answer any questions on this point at the sentencing hearing, if necessary.

4

legitimate medical purpose.[3] *Id.*

Jones is wrong. The United States introduced extensive evidence showing that Meadows' other prescriptions were equally (if not more) problematic as those identified in Counts 5 and 6. To begin with, United States presented the testimony of two experts, Paula York and Katie Busroe, both of whom are trained pharmacists and experienced in drug diversion investigations. Both testified without any hesitation that Jones breached her corresponding responsibility under 21 C.F.R. § 1306.04 by dispensing these drugs to Meadows (and other patients). York and Busroe both explained the concept of "red flags" for potential diversion, including distant out-of-state travel, frequent switching of providers, group travel, and the types and combinations of controlled substances prescribed to a patient. Both experts also explained that it is rare for non-terminally ill patients to legitimately require heavy dosages of multiple Schedule II opioid pain killers for extended periods. York and Busroe applied this concept to Jones' dispensing history and explained how Jones continued dispensing addictive controlled substances to Meadows (and many other patients) despite numerous glaring red flags. Both York and Busroe also explained that their opinion was not limited to the specific prescriptions listed in the Superseding Indictment; instead, these were just samples from a broader pattern of problematic

---

[3] Jones also argues that if any other drugs are included, (1) only those dispensed *after* March 2, 2017, should be included; and (2) only other prescriptions for Oxycodone 15mg and Oxymorphone 7.5mg should be included. [Objection at 2.] But, to the Government's knowledge, Meadows did not fill any controlled substance prescriptions for Meadows after March 2, 2017. *See* Gov. Ex. 64b. And there is no logical basis to include only those dosages and quantities to the exclusion of other Schedule II controlled substances. If it was improper for Jones to dispense Meadows Oxycodone 15mg pills, it is hard to see how dispensing him Oxycodone 20mg or 30mg, for example, was somehow more legitimate.

dispensing to each patient.

The United States supplemented this testimony with extensive evidence showing the unusual pattern of Meadows' prescriptions. For instance, with data and graphics, the United States showed that Meadows traveled to approximately 18 different towns or cities between 2010 and 2017 to obtain controlled substance prescriptions from approximately 28 different doctors. *See* Gov. Ex. 33d. As shown in Figure 1 below, Meadows's travel progressed from Southern Florida, to Georgia, Virginia, West Virginia, and Tennessee.

**Figure 1**

Leslie Meadows Doctor Travel from Williamsburg, KY

| | City | State | Approx. Distance | No. of Trips |
|---|---|---|---|---|
| 1 | Boca Raton | FL | 900 mi. | 1 |
| 2 | Lake Worth | FL | 882 mi. | 1 |
| 3 | Lake Park | FL | 869 mi. | 1 |
| 4 | Boca Raton | FL | 900 mi. | 2 |
| 5 | Jacksonville | FL | 614 mi. | 1 |
| 6 | Lawrenceville | GA | 298 mi. | 2 |
| 7 | Cartersville | GA | 241 mi. | 4 |
| 8 | Tucker | GA | 286 mi. | 3 |
| 9 | Atlanta | GA | 280 mi. | 1 |
| 10 | Tucker | GA | 286 mi. | 9 |
| 11 | Woodstock | GA | 262 mi. | 10 |
| 12 | Norcross | GA | 284 mi. | 2 |
| 13 | Fisherville | VA | 404 mi. | 7 |
| 14 | Charleston | WV | 252 mi. | 14 |
| 15 | Wytheville | VA | 249 mi. | 3 |
| 16* | Mechanicsville | VA | 505 mi. | 1 |
| 16* | Wytheville | VA | 252 mi. | 1 |
| 17 | Mechanicsville | VA | 505 mi. | 16 |
| 18 | Clarksville | TN | 229 mi. | 5 |

*Both locations on the same date.

⬠ = Home     ★ = Pharmacy

In almost every instance, Meadows obtained multiple prescriptions for Schedule II opioids at each stop, including Oxycodone, Oxymorphone, and Fentanyl. As York and Busroe explained, these should be glaring red flags to any pharmacist. Moreover, eleven of the physicians who prescribed to Meadows during this timeframe lost their DEA registrations. *See* Gov. Ex. 32, 55.

6

The jury also heard testimony from Mr. Meadows' wife, Rebecca Meadows. She testified that she had known Jones personally for many years and, like her husband, she filled numerous controlled substance prescriptions from out-of-state physicians at Kim's Hometown Pharmacy. She described that many of these physicians were not "real doctors" and that she went through withdrawal when she stopped taking painkillers, causing her to seek Suboxone. She also told the jury about her husband's addiction and that he traveled long distances to get his prescriptions.

Combined, all of this evidence[4] established by a preponderance that Jones' unlawful dispensing was not limited to the two prescriptions she filled for Leslie Meadows on March 2, 2017. If anything, many of the earlier prescriptions were even *more* problematic because of the quantities of those drugs or the location of the other doctors. *See* Gov. Ex. 33d (showing, for example, that Jones filled prescriptions Dr. Jacob Dreszer in Boca Raton, Florida, wrote for 180 Oxycodone 30mg pills and 60 Oxycodone 15mg pills on January 26, 2010).

In her Objections, Jones does not meaningfully distinguish the prescriptions identified in Counts 5 and 6 from the earlier drugs she dispensed to Meadows. Instead, she

---

[4] For the sake of brevity, the United States has not exhaustively listed all of the evidence that proved Jones unlawfully filled these other prescriptions. If the Court requires additional proof, it can also consider, for example, (1) that Jones never ran a KASPER on Leslie Meadows, *see* Gov. Ex. 43; (2) the testimony of relief pharmacists Sam Moore and Rick Loudermelt, both of whose practices contrasted sharply with Jones'; and (3) the volume and nature of the other prescriptions Jones filled during this time period, which included many combinations of opioids, benzodiazepines, and other addictive controlled substances, *see* Gov. Ex. 64b.

7

cites to a Seventh Circuit case, *United States v. Chube*, 538 F.3d 693, 703 (7th Cir. 2008), which has no impact on the USPO's analysis here. There, the Seventh Circuit expressed concern when the district court assumed a lack of medical purpose for 98 different patients' prescriptions "after discussing only 10 [patient's] files with any specificity. . . ." *Id*. at 704.[5] But in this case, the Court has the benefit of two expert opinions, as well as a host of other corroborating evidence, that specifically address Meadows' prescriptions included in the PSR. The PSR has not blindly extrapolated that proof out to a number of other patients as was the case in *Chube*. *See United States v. Rodriguez-Iznaga*, 575 F. App'x 583, 587 (6th Cir. 2014) (distinguishing *Chube* and affirming because "the district court did explain why the prescriptions to the OH–KY–WV residents were . . . indicative of drug trafficking, holding that no reasonable person in that much pain would travel 15–plus hours to Florida (every 30 days)").

Moreover, given the amount of the proof about the scores of other problematic prescriptions identified at trial, the Court can comfortably "conclude that it is more likely than not that the defendant is actually responsible for an amount greater than or equal to the amount" actually included in the PSR. *Huffman*, 529 F. App'x. at 428–29 (6th Cir.

---

[5] The Seventh Circuit has further clarified *Chube*, explaining that "[i]t is not necessary . . . for the government to systematically discuss every single prescription that every single patient received. That would be a duplicitous and meaningless procedural requirement. A district court may not, however, as it did in *Chube*, only discuss some of the patient files and extrapolate that, because some of the patients received prescriptions that had no legitimate medical purpose and were outside the usual course of medical practice, all of the prescriptions written to all of the patients had no legitimate medical purpose. . . ." *United States v. Rosenberg*, 585 F.3d 355, 357–58 (7th Cir. 2009).

8

2013).

### B. The PSR Correctly Applies the Drug Premises Enhancement

Jones also objects to a two-level increase under U.S.S.G. § 2D1.1(b)(12) for maintaining a premises for the purpose of distributing a controlled substance. The enhancement applies to anyone who "(1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013).

Here, the first two elements seem to be undisputed. As to the third element, "distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises." *Id.*; *see also United States v. Bell*, 766 F.3d 634, 637 (6th Cir. 2014).

The proof at trail established that unlawfully distributing controlled substances was one of the principal uses of Kim's Hometown Pharmacy. The United States submitted proof that Jones filled thousands of controlled prescriptions for suspicious out-of-state providers, and that Jones continued doing so even after being warned by the DEA about problematic specific doctors. *See* Gov. Ex. Gov. Ex. 36a-f; Gov. Ex. 55 (listing over 35 providers with surrendered DEA registrations whose prescriptions Jones filled). Jones also repeatedly filled prescriptions for groups of individuals who traveled to multiple out-of-state clinics at the same time. *See* Gov. Ex. 34a-e. Multiple patients testified about their addictions and their unusual behavior when obtaining and filling their prescriptions. And while Jones was filling all of these prescriptions, she was also unlawfully loaning controlled substances to other customers without prescriptions. *See*, *e.g.*, *United States v.*

9

*Otano*, 679 F. App'x 776, 778 (11th Cir. 2017) (affirming pharmacist's sentence (which included the drug involved premises enhancement) who operated a pharmacy that filled fraudulent Oxycodone prescriptions).

Jones objects that the jury acquitted Jones of Count 36 and that she conducted other lawful business at the pharmacy. But her acquittal on Count 36 does not preclude the Court from finding that the enhancement applies by a preponderance and Jones' use of the pharmacy to lawfully dispense other drugs does not negate the enhancement. *See United States v. Bell*, 766 F.3d 634, 638 (6th Cir. 2014) (rejecting argument that lawful activity on premises negated enhancement because "[o]ne can maintain a premises for more than one purpose").

### C. The PSR Correctly Applies the Obstruction of Justice Enhancement

Jones also objects to the PSR's inclusion of a two-level enhancement under U.S.S.G. § 3C1.1 for obstructing justice. It is well established that the enhancement applies to a defendant who "testified falsely concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Chance*, 306 F.3d 356, 390 (6th Cir. 2002) (citations and quotations omitted). To impose the enhancement, the Court "must identify those particular portions of the defendant's testimony that it considers to be perjurious, and either make specific findings as to each element of perjury or make a finding that encompasses all of the factual predicates for a finding of perjury." *United States v. Fitzgerald*, 754 F. App'x 351, 368–69 (6th Cir. 2018). "In turn, the offense of perjury requires the establishment of three elements: that the defendant made "(1) a false statement under oath (2) concerning a

10

material matter (3) with the willful intent to provide false testimony." *United States v. Macias-Farias*, 706 F.3d 775, 782 (6th Cir. 2013)

Here, the PSR correctly applies two-level enhancement under U.S.S.G. § 3C1.1 in light of Jones' trial testimony summarized in the PSR, as well as Jones' statements to investigators in the underlying investigation. *See* U.S.S.G. § 3C1.1, N. 4 (explaining that "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense" is the type of conduct to which the enhancement applies). For example, the following statements (all identified in the PSR) related to material issues in the Superseding Indictment and evidence an intent to provide false testimony:

- Jones testified that she never loaned controlled substances without a prescription;
- Jones testified that notes in the pharmacy system were the result of a computer glitch (or that someone else had entered the notes);
- Jones denied loaning pills to a customer named Croley Ball (despite Gov. Ex. 46 and her prior statement to investigators);
- Jones denied that investigators warned her that Dr. Gowder and Dr. Moore had been indicted (forcing the government to call a new witness from the DEA in rebuttal)

This list is not exhaustive, but it suffices to support the USPO's recommended two-level enhancement under U.S.S.G. § 3C1.1.

In her Objections, Jones generically "takes exception to the notion that she lied under oath" and "takes the position that her testimony at trial was truthful and was not a willful obstruction or impediment to justice." [Objections at 6.] But Jones does not

11

actually dispute that she made any of the false statements identified in the PSR. *Id.* Accordingly, the Court should adopt the PSR's findings and apply the enhancement. *See United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003); *see also United States v. Adkins*, 729 F.3d 559, 570 (6th Cir. 2013).

### D. The PSR Correctly Applies the Position of Trust or Special Skill Enhancement

A two-level enhancement applies if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3.  A position of trust is characterized by professional or managerial discretion, and a person occupying a position of trust ordinarily receives less supervision than an employee whose responsibilities are non-discretionary in nature.  U.S.S.G. § 3B1.3, comment (n.1).

Here, the PSR correctly applies the § 3B1.3 enhancement given the evidence presented at trial showing the degree of trust placed in Jones as a pharmacist, especially with respect to controlled substances.  The trial evidence also showed that as the owner of Kim's Hometown Pharmacy, Jones had the final say about when drugs were dispensed from the pharmacy.  Jones abused this trust[6] by exercising her discretion to dispense controlled substances illegally.  *See United States v. Mekowulu*, 556 F. App'x 865, 869

---

[6] Jones also used a "special skill" to facilitate the commission of the offense.  The commentary explains that a "special skill" is "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." U.S.S.G. 3B1.3, n. 4.  Jones' training and licensure as a pharmacist meets this definition.  Her status as a licensed pharmacist clearly facilitated her distribution of controlled substances, as she would not have been able to acquire or dispense any prescription medications absent her training and licensure.

(11th Cir. 2014) (applying enhancement because "a licensed pharmacist does exercise discretion when faced with indicators of drug diversion: The pharmacist can investigate the indicators, or he can fill the suspect prescription"); *United States v. Agyekum*, 846 F.3d 744 (4th Cir. 2017) (enhancement applied to licensed pharmacist intern and manager of pharmacy); *see also United States v. Hoffer*, 129 F.3d 1196, 1204 (11th Cir.1997) (defendant "betrayed society's trust by using his prescription writing privileges to distribute controlled substances outside the legitimate practice of medicine").

Nonetheless, Jones objects to the enhancement, but does not dispute that a licensed pharmacist possesses a special skill or occupies a position of trust. Instead, she argues that because she was acquitted on other charges, "the jury found that she performed her duties as a pharmacist in good faith and did not abuse her position of trust as a pharmacist." [Objections at 6.] But the acquitted counts have no impact on this analysis. With respect to each of the seven counts of conviction, Jones abused the trust placed in her as a pharmacist and illegally dispensed controlled substances. Nothing more is required.

## II.     The United States Sentencing Recommendation Under 18 U.S.C. § 3553(a)

As noted, the advisory Guidelines range serves as the "starting point and initial benchmark" for the Court's sentencing analysis. *United States v. Bolds*, 511 F.3d 568, 579-80 (6th Cir. 2007) (citation omitted). The Court also considers the factors set forth in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, and to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(1)-(2).

The United States respectfully submits that the seriousness of the offense, the need to promote respect for the law, and deterrence are critical factors in this case. Pharmacists play a critical role in protecting against the unlawful proliferation of addictive controlled substances, especially opioid painkillers. Pharmacists should act as gatekeepers, not enablers. But too many professionals like Jones have been complicit in their patients' addictions, and our district, like many others across the country, is now grappling with the consequences. The sentence in this case must reflect the seriousness of this problem and signal to other professionals that they will receive meaningful punishment if they intentionally abandon their responsibilities under the law.

Accordingly, the United States anticipates that it will ask for a meaningful custodial sentence, but it will articulate its position in greater detail at the sentencing hearing after reviewing the defendant's position and any other materials that might be submitted to the Court.

Respectfully submitted,

ROBERT M. DUNCAN, JR.
UNITED STATES ATTORNEY

By:  /s/ Andrew E. Smith
     Assistant United States Attorney
     260 W. Vine Street, Suite 300
     Lexington, Kentucky 40507-1612
     (859) 685-4849
     Andrew.E.Smith@usdoj.gov

## **CERTIFICATE OF SERVICE**

On June 5, 2019, I electronically filed this document through the CM/ECF system, which will send notice to counsel of record.

/s/ Andrew E. Smith
Assistant United States Attorney
