```
 1                  UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
 2                   SOUTHERN DIVISION AT LONDON

 3    UNITED STATES OF AMERICA,

 4         Plaintiff,

 5                                  Docket No. 6:18-CR-30
      VS.                           At London, Kentucky
 6                                  Wednesday, January 30, 2019
                                    9:53 a.m.
 7    KIMBERLY JONES,

 8         Defendant.
                             - - -
 9
          TRANSCRIPT OF JURY TRIAL PROCEEDINGS BEFORE
10      U.S. DISTRICT JUDGE GREGORY F. VAN TATENHOVE
                     Day 2 of 8 Days
11
                             - - -
12
      APPEARANCES:
13
      For the United
14    States:             ANDREW E. SMITH
                           Assistant United States Attorney
15                         260 West Vine Street
                           Suite 300
16                         Lexington, Kentucky  40507-1612
                           (859) 685-4849
17
      For the Defendant:  NED PILLERSDORF
18                         RYAN D. MOSLEY
                           Pillersdorf, DeRossett & Lane
19                         124 West Court Street
                           Prestonsburg, Kentucky  41653
20                         (606) 886-6090

21    Court Reporter:     SANDRA L. WILDER, RMR, CRR
                           Official Court Reporter
22                         313 John C. Watts Federal Building
                           330 West Broadway, Suite 327
23                         Frankfort, Kentucky  40601

24
             Proceedings recorded by mechanical stenography,
25       transcript produced by computer.
```

1

INDEX

2
GOVERNMENT WITNESSES:

3

CHARLES D. SWANSON
     Direct Examination . . . . . . . . . . . Page   54
     Cross-examination. . . . . . . . . . . . Page   72
     Redirect Examination . . . . . . . . . . Page   82

KYLE SIZEMORE
     Direct Examination . . . . . . . . . . . Page   84
     Cross-examination. . . . . . . . . . . . Page  155
     Redirect Examination . . . . . . . . . . Page  162

JAMIE SWARTWOOD
     Direct Examination . . . . . . . . . . . Page  166

MANAR JEAN-JACQUES
     Direct Examination . . . . . . . . . . . Page  176

DIANA WOOLUM
     Direct Examination . . . . . . . . . . . Page  209
     Cross-examination. . . . . . . . . . . . Page  221
     Redirect Examination . . . . . . . . . . Page  227

TAYLOR CARR
     Direct Examination . . . . . . . . . . . Page  229
     Cross-examination. . . . . . . . . . . . Page  256
     Redirect Examination . . . . . . . . . . Page  263

Reporter's Certificate                       Page  271

1                              EXHIBITS

2     GOVERNMENT EXHIBITS

3     Exhibit No. 44A, January 22, 2013 Indictment of
4     Dr. Williams
           Identified . . . . . . . . . . . . . . . Page 90
5          Admitted . . . . . . . . . . . . . . . . Page 92

6     Exhibit No. 44B, August 6, 2014 Indictment of Dr. Stokes
           Identified . . . . . . . . . . . . . . . Page 92
7          Admitted . . . . . . . . . . . . . . . . Page 93

8     Exhibit No. 44C, August 25, 2014 Indictments of Drs.
      Gowder and Moore
9          Identified . . . . . . . . . . . . . . . Page 93
           Admitted . . . . . . . . . . . . . . . . Page 94
10
      Exhibit No. 37, August 2017 DEA Controlled Substances
11    Audit
           Identified . . . . . . . . . . . . . . . Page 96
12         Admitted . . . . . . . . . . . . . . . . Page 97

13    Exhibit No. 55,  List of DEA Registration Actions for
      Selected Providers
14         Identified . . . . . . . . . . . . . . . Page 111
           Admitted . . . . . . . . . . . . . . . . Page 112
15
      Exhibit No. 2, February 13, 2014 Prescription Issued to
16    F.T. Oxycodone 30 mg N124192
           Identified . . . . . . . . . . . . . . . Page 115
17         Admitted . . . . . . . . . . . . . . . . Page 116

18    Exhibit No. 3, October 3, 2014 Prescription Issued to
      L.T. Oxycodone 15 mg N141009
19         Identified . . . . . . . . . . . . . . . Page 115
           Admitted . . . . . . . . . . . . . . . . Page 116
20
      Exhibit No. 4, June 16, 2016 Prescription Issued to C.S.
21    Oxycodone 30 mg N204332
           Identified . . . . . . . . . . . . . . . Page 115
22         Admitted . . . . . . . . . . . . . . . . Page 116

23    Exhibit No. 5, June 16, 2016 Prescription Issued to D.A.
      Oxycodone 30 mg N204328
24         Identified . . . . . . . . . . . . . . . Page 115
           Admitted . . . . . . . . . . . . . . . . Page 116
25

GOVERNMENT EXHIBITS (Cont.)

Exhibit No. 6, March 2, 2017 Prescription Issued to L.M.
Oxymorphone 7.5 mg N224635
     Identified . . . . . . . . . . . . . . Page 115
     Admitted . . . . . . . . . . . . . . . Page 116

Exhibit No. 7, March 2, 2017 Prescription Issued to L.M.
Oxycodone 15 mg N224634
     Identified . . . . . . . . . . . . . . Page 115
     Admitted . . . . . . . . . . . . . . . Page 116

Exhibit No. 8, April 10, 2017 Prescription Issued to
C.S. Oxycodone 30mg N227593
     Identified . . . . . . . . . . . . . . Page 115
     Admitted . . . . . . . . . . . . . . . Page 116

Exhibit No. 9, August 22, 2017 Prescription Issued to
E.J. Oxycodone 30 mg N237064
     Identified . . . . . . . . . . . . . . Page 115
     Admitted . . . . . . . . . . . . . . . Page 116

Exhibit No. 10, August 22, 2017 Prescription Issued to
E.J. Oxymorphone 30 mg N237062
     Identified . . . . . . . . . . . . . . Page 115
     Admitted . . . . . . . . . . . . . . . Page 116

Exhibit No. 11, August 31, 2017 Prescription Issued to
L.V. Oxycodone 30 mg N237781
     Identified . . . . . . . . . . . . . . Page 115
     Admitted . . . . . . . . . . . . . . . Page 116

Exhibit No. 12, August 31, 2017 Prescription Issued to
L.V. Oxymorphone 20 mg N237779
     Identified . . . . . . . . . . . . . . Page 115
     Admitted . . . . . . . . . . . . . . . Page 116

Exhibit No. 13, August 31, 2017 Prescription Issued to
T.M. Oxycodone 30 mg N237786
     Identified . . . . . . . . . . . . . . Page 115
     Admitted . . . . . . . . . . . . . . . Page 116

Exhibit No. 14, August 31, 2017 Prescription Issued to
T.M. Oxymorphone 30 mg N237785
     Identified . . . . . . . . . . . . . . Page 115
     Admitted . . . . . . . . . . . . . . . Page 116

GOVERNMENT EXHIBITS (Cont.)

Exhibit No. 15, September 27, 2017 Prescription Issued
to K.H. Oxymorphone 7.5 mg N239592
    Identified . . . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . . . Page 116

Exhibit No. 16, September 27, 2017 Prescription Issued
to K. H. Oxycodone 30 mg N239593
    Identified . . . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . . . Page 116

Exhibit No. 17, December 22, 2017 Prescription Issued to
C.C. Oxycodone 15 mg N245188
    Identified . . . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . . . Page 106

Exhibit No. 18, December 22, 2017 Prescription Issued to
C.C. Oxycodone 30 mg N245187
    Identified . . . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . . . Page 116

Exhibit No. 19, December 28, 2017 Prescription Issued to
B.W. Oxycodone 30 mg N245349
    Identified . . . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . . . Page 116

Exhibit No. 20, January 15, 2018 Prescription Issued to
D.W. Oxycodone 15 mg N246468
    Identified . . . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . . . Page 116

Exhibit No. 21, January 15, 2018 Prescription Issued to
D.W. Oxycodone 30 mg N246467
    Identified . . . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . . . Page 116

Exhibit No. 22, January 17, 2018 Prescription Issued to
D.W. Oxycodone 15 mg N246660
    Identified . . . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . . . Page 116

Exhibit No. 23, January 17, 2018 Prescription Issued to
D.W. Oxycodone 30 mg N246659
    Identified . . . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . . . Page 116

GOVERNMENT EXHIBITS (Cont.)

Exhibit No. 24,  January 18, 2018 Prescription Issued to
L.V. Oxycodone 30 mg N246727
    Identified . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . Page 116

Exhibit No. 25, January 18, 2018 Prescription Issued to
L.V. Oxymorphone 20 mg N246728
    Identified . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . Page 116

Exhibit No. 26,  January 18, 2018 Prescription Issued to
T.M. Oxycodone 30 mg N246718
    Identified . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . Page 116

Exhibit No. 27, January 18, 2018 Prescription Issued to
T.M. Oxymorphone 30 mg N246725
    Identified . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . Page 116

Exhibit No. 28, January 19, 2018 Prescription Issued to
K.H. Oxycodone 30 mg N246779
    Identified . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . Page 116

Exhibit No. 29,  January 19, 2018 Prescription Issued to
K.H. Oxymorphone 10 mg N246778
    Identified . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . Page 106

Exhibit No. 30, January 30, 2018 Prescription Issued to
D.W. Oxycodone 30 mg N247439
    Identified . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . Page 116

Exhibit No. 31,January 30, 2018 Prescription Issued to
D.W. Oxycodone 15 mg N247438
    Identified . . . . . . . . . . . . . . Page 115
    Admitted . . . . . . . . . . . . . . . Page 116

Exhibit No. 42, August 18, 2017 KASPER Information
Printout Seized from Kim's Hometown Pharmacy
    Identified . . . . . . . . . . . . . . Page 125
    Admitted . . . . . . . . . . . . . . . Page 126

GOVERNMENT EXHIBITS (Cont.)

Exhibit No. 41, Handwritten Notes Re KASPER Account
Seized from Kim's Hometown Pharmacy
    Identified . . . . . . . . . . . . . . Page 127
    Admitted . . . . . . . . . . . . . . . Page 128

Exhibit No. 38, March 2018 DEA Controlled Substances
Audit
    Identified . . . . . . . . . . . . . . Page 131
    Admitted . . . . . . . . . . . . . . . Page 132

Exhibit No. 53B, Photograph - Open Desk Drawer Showing
Pill Bottle
    Identified . . . . . . . . . . . . . . Page 140
    Admitted . . . . . . . . . . . . . . . Page 141

Exhibit No. 53C, Photograph - Close Up Photo of Pill
Bottle in Desk Drawer
    Identified . . . . . . . . . . . . . . Page 141
    Admitted . . . . . . . . . . . . . . . Page 142

Exhibit No. 45, Exhibit No. 30, January 30, 2018
Prescription Issued to D.W. Oxycodone 30 mg N247439
    Identified . . . . . . . . . . . . . . Page 144
    Admitted . . . . . . . . . . . . . . . Page 145

Exhibit No. 46, Undated Handwritten Note re Loaned Drugs
Seized from Kim's Hometown Pharmacy
    Identified . . . . . . . . . . . . . . Page 147
    Admitted . . . . . . . . . . . . . . . Page 147

Exhibit No. 52, Prescription Data for Kim's Hometown
Pharmacy through March 19, 2018 (on CD)
    Identified . . . . . . . . . . . . . . Page 169
    Admitted . . . . . . . . . . . . . . . Page 170

Exhibit No. 39, Data Extracted from KHP Computer System
re Pill "Loaning" (on CD)
    Identified . . . . . . . . . . . . . . Page 173
    Admitted . . . . . . . . . . . . . . . Page 174

Exhibit No. 32, Summary of Out-of-State Prescriptions
Seized from Kim's Hometown Pharmacy (on CD)
    Identified . . . . . . . . . . . . . . Page 178
    Admitted . . . . . . . . . . . . . . . Page 179

GOVERNMENT EXHIBITS (Cont.)

Exhibit No. 33A, Summary of C.C.'s Other Prescriptions
     Identified . . . . . . . . . . . . . . Page 181
     Admitted . . . . . . . . . . . . . . . Page 183

Exhibit No. 33B, Summary of K.H.'s Other Prescriptions
     Identified . . . . . . . . . . . . . . Page 181
     Admitted . . . . . . . . . . . . . . . Page 183

Exhibit No. 33C, Summary of E.J.'s Other Prescriptions
     Identified . . . . . . . . . . . . . . Page 181
     Admitted . . . . . . . . . . . . . . . Page 183

Exhibit No. 33D, Summary of L.M.'s Other Prescriptions
     Identified . . . . . . . . . . . . . . Page 181
     Admitted . . . . . . . . . . . . . . . Page 183

Exhibit No. 33E, Summary of T.M.'s Prescriptions
     Identified . . . . . . . . . . . . . . Page 181
     Admitted . . . . . . . . . . . . . . . Page 183

Exhibit No. 33F, Summary of F.T.'s Prescriptions
     Identified . . . . . . . . . . . . . . Page 181
     Admitted . . . . . . . . . . . . . . . Page 183

Exhibit No. 33G, Summary of L.V.'s Prescriptions
     Identified . . . . . . . . . . . . . . Page 181
     Admitted . . . . . . . . . . . . . . . Page 183

Exhibit No. 33H, Summary of B.W.'s Prescriptions
     Identified . . . . . . . . . . . . . . Page 181
     Admitted . . . . . . . . . . . . . . . Page 183

Exhibit No. 33I, Summary of D.W.'s Prescriptions
     Identified . . . . . . . . . . . . . . Page 181
     Admitted . . . . . . . . . . . . . . . Page 183

Exhibit No. 33J, Summary of D.W.'s Prescriptions
     Identified . . . . . . . . . . . . . . Page 181
     Admitted . . . . . . . . . . . . . . . Page 183

Exhibit No. 33K, Summary of D.W.'s Prescriptions
     Identified . . . . . . . . . . . . . . Page 181
     Admitted . . . . . . . . . . . . . . . Page 183

1
GOVERNMENT EXHIBITS (Cont.)
2

3  Exhibit No. 33L, Summary of C.S.'s Prescriptions
       Identified . . . . . . . . . . . . . . . Page 181
4      Admitted . . . . . . . . . . . . . . . . Page 183

5  Exhibit No. 33M, Summary of D.A.'s Prescriptions
       Identified . . . . . . . . . . . . . . . Page 181
6      Admitted . . . . . . . . . . . . . . . . Page 183

7  Exhibit No. 33N, Summary of L.T.'s Prescriptions
       Identified . . . . . . . . . . . . . . . Page 181
8      Admitted . . . . . . . . . . . . . . . . Page 183

9  Exhibit No. 34A, Summary of Group Travel - Mustang Road
   Customers
10     Identified . . . . . . . . . . . . . . . Page 185
       Admitted . . . . . . . . . . . . . . . . Page 186
11
   Exhibit No. 34B, Summary of Group Travel - T.M. and L.V
12     Identified . . . . . . . . . . . . . . . Page 188
       Admitted . . . . . . . . . . . . . . . . Page 189
13
   Exhibit No. 34C, Summary of Group Travel - B.W., D.W.,
14 D.W., D.W., and C.C. Prescriptions
       Identified . . . . . . . . . . . . . . . Page 190
15     Admitted . . . . . . . . . . . . . . . . Page 190

16 Exhibit No. 34D, Summary of Group Travel - L.T. Group
   Prescriptions
17     Identified . . . . . . . . . . . . . . . Page 192
       Admitted . . . . . . . . . . . . . . . . Page 193
18
   Exhibit No. 34E, Summary of Group Travel - C.S. and D.A.
19 Prescriptions
       Identified . . . . . . . . . . . . . . . Page 194
20     Admitted . . . . . . . . . . . . . . . . Page 195

21 Exhibit No. 36A, All CII Prescriptions from Florida
   Doctors Since 2010
22     Identified . . . . . . . . . . . . . . . Page 197
       Admitted . . . . . . . . . . . . . . . . Page 197
23

24

25

1

GOVERNMENT EXHIBITS (Cont.)

2

3   Exhibit No. 36B,  All CII Prescriptions from
    Dr. Williams in Georgia between June 2011 and
4   January 2013
        Identified . . . . . . . . . . . . . . Page 199
5       Admitted . . . . . . . . . . . . . . . Page 200

6   Exhibit No. 36C, All CII Prescriptions from Dr. Stokes
    Between June 2013 and October 2017
7       Identified . . . . . . . . . . . . . . Page 201
        Admitted . . . . . . . . . . . . . . . Page 201
8
    Exhibit No. 36D,  All Prescriptions for Dr. Gowder and
9   Dr. Moore Between August 2011 and June 2016
        Identified . . . . . . . . . . . . . . Page 202
10      Admitted . . . . . . . . . . . . . . . Page 202

11  Exhibit No. 36E, All Prescriptions for Dr. Brown in
    North Caroline Between December 2016 and August 18,
12  2017
        Identified . . . . . . . . . . . . . . Page 204
13      Admitted . . . . . . . . . . . . . . . Page 205

14  Exhibit No. 36F, All Prescriptions for Dr. Brown in
    North Caroline Between August 19, 2017 and March 20,
15  2018
        Identified . . . . . . . . . . . . . . Page 205
16      Admitted . . . . . . . . . . . . . . . Page 206

17

                        - - -

18

19

20

21

22

23

24

25

1          *[Proceedings commenced at 9:53 a.m. in open*
2    *court.]*
3          THE COURT:  Good morning, ladies and
4    gentlemen.  We've convened outside the presence of the
5    jury to take up preliminary matters.  I'm happy to
6    hear from either side.  Mr. Pillersdorf.
7          MR. PILLERSDORF:  Very briefly, Your Honor.
8    I have made arrangements to be here.  I can be here
9    Monday at 1.
10          THE COURT:  Okay, terrific.  That'll --
11          MR. PILLERSDORF:  The other thing, Your
12    Honor, I don't know if we've ask for it, but we would
13    ask for the rule on witnesses.  I don't know if that's
14    in effect, but we would ask for it.
15          THE COURT:  It will be in effect.  That's
16    self-enforcing.  You know who your witnesses are, so
17    I'll ask both sides to be careful not to have their
18    witnesses in the courtroom as the proceedings unfold.
19          If there's nothing else, we'll have the jury
20    brought into the courtroom.
21          [JURY ENTERS COURTROOM]
22          THE COURT:  You can be seated.  Well, good
23    morning, ladies and gentlemen.  The jury is here and
24    accounted for.  I hope you had safe travels.  It's a
25    cold winter day out there.  We appreciate your

appearance today.  I'm going to recognize the parties

here in a moment for their opening statements.

They're going to summarize the evidence that will be

presented at this trial.

I want to make sure our technology's working.

Gentlemen, is that working for both of you?

MR. PILLERSDORF:  Yes, sir.

MR. SMITH:  Yes.

THE COURT:  Okay.  Mr. Smith, you're

recognized for the opening statement on behalf of the

United States.

MR. SMITH:  Thank you, Your Honor.  May it

please the Court.

THE COURT:  Mr. Smith.

MR. SMITH:  Good morning, ladies and

gentlemen.  Let me start by saying what we say in

every trial, what the judge said yesterday, which is

thank you for being here.  We know, especially in the

cold and the winter months, it's not an easy thing to

get here each day.  We sincerely appreciate it.

In this country having a fair trial, and

having a trial by your jurors -- by your peers, is one

of the best things we do in this country, and it's one

of our most sacred rights.  So on behalf of the United

States, thank you for being here.  And please give the

1  defendant a fair trial; everyone in this room wants a

2  fair trial.

3       Someone once said that, and this is a good

4  quote, I think, "Half the troubles in life come from

5  saying yes too often and too quickly, and not saying

6  no quickly enough."  A lot of you probably know that

7  from your life's experience.  You can think of it with

8  family members, with friends, maybe a colleague,

9  whether it's with money or your time, or whatever it

10  is.  There are situations in life where the kindest

11  thing you can do sometimes and the best thing you can

12  do for someone else and for yourself, is to say no.

13       Now, you already know from the outset of this

14  case and what we talked about yesterday, that this

15  case has a lot to do with what are called controlled

16  substances.  Specifically, they're about prescription

17  drugs you get from doctors and pharmacies.  You'll

18  hear drugs like oxycodone and hydrocodone and drugs

19  like this.

20       Unfortunately, many of you probably know from

21  your life's experience and what was discussed a little

22  bit yesterday, that these drugs are addictive, they

23  can be dangerous.  And that's why they're controlled.

24  That's why we limit who can get them.  We want to make

25  sure the only people who really need them, get them,

1  and that the people who get them, only get them for as

2  long as they need them, in the amounts they need them.

3       And that's where pharmacists come in.

4  Pharmacists play a real critical role in that chain.

5  And kind of put simply, one of their important jobs is

6  to say no when they need to say no.  If they don't do

7  that, that has real consequences.

8       It would be nice if we lived in a world in

9  which doctors always wrote prescriptions that people

10 really needed.  Then when patients went to doctors,

11 they were always honest with them, and they truly had

12 a medical condition that needed medication, rather

13 than the need to abuse the drug.  But unfortunately,

14 we don't live in that world.  And that's why it's

15 important for pharmacists to do their job.

16      Now, there's one critical thing I'd like you

17 to understand.  And if you don't take anything else

18 away from my comments this morning, please remember

19 this.  A pharmacist isn't situated just like everybody

20 else under the law.  You'll hear something over and

21 over again in this trial called a pharmacist's

22 corresponding responsibility or corresponding duty.

23 And we'll show you that and where that is in the Code

24 of Federal Regulations.

25      But what that basically means is, you don't

have to be a pharmacist, but if you choose to be a
pharmacist, you don't have to dispense controlled
substances, but if you want to do that, you get
registered with the DEA, and you have a license to do
that.  If you're going to do that, just like when you
drive a car or any other privilege, you have to stay
within the lanes, right; you have to do things the
right way.  And what it says is you, as a pharmacist,
have an independent obligation to act as a
professional and make sure that the prescriptions were
issued for a legitimate medical purpose and were
issued by a practitioner acting in the ordinary course
of professional practice.  It's a lot of words.  Those
are the words in this regulation.  You'll hear that
over and over again; you'll be sick of it.

The general idea is this:  Just because
somebody walks in with a prescription isn't enough.
And just because somebody walks in with a
prescription, the pharmacist can't just throw up their
hands and say, "Well, a doctor wrote it.  It's there
on paper.  I can fill it."

Instead, the pharmacist has to act as an
independent professional and look at the patient, and
decide, "In my professional judgment, I really think
this person needs this medicine."  And you're going to

see that over and over again in this case.  And like I said, their job ultimately is to say no when they need to.  Sometimes that's the best thing you can do for a patient.

So with that little bit of background in mind, I want to show you something.  So most of you probably don't know much more about pharmacies other than when you've been to one, and that little bit I just told you about pharmacists.

But I want you to imagine a customer walks into a pharmacy in southeastern Kentucky with this prescription.  And please don't get confused by the void there.  That's just the way it's photocopied, so I know it's a bit of an eyesore.

The pharmacist might look at this prescription, and knowing nothing else about the patient, might notice a couple things.  One is that this patient is from Kentucky, but that the clinic -- the doctor that wrote the prescription is from somewhere in Murphy, North Carolina.

You might also notice the drug that's involved; it's 30 milligrams of something called oxycodone, which you'll hear about is, which is a strong pain reliever.  Thirty (30) milligrams is a fairly strong dose, and that's for 120 of them.

1        But what if that pharmacist then also was

2   handed a second prescription by that patient at the

3   same time.  Again, a Kentucky patient from a North

4   Carolina clinic, same date, this time for something

5   called oxymorphone, which is a very strong pain

6   reliever.

7        So two strong Schedule II drugs at the same

8   time from the same out-of-state clinic.  At what point

9   does that pharmacist get suspicious and start raising

10  eyebrows?

11       Well, what if at the same time and on that

12  same day, in addition to those two prescriptions, at

13  the same time, somebody else hands very similar

14  prescriptions for the same two Schedule II controlled

15  substances, oxycodone and oxymorphone, and they have

16  the same address listed on the prescription.

17       At some point, the pharmacist would look at

18  this, and knowing nothing else, might start asking

19  themselves, what are the odds that somebody who lives

20  in the same household has the exact same medical

21  condition that requires the same drug therapy?  How

22  common could that possibly be?

23       I'll give you another example.  What if a

24  woman walks into the same pharmacy and presents this

25  prescription.  The pharmacist might notice it's from a

1  Georgia clinic many hours away, but the patient has a
2  Georgia address on the front.  It's for oxycodone
3  again.
4          And what you will hear in this case is that
5  when a prescription's filled -- and you'll see a lot
6  of prescriptions -- the pharmacy generates a label and
7  sticks it on the back.  So you'll see fronts of
8  prescriptions and backs of prescriptions.  So here's
9  the back of this prescription.  And the address for
10 this patient provided to the pharmacy is in
11 Barbourville.  So we have a Georgia address on the
12 front, a Kentucky address on the back for a Georgia
13 clinic.  And what if this person, just like we saw
14 before, presents not one, but two prescriptions for
15 the same drug, one for 112 oxycodone 30s, 30
16 milligrams, and one for 84 oxycodone 15s.  Again, at
17 what point is that pharmacist whose job it is to say
18 no when it's appropriate, start asking questions?
19         And what if that person wasn't alone?  What
20 if other people with that last name following the same
21 pattern also in a one-month span present that?  Not
22 two people with the same last name, not three people
23 with the same last name.  Four people with the same
24 last name.
25         And then someone else, who as you'll hear

1 when the evidence is presented, is an old friend of

2 his family, all going to these Georgia clinics, all

3 getting these similar combinations of oxycodones.

4      And one more thing.  What if I told you that

5 this didn't just happen once or it didn't just happen

6 once in awhile, but that this same patient had been

7 bouncing around from clinic to clinic in Georgia, over

8 the course of many months, and had been filling these

9 things over and over again, all back at this same

10 pharmacy in Kentucky.

11      What you might have gathered, what I just

12 gave you wasn't a what-if; it wasn't hypothetical.

13 All those people, all those prescriptions you just

14 saw, those people walked out of this pharmacy at Kim's

15 Hometown Pharmacy with those drugs in their hand.  Not

16 knowing anything else about the practice of pharmacy.

17 That's problematic.  And that's what brings us here

18 today.  The defendant, Kim Jones, ran this pharmacy,

19 Kim's Hometown Pharmacy in Williamsburg, Kentucky.

20      And what you're going to hear about

21 pharmacies and pharmacists is that, as I kind of

22 alluded to before with this business of having this

23 obligation to say no when appropriate is, a pharmacist

24 is someone we put our trust in, just like doctors,

25 just like other people who have jobs, who go to

1   school, and they get trained, they get certified and

2   licensed.  We expect them to act as professionals,

3   because if they don't, it has consequences.

4        There's really two important ways you're

5   going to hear about this trust manifesting itself in

6   this case.  So the first is what we just talked about

7   with controlled substances.  We trust that a

8   pharmacist is going to do their job, exercise this

9   corresponding responsibility I talked about, and make

10  sure that the drugs that go out the door are the ones

11  that really need to go out the door.

12       The second type of trust comes in, and it's a

13  little bit more of a headache, but bear with me.  It

14  has to do with how we pay for drugs in this country,

15  just like how we pay for medical services in this

16  country.

17       As many of you already probably know, most of

18  us pay for medical services, at least in part, with

19  insurance.  And the way that works is in a pharmacy,

20  when a customer comes in and submits a prescription

21  that's typed into a computer, it generates a label,

22  the same time a claim is submitted to Medicare or

23  Medicaid or private insurance, depending upon what the

24  patient has.  And the idea is, unfortunately this is

25  the way it has to work in this country, the insured

doesn't come out and look over the pharmacist's shoulder for every prescription they fill.  I mean, you can imagine how many that is and how cumbersome that may be.

Instead, insurers trust providers like doctors, like pharmacists, that when they say they're getting a service, or they say they're providing a drug, they're actually doing it, right?  It's actually not that complicated.  It's like anything else.  If you're paying for something, you expect that it actually be given.

And so there's this trust that's built in with providers that when you submit a claim, when you submit a bill to Medicare or Medicaid or to another insurer, you're doing what you said you did, which is I gave this patient this drug, pay me back for it. It's called the reimbursement in the insurance world.

What you're going to hear in this case is that the defendant, Kim Jones, breached both of these kinds of trust repeatedly.  First by repeatedly dispensing controlled substances outside the scope of professional practice like they talked about.  And the second is by repeatedly billing insurers for drugs that her customers never picked up and that were, in fact, returned back into her pharmacy's stock.  And

1  that happened over the course of several years over

2  and over again.  I'll talk about both in greater

3  detail.

4        But before I did that, I want to give you a

5  sense of how we get here today and a little bit about

6  the investigation, which is what you're going to hear

7  about over the next week or two.

8        The case really started back in August 2017.

9  In August -- on August 3rd, the DEA, which is an

10 agency tasked with overseeing pharmacies and

11 controlled substances in this country, went out and

12 performed an accountability audit at the pharmacy.

13 And part of the reason they did that is they had

14 noticed in some of their other investigations that --

15 and you'll hear an investigator named Kyle Sizemore

16 talk about this, that Ms. Jones' pharmacy had come up

17 with respect to other investigations, just the name of

18 this pharmacy just kept coming up.  And when they

19 looked at the prescription history of where this

20 pharmacy had been filling from, they noticed, for

21 instance, they filled in excess of 500 prescriptions

22 from Florida doctors between 2010 and 2014.

23        There was also a trend they saw, and some

24 interesting things they saw with respect to certain

25 particular doctors that they'd investigated and knew

1    to be problematic.

2              For instance, the pharmacy had filled over

3    400 Schedule II controlled prescriptions from a doctor

4    named Dr. Williams in Georgia.  And then that stopped

5    when Dr. Williams was indicted on federal drug charges

6    in 2013.

7              The pharmacy then began filling prescriptions

8    for a doctor named Dr. Stokes in Georgia.  Again, that

9    ran up until when Dr. Stokes was indicted on federal

10   drug charges.

11             And during that same time period, and you'll

12   hear about this, the pharmacy was filling for a clinic

13   called Tennessee Pain Institute, with these Drs.

14   Gowder and Dr. Moore.  And again, that ran up until a

15   time period, and then Dr. Moore and Dr. Gowder were

16   eventually indicted.

17             And then a lot of those patients started

18   going to this Murphy Clinic, the one you saw

19   referenced early this morning, switching to another

20   out of state clinic, and the pharmacy kept filling.

21             So with that background in mind, the DEA went

22   out and did an audit.  That audit, as you'll hear,

23   revealed a significant number of oxycodone and

24   hydrocodone missing from the pharmacy.

25             The DEA, you'll hear, then asked to sit down

with Ms. Jones.  And you'll hear that at the outset,
the DEA's goal isn't always -- especially on the
diversion side with respect to pharmacies -- the goal
isn't always to start criminal investigations and get
people in trouble or anything like that.  A lot of
times it's to work with pharmacists.

So they wanted to sit down and meet with her,
discuss the results and kind of see what was going on
at the pharmacy.

So they sat down and discussed that -- this
audit with her, and they discussed out-of-state
prescriptions and a variety of other things.  And I'll
talk a little bit more about that interview and that
discussion later on.

But as you'll hear, that discussion with the
defendant, an another one later in March, are going to
play a real pivotal role in this case.

After that interview, the agents decided,
because of some of the things they'd heard, to begin
investigating.  And so along with the Department of
Health and Human Services and other agencies, an
investigation was opened.

And while they were doing that, along the way
they started noticing these allegations of potential
improper billing, and investigating that.  So one of

1   the things that investigator did was what's called a

2   trash pull where you go behind the pharmacy's trash

3   and see what had been discarded.  In that trash pull

4   they found pharmacy labels and boxes that had been

5   billed to insurers, but for some reason were in the

6   trash.

7          They continued doing a variety of other

8   things.  All the while, even after this meeting in

9   August 2017, the pharmacy kept filling for that-out-of

10  state clinic, that Murphy out-of-state clinic.

11         Finally, that led in March 20, as you'll

12  hear, to a search warrant that was executed out at the

13  pharmacy.  And, again, at that time, investigators

14  again spoke with Ms. Jones.  And like I said, those

15  two interviews, the August 2017, and March 2018

16  interviews are going to play an important role in this

17  case, and I'll talk about that.

18         So we heard about this timeline.  Eventually

19  the indictment in case was issued, and that's what

20  brings us here today.  And that was issued in June

21  2018.

22         So with that indictment, I just wanted to

23  give you a quick overview of what the charges are in

24  this case and kind of a preview of what we think some

25  of the evidence will show.

1          So there's really kind of two groups of

2    charges, and I've already alluded to these.  There's

3    kind of the drug case, and then there's the fraud

4    case.  And I think that'll be a helpful way to think

5    about it as you go through.  Don't focus so much on

6    the number of charges because that might make you

7    think one is more important than the other.  And

8    please give it all your full attention.

9          You'll see the drug charges, of course, your

10   Counts 1 through 35, are also kind of split up.

11   There's 30 counts that deal with what we're just kind

12   of shorthanding as bad prescriptions; these are all

13   out-of-state prescriptions, and we'll talk about those

14   in a moment.

15         You will also hear evidence for the other

16   five counts, 31 through 35, that Ms. Jones loaned

17   controlled substances, that is gave controlled

18   substances to patients without a prescription in

19   place, which you'll hear from witnesses is absolutely

20   not the way to do it.  It's absolutely not allowed

21   under the law.

22         Count 1 through 30, this is what I talked

23   about this morning, this idea of corresponding

24   responsibility.  This is captured in the Code of

25   Federal Regulations.  I'm going to reference the law

1  on occasion and statutes.  Please keep in mind that

2  ultimately, the judge is the one that instructs you on

3  the law.  I'm just trying to give you kind of a

4  guidepost of what we're talking about, and why we're

5  talking about certain things.

6          But you're going to hear these words,

7  legitimate medical purpose, and course of professional

8  practice over and over again.  And that's because

9  that's the standard for pharmacists.  When you get

10 your DEA registration, you get this license to

11 dispense controlled substances.  You have this

12 affirmative responsibility to make sure that you're

13 doing that.  Again, you can't just hide behind, well,

14 there's a prescription, or I don't really care.  You

15 have to independently act and exercise your judgment.

16         What you'll hear from a variety of witnesses,

17 and you'll hear from several pharmacists in this case

18 is, well, how does a pharmacist go about doing that?

19 And you'll hear that there's this concept in the

20 pharmacist community of red flags, especially when it

21 has to do with controlled substance prescriptions.

22 And those are just little bitty warning signs that you

23 put together when you're exercising your judgment.  So

24 some of those things you'll hear are if you have

25 out-of-state patients, patients who switch between

1   doctors frequently, patients who present similar

2   groups of prescriptions, and the list goes on.  I've

3   listed some there.

4        The idea is, it's never just one thing that

5   settles it, right?  But a pharmacist can put together

6   a variety of pieces of information, and say at a

7   certain point, what are the chances that this patient

8   really needs this combination of drugs based on all

9   the things I'm seeing here?

10        If the patient is switching frequently from

11  out-of-state clinic to out-of-state clinic, and

12  they're always getting real high doses of something,

13  and then they're always bringing it in with somebody

14  else or near the same time as somebody else from this

15  far away clinic, at some point you know what's going

16  on.  And that's what red flags are all about, right?

17  It's about doing this job I talked about, this

18  corresponding responsibility.

19        You'll see evidence that some of the

20  prescriptions we're going to talk about in this case,

21  the ones that we've charged were issued to patients

22  who had this kind of history where they had gone to

23  multiple out-of-state clinics over the course of time,

24  and they would be in Florida one month and go to

25  Georgia the next month, and back to Florida the next

month.  And they had went to a number of different states and a number of different doctors.

And this is one of those areas where the judge will talk to you about your common sense and your life's experience, and how you don't have to check that at the door.

You already know from your life's experience, and I think the evidence will show, that this isn't normal.  Most people don't go around, if they really have a legitimate condition, if they're really in pain or have some other medical condition, you don't skip around from doctor to doctor to doctor.

But we'll show you examples of patients that did just that repeatedly.  You'll also see examples where patients were getting combinations of drugs. You saw some of that at the beginning, multiple oxycodone, or oxycodone and oxymorphone.  Oxycodone, and methadone.  And you'll hear from pharmacists who talk about when that should actually occur, how rare it is for patients to actually need really high dosages of combinations of strong Schedule II painkillers.

You'll also see evidence about what we think shows group travel, meaning people who all live in the same area.  Here's an example of patients who all

1  lived on the same road, filling on or about the same
2  dates and going to these same clinics kind of in
3  coordination, be it one doctor in Florida one month,
4  and a different doctor the next month.

5        And the question here that you'll be asking
6  as you look at all this is the same one a pharmacist
7  should ask, which is realistically, what are the
8  chances that these patients really needed this
9  medication at the same time in the same way?  And
10 ultimately, the question with all of that is, a
11 pharmacist who has this affirmative duty to say no
12 when they need to say no, is this even close to that
13 line?

14       You'll also hear about -- I mentioned this
15 investigation timeline and how the DEA met with
16 Ms. Jones.  And one of the things they talked to her
17 about was that Murphy Clinic and these combinations of
18 oxycodone and oxymorphone, and they referenced
19 earlier, even after that meeting, after being a
20 counselor, she kept on filling those prescriptions.

21       So I want to talk to you real quick about
22 these two interviews with respect to this controlled
23 substances dispensing.

24       In that initial interview, they discussed,
25 investigators discussed with Ms. Jones out-of-state

controlled substance.  They talked about red flags like we just talked about.  And Ms. Jones said some interesting things.  She said, we think the evidence will show, that she said, I don't fill for Florida doctors.  I don't recall anything about Dr. Williams. Again, remember these are what we just talked about, the number of prescriptions that we think the evidence will show were actually billed there.

I don't -- I remember seeing prescriptions for Dr. Stokes, but I don't remember anything.  I think I called Moore and Dr. Gowder about two patients, and I don't know if I had that many patients going to Dr. Brown.

What we're going to ask is when you hear these things, and ultimately when you weigh the evidence at the end of the case, does that sound like a straight up response?  Does that sound like a pharmacist who was doing her job and being honest with investigators?  It will be your job to decide that.

She told investigators that she understood these red flags, and what they'd discussed, and that she'd be more careful.  Again, as we talked about, she then continued selling those prescriptions.  And you'll see that a majority of the prescriptions in those Counts 1 through 30 were charged are after that

1  August deadline or time frame.

2         She then was asked about these again during
3  the search warrant in that March 20 interview.  She
4  said she never filled any prescriptions that she
5  thought were suspicious.  Investigators asked her to
6  name a patient or patients that she had refused to
7  fill for exercising this job, and she came up with one
8  name, and she couldn't remember the last name, but
9  that that patient was from that Tennessee Pain
10 Institute.

11        Additionally, we talked about this pill
12 loaning idea.  Now, if the idea with pill loaning, I
13 think we'll hear from the evidence, is this.  There
14 were times when patients came into the pharmacy, and
15 either their prescription had run out, or they hadn't
16 gotten one yet, but they wanted their drugs.  And
17 you'll hear from pharmacists about why that presents a
18 problem.  You might already kind of get this from
19 common sense.  But if somebody runs out of controlled
20 substances or prescriptions too early, that could
21 potentially be a red flag that they either weren't
22 taking it the way they should have, or had gone
23 somewhere else.

24        Or if they haven't gotten a prescription yet,
25 obviously you don't know for sure what that doctor's

going to write for.  And there were times, and you'll hear evidence of this, where Ms. Jones still gave those patients controlled substances.  How do we know this?  Number one, you'll hear from witnesses who worked at the pharmacy who saw this happening with their own two eyes.

During the search warrant, investigators went in and imaged the computer at the pharmacy system, and in that computer, they were able to type in notes. And they saw notes that looked like this where there were records for that patient that certain controlled substances, like hydrocodone there, were loaned.  And you'll hear that's typically how it worked; these witnesses will describe that when a patient came in and got loaned prescriptions, they put a note on the computer to make sure that when -- if that patient did bring that prescription in, they weren't going to be out extra drugs basically in the way of tracking.

But you'll hear from pharmacists, practicing pharmacists, you can't do this.  And maybe that's just common sense.  But that is not dispensing for legitimate medical purpose within the ordinary scope of professional practice.  You can't dispense without a prescription.  And yet you'll hear about how that happened repeatedly.

1    She was asked about this in that March 20
2  interview.  And initially, she denied loaning any
3  controlled substances.  And then as the interview went
4  on, and, again, the investigators speak to this -- I'm
5  just giving you a preview of what I think the evidence
6  will show -- she eventually admitted that she had
7  loaned a controlled substance in the past, but not to
8  the extent that was uncovered in the investigation.
9    Again, is this a pharmacist doing their job,
10  with those straight up responses?  These are things
11  that we're going to ask you to evaluate.
12    Also, we talked about these missing pills.
13  And this is where this really becomes relevant.  If
14  you're loaning pills to someone, and they ultimately
15  don't bring in a prescription, you're now out those
16  pills, and you don't really have a record of where
17  they went.  That's how you might end up with a
18  shortage at the pharmacy.
19    Now, to be clear, we're not saying that every
20  single pill that was missing in these audits is
21  because of loan, okay?  What we're saying is those
22  missing pills, and I think the evidence will show
23  this, that that is probative if it gives you a sense
24  that this was occurring and further corroboration from
25  that other stuff we talked about.

1          She was asked about these missing pills, and
2    you'll hear that she expressed -- basically it was
3    conveyed to her that they were missing oxycodone,
4    hydrocodone.  And one of the things that she did in
5    that interview was blamed others for those missing
6    pills, including a gentleman named Jeff Holmes, who
7    had been her relief pharmacist who worked with her at
8    Kim's Hometown Pharmacy, and a pharmacy tech who
9    worked there named Britany Petrey.
10          Now, this seems a little bit like an aside,
11   but I want you to listen for this in the testimony
12   that you're going to hear.
13          In 2017, the DEA, as we told you about, told
14   her about these missing pills from that first audit,
15   so she was on notice that these pills were missing.
16          You'll hear that sometime in the fall of
17   2017, she called this pharmacist called Family
18   Discount Drugs, and a guy named Scott Marcum, who
19   worked there, about Jeff Holmes, who was talking about
20   missing controlled substances, theft of control
21   substances.  It seems kind of random.  But then in
22   March 2018, during that interview with the DEA,
23   Ms. Jones affirmatively blames Mr. Holmes and claims
24   he had stolen from other employers.  So the idea
25   there, and the inference there is that Ms. Jones had

learned from this Family Discount Drug that Jeff
Holmes had stolen from there, and so he must have
stolen from -- been responsible for those missing
pills.

But you're going to hear from Scott Marcum
who said that, Well, she called me and told me stuff,
but I didn't fire Jeff Holmes.  In fact, Jeff Holmes
still works for him today.  And so one question we'll
ask at the end of this case is why tell this story?
This is all an innocent mistake.  Why say things like
this?

Ultimately both those counts, those groups of
counts, Counts 1 through 30 and 31 through 35 are
under the same statute, the same crime.  I'm just
giving you a quick preview of this.  You'll hear
instructions about this towards the end.  But it's a
violation of 21 U.S.C., Section 841.  And that
basically says just, you know, you cannot dispense
controlled substances except as you're allowed to,
right?  So that's the crime charged.

Second, and it's related to this, there's a
separate offense of maintaining a drug involved
premises.  And the allegations there are that
Ms. Jones maintained her pharmacy for the purpose --
it doesn't have to be the only purpose, we expect the

1 judge will instruct you, but for the purpose of

2 dispensing controlled substances like we've alleged in

3 the first group of counts. So those are the drug

4 counts.

5        Now, just very briefly I want to talk to you

6 about the fraud counts as well, and I'll just move

7 through that fraud count. Sorry.

8        As I told you, insurers trust providers like

9 pharmacists that when you submit a bill, you're

10 actually providing what you say you're providing.

11 It's pretty basic. So you're going to hear about

12 Medicare and Medicaid and reimbursement, and there's

13 lot of just frankly annoying terms that come with the

14 insurance world, and you've probably all experienced

15 that in your personal lives. But just think about

16 this as any other transaction. If you say you're

17 giving something, and you don't, that's fraud. That's

18 what we think the evidence is going to show here.

19        The way that the billing process works is

20 provider enrolls with Medicare and Medicaid, the

21 insurer, they agree to the terms of service, they

22 perform the procedure or give the, in this case, the

23 medication, they submit a claim for it, and the claim

24 is basically the bill, right? And then they get

25 what's called reimbursement or payment back from the

1  insurer.

2       You'll hear about Medicare, which many of you

3  already know, and Medicaid; these are

4  government-funded insurers.  And here's how this

5  scheme worked.  So when a prescription comes into a

6  pharmacy, typically most pharmacies now use computer

7  systems, and Kim's Hometown Pharmacy used a pharmacy

8  computer system, as you'll hear about.  That gets

9  entered into the computer, and that does two things.

10 First, it submits a claim for Medicare, Medicaid, or

11 whoever the insurer might be.  At the same time, it

12 also generates a label.  You take that label, and you

13 put it on the bottle, and you fill the prescription,

14 and then wait for the customer to come to pick up,

15 right?  And you've probably all experienced this when

16 you've been to a pharmacy.

17      Well, what happens if the customer, again,

18 the idea is if all goes according to plan, the

19 customer picks up the drug, Medicare pays, right, and

20 they don't look over the pharmacy's shoulder to make

21 sure did you actually give John Doe, you know, your

22 Amoxicillin on February 3rd.  Just nobody would

23 actually do that, given the millions of prescriptions

24 that go out in this country.

25      So what happens if the customer doesn't pick

1  up the prescription?  Or that prescription's never

2  actually filled?  What you'll hear is what the

3  pharmacist is supposed to do, the pharmacy's supposed

4  to do, it's called reverse the claim, meaning you give

5  the money back.  And you can go into the computer

6  system and reverse the claim saying, Hey, I know I

7  billed that, and this is fine to do, but the customer

8  didn't actually pick it up, so reverse the claim.  And

9  that's the way it's supposed to work, the trust

10  system, the honor system.  The pharmacy then takes the

11  drugs and puts them back in stock, and gives it no

12  another customer who needs it, right?  And that's the

13  way it's supposed to work.

14          But what you'll hear is in this case with

15  those claims never got reversed, and it happens over

16  and over and over again.  And how do we know that?

17  Well, you'll hear -- you've heard about the trash

18  pull, I mentioned that earlier, in finding these torn

19  labels or discarded labels.  When they went in on the

20  search warrant on March 20, they also found

21  prescription vials, the little bottles we take home

22  with us, and they had torn or blacked-out labels.  And

23  you'll hear from investigators found that some of

24  these had been billed and never backed out from

25  insurers.

1            You'll also hear that just to be doubly sure

2   what the government did in this case, you'll hear from

3   Ms. York about this, is did this fairly complicated

4   records analysis.  And what they did was look at all

5   of the wholesalers that the pharmacy got drugs from.

6   And the idea is let's get a count for a given drug

7   list, let's say it's an inhaler.  How many inhalers

8   during a certain period of time did you ever have to

9   sell?  So let's say it's a hundred.  And then what

10  they did is checked that against the pharmacy's own

11  dispensing records and also the billing records.  And

12  the idea is, if you only had a hundred of something to

13  sell, let's see how many you claimed you sold, and

14  those should match up, or should be left, and you

15  still have some left in inventory, right?  You can't

16  sell more of something that you never had.  So if you

17  had a hundred inhalers, and the records show that you

18  somehow dispensed or billed for 200 inhalers, what's

19  up with that, right; what's happened there?  And

20  that's what happened with the drug records analysis.

21  You'll see that for a number of drugs, found

22  significant discrepancies using both the pharmacy's

23  own dispensing records and the billing data of the

24  bills that were submitted, that repeatedly more drugs

25  were supposedly sold than billed for than she ever

1    acquired.  And that was to the tune of approximately

2    $400,000 in billings over the period we talked about.

3            Now, as I said, these interviews are going to

4    play a pretty pivotal role on our proof to you.  She

5    was also asked about this, this billing scheme during

6    that March 20, 2018, interview.  She initially claimed

7    that the prescriptions that didn't go out the door,

8    were always backed out, or, at least, you know, very

9    rarely didn't get backed out.  She knew it was wrong

10   to bill for drugs that had not been picked up; she

11   told investigators that.  And then she conceded as the

12   interview went on, Well, it had happened on occasion,

13   but she'd been -- since 2008 -- but she'd been

14   planning to back them out for a year.

15           And remember those blacked-out or torn labels

16   I told you about?  The investigators will tell you

17   that she initially said that the ones they found, they

18   asked her about that, she said those haven't billed.

19   And by the end of this interview, she'll say, Well,

20   half have been billed, or some of them have been

21   billed.  She knew it was wrong, and that it wasn't the

22   right thing to do, and that she shouldn't have let it

23   happen.

24           So, ladies and gentlemen, kind of tying all

25   this back up, and we'll talk about, that's the crime

1  that charges 18 U.S.C., Section 1347, we'll talk about

2  the elements of that at the end of the case, and the

3  judge will instruct you on that.  But it basically

4  outlaws, it penalizes healthcare fraud schemes, which

5  is what we think was this was.

6        You will hear from a variety of witnesses

7  from the government.  You'll hear from Kyle Sizemore

8  who works for DEA.  You'll hear from employees of the

9  pharmacy, relief pharmacists, pharmacists who filled

10 in from the pharmacy.  You'll hear from Katie Busroe,

11 who works at the Board of Pharmacy and reviewed some

12 of the prescriptions that Ms. Jones issued.  You'll

13 also hear from some customers, some of these patients

14 who came in to get their prescriptions filled.

15       Now, let me say this about the patients.  We

16 expect some will come in and they will say they admit

17 that they were addicted to drugs.  But I think maybe,

18 as some of you already know from your life's

19 experience and might anticipate, we don't anticipate

20 that every patient will come in here and testify and

21 say that they had an addiction.  We don't expect that

22 every patient will come in here and will say that

23 Ms. Jones is mean or evil or anything like that.

24       What we're going to ask you to do is look at

25 the totality of the evidence, look at what they say,

how they say it, and judge them accordingly.  That's
your job to do as jurors.

You'll also hear from Special Agent Rob
Lepley who works with HHS.  He'll talk to you about
his investigation on this billing issue.  And then
you'll also hear from Paula York, who for works the
Cabinet for Health and Family Services, and she's our
case agent here throughout the trial.

So ultimately, ladies and gentlemen, when we
go back and kind of put all this together, there's
these two groups of cases, charges.  There's the drug
charges and the fraud charges.  But they really all
kind of tie back to that initial point that I was
trying to make this morning, which is, we trust
pharmacists to do the right thing.  Nobody's looking
at them all the time.  The payers who pay for health
insurance products aren't looking over their shoulder
the whole time, and we expect them to act as
professionals with controlled substances, expect them
to say no when it's appropriate to do it.

We think the evidence is going to show,
including largely based on her admissions, that she
admitted to the pill loaning, she admitted to billing
for stuff that she didn't dispense, but also all the
other evidence you're going to hear will show you

1  beyond a reasonable doubt that she's guilty of all

2  these offenses that have been charged.

3          Ladies and gentlemen, thanks again for your

4  time.  We look forward to presenting this case to you.

5  Thank you, Your Honor.

6          THE COURT:  Thank you, Mr. Smith.

7  Mr. Pillersdorf.

8          MR. PILLERSDORF:  Thank you, Your Honor.

9  Members of the jury, as I indicated yesterday, my name

10  is Ned Pillersdorf, and I'll be representing Ms. Jones

11  throughout this trial.

12          Let me tell you a little bit about Ms. Jones,

13  a little bit about her background, and I think it will

14  be very be relevant to understand why she's in the

15  predicament she's in today in.

16          Ms. Jones is 53 years of age, a life-long

17  resident of Whitley County.  Went to Williamsburg High

18  School, Eastern Kentucky University, and got her

19  pharmacy degree from the University of Kentucky.

20  Came to her hometown, and has been in the pharmacy

21  business for 30 years.

22          The last ten years she's operated Kim's

23  Hometown Pharmacy.  Why do I tell you that?  What

24  you're going to hear throughout this trial is Kim

25  knows her customers.  They're local.  She grew up with

them.  She knows their problems.  She is -- we're going to ask you at the end of the trial to find her not guilty of all these charges.

But let me go ahead and address why I just went through the background.  You just heard Mr. Smith, I think he used the expression, "There's 30 bad prescriptions."  I think they're actually listed in the indictment.  When we got the indictment, it just had the initials.  Ms. Jones immediately knew who those people were.  She grew up with them.  She grew up with Charles Hicks.  I think you might have just seen his name.  Kim and Mr. Hicks have a connection through horses.  Mr. Hicks unfortunately got stomped on by a horse, had his eye put out, had numerous facial surgeries, and he's in pain.

Mr. Hicks isn't coming in to Kim's Pharmacy because he's a perfectly healthy guy who wants some pain pills that he can go out on the street and sell. He comes in her pharmacy because he's legitimately in pain.

What's really going on throughout this trial is if you're a pharmacy today in the climate we're in, and I recognize we've got an awful lot of addicted people; we've got an awful lot of problems with addicts, but if you're a pharmacist today, the way the

1  government's approaching this case, you're a real

2  legal obstacle course.  Pardon my language, you're

3  dammed if you do and dammed if you don't.

4          The government's position seem to be to tell

5  Mr. Hicks, get out of my pharmacy, limp out of here,

6  and deal with your pain.  I'm not giving you this.

7  She knows Mr. Hicks.  In fact, she knows just about

8  every one of these people.

9          One of the initials was a Leslie Meadows.

10 It's actually a man.  Kim knows him.  He had a

11 horrific injury.  He was run over by a truck.  These

12 are the prescriptions they're calling bad

13 prescriptions.

14         What you're going to hear is Kim and her

15 workers commonly said no to people.  One of the

16 expressions Mr. Smith used was professional judgment,

17 and that's what this case is about.  She is on trial

18 for judgment calls.  Remember, she's not the doctor.

19         What the government is saying she committed a

20 crime for, is she intentionally did not overrule a

21 doctor.  She doesn't form MRIs on people, she doesn't

22 go through their medical history, she doesn't do their

23 testing.  She is presented with prescriptions.

24         Well, the government says, Well, a lot of

25 these prescriptions are out of state.  I think you

might already know this; Williamsburg, Kentucky, is much closer to Knoxville, Tennessee, than Lexington, Kentucky.  And during this time frame, you'll hear that there were basically no pain clinics operating in this region.  There were waiting lists, and people that had legitimate pain went to Tennessee, went to North Carolina.  You saw the name Charles Swanson. Charles Swanson is one of the people they've indicted this lady for filling his prescription.

What happened is when Mr. Swanson came in, Kim was not that familiar with him, she actually called a local doctor, who's in Corbin.  I think his name is Dr. Glen Baker.  I don't think he's practicing anymore.  And Dr. Baker assured her that he was legitimately injured and in need of his pain medication.  So she filled it.  Well, the government's suspicious.  He got his prescription filled elsewhere.

Swanson, interestingly enough, stopped coming to her pharmacy because he found a cheaper pharmacy in North Carolina to fill his prescriptions.  Of course, she's indicted for that.  I don't know what happened to the North Carolina pharmacy.

By the way, when you hear about these bad prescriptions, you're going to hear these people are basically getting their prescriptions elsewhere.

1  Other pharmacists aren't saying no.

2       You'll also hear that in listening to
3  Mr. Smith, you would think that Ms. Jones is a
4  one-person operation.  She's not.  You will hear that
5  she has -- and you'll hear from -- we will call four
6  witnesses who worked for Ms. Jones for long periods of
7  time.  And these four people by way as a result of
8  this indictment, her pharmacy's closed.

9       You'll hear from Marty Douglas and Judy
10 Douglas.  They have no real connection to Ms. Jones,
11 except they work for her.  They worked in pharmacies
12 for years.  And they understand their responsibility.
13 They've got an antenna for what prescriptions should
14 be filled and not filled.  And they're actually in the
15 pharmacy a lot more than Ms. Jones.  In fact, during a
16 lot of this time period, Ms. Jones wasn't even in the
17 pharmacy.  She was dealing with significant health
18 issues.  She had a back surgery.  She had some
19 personal problems with her daughters having medical
20 issues.

21       But what you'll hear from Marty and Judy
22 Douglas, and you'll probably hear from them next week,
23 and I ask you to pay attention to them, they don't
24 understand why they're here.  They were in the
25 pharmacy more than her.  And they will tell you they

1  exercised their judgment and understand that yes, a
2  lot of people come in from out of state to fill
3  prescriptions.  And they will tell you that they're
4  between a rock and a hard place.  Do you tell people
5  who are in pain who present a prescription, No, get
6  out of here, and limp out of here, go deal with your
7  pain, I'm not going to help you?
8        You'll also hear from April Bryant.  The same
9  thing, she's worked lots of pharmacies. She'll be here
10 to tell you the same story.  She works in a pharmacy,
11 and she doesn't understand why we're here.
12        You'll also hear from Amanda Bingham.  Now,
13 she's a relative.  I'll ask you to judge her
14 credibility.  The same testimony, she's there all the
15 time.  And she will tell you that Kim commonly says
16 no, but it's always a tough call.  It is a volume
17 business at a pharmacy.  But, you know, the
18 interesting thing you're going to hear, and I think
19 this is important.  We've all heard the expression
20 pill mill, some out-of-town doctor comes in, sets up
21 shop, lots of cash, lines out the door, lots of cash,
22 and this doctor suddenly owns three cars, driving
23 around in Porches, Maseratis, big homes.
24        What you're going to hear throughout this
25 case is that Kim Jones, Kim's Hometown Pharmacy was

1  not a particularly profitable business throughout all

2  this.  She had significant cash flow problems.

3  There's some evidence the government has give us that

4  people complained that occasionally the checks

5  bounced, the payroll checks.

6         So is this an operation where Kim is handing

7  out pills like candy?  No.  This is a struggling

8  operation dealing with the opioid crisis we're in.

9         But on the other hand, from her perception,

10 and these -- I'll submit to you, these honorable

11 people who work for her, they are presented with

12 prescriptions and telling someone no, you can't have

13 it is not.  You'll hear that Kim did some

14 investigation.  But basically what's interesting about

15 the 30 prescriptions they're going to present

16 evidence, Kim knows these people.  She doesn't need to

17 run a background check on them.  She knows their

18 medical conditions.  She's talked to them.  She knows

19 them.  She -- and I indicate she did say no.

20        Let me talk to you a little bit about the

21 pill loaning.  I mean, you get these situations where

22 people have basically medical emergencies, and they

23 need some pills to get by.

24        You'll hear from these four employees that

25 they document that, they loan the pills, but it's just

1 a discretionary call.

2          The other thing you need to understand is --
3 we'll talk more about this later -- it's fairly
4 complicated, but what Mr. Smith showed you in the
5 graphic about the healthcare fraud, about what they
6 buy from wholesalers, and what they dispense.  In
7 fact, when Kim was interviewed, and I like to suggest
8 to you Mr. Smith only played snippets of her
9 interviews and left other parts out, she explained to
10 them, and this made news to me; I didn't know this, if
11 you run a pharmacy, and there's a five or six
12 pharmacies in your town, you don't get all your pills
13 from wholesalers.  There's actually -- sort of
14 interesting -- there's kind of a free market where you
15 get borrowed pills from other pharmacies, you -- some
16 pharmacy gets a good deal on some pharmacy from some
17 salesmen.  And there is this whole sort of random,
18 unorganized marketplace where Kim commonly gets pills.
19 In fact, in one of her interviews in terms of how
20 profitable she was or not so profitable, I think she
21 told one of the investigators she still owes this one
22 pharmacy, I think it was 10 or $20,000 for a bunch of
23 pills she bought from them.  I mean, there's just a
24 whole other marketplace.  So the simple idea of, well,
25 she borrowed from wholesaler X, and she only dispensed

1  Y is totally misleading.  There is this whole complex

2  situation where how you stay in.

3          And once again, she is in business.  The idea

4  that she should say no to everybody, as the government

5  suggests, well, I don't know why anybody would want to

6  be a pharmacist.  Somebody looking at what she's being

7  accused of, and this Monday morning quarter backing,

8  Well, you shouldn't have given him those pills.  I

9  don't know why anybody would want to be a pharmacist

10 in this environment.

11         Kim's going to testify.  And the statements

12 Mr. Smith told you, I mean, those are -- those are not

13 accurate.  They were taken out of context.  One of the

14 things you're going to consider in this case is what

15 you all do.  What your job here today, as the judge

16 told you, and you don't decide the law.  You decide

17 who do you believe.

18         Yesterday I told you, I think the only

19 question I asked on voir dire is if Ms. Jones takes

20 the witness stand, are you automatically going to

21 disbelieve her because she's a defendant?  Ms. Jones

22 is going to testify.  But you know what's interesting

23 what Mr. Smith just told you?  Was she acting like a

24 guilty person throughout all this?  She was giving

25 interviews, she was cooperating, she was talking to

1  the DEA, she acknowledged mistakes were made.

2          The truth is, it's tough being a pharmacist
3  in this day and age, and there's an opioid crisis.
4  But to make her a scapegoat for what others are doing
5  is wrong and unfair.  Being a pharmacist is an
6  honorable profession.  You help people in pain.  You
7  don't make Mr. Swanson walk out that door and say, I'm
8  not going to give you these pills.  You're on your
9  own.

10         But really, at the end of the day, we're
11 going to ask you to find her not guilty.  And then
12 maybe when Ms. Jones once upon a time made the
13 decision to go to pharmacy school, I suspect right now
14 she's reconsidering that decision because, boy, if the
15 government's going to prosecute you for the way she
16 operated her business and others operated her
17 business -- helped her operate her business, it's an
18 obstacle course that's unfair, and she ought to be
19 found not guilty of all these charges.  Thank you.

20         THE COURT:  Thank you, Mr. Pillersdorf.
21 Let's reorient the podium in the direction of the
22 witness stand, please.  And then we're going to give
23 each of you notebooks and a pen in the event that
24 you'd like to take notes.  You're not required to take
25 notes.  It's purely for your own benefit, and you'll

be given an instruction at the end of the trial how to treat those notes.

In essence, your notes shouldn't take precedence over your own memory of the evidence.  And your notes shouldn't take precedence over some else's memory of the evidence as well.

I'd ask that you put your number on those notebooks.  We keep no record of notes, by the way. Those are always shredded at the end of the trial.

Mr. Smith, you can call your first witness.

MR. SMITH:  Thank you, Your Honor.  The United States would call Charles Swanson.

THE COURT:  Charles Swanson will be called for the government.

[THE WITNESS CHARLES SWANSON WAS SWORN]

THE COURT:  Make sure you lean right in so we can hear you.

THE WITNESS:  Yes, sir.

THE COURT:  Are you comfortable, sir?

THE WITNESS:  Yes, sir.

THE COURT:  Mr. Smith.

MR. SMITH:  Thank you, Your Honor.

Government's Proof

DIRECT EXAMINATION

BY:  MR. SMITH:

1    Q.    Good morning, Mr. Swanson.

2    A.    Good morning.

3    Q.    Could you please give us your name, and

4  spell your last name for the court reporter.

5    A.    Charles D. Swanson, S-W-A-N-S-O-N.

6    Q.    What town do you live in?

7    A.    I live in between London and Corbin.

8    Q.    What town is that?

9    A.    Laurel County.

10   Q.    How old are you?

11   A.    Thirty-three (33).

12   Q.    Do you work?

13   A.    Yes, sir.

14   Q.    What do you do?

15   A.    I work at a factory in Corbin called TCF.

16   Q.    I'll start out by asking you some

17  questions about controlled substances.  Do you know

18  what the word controlled substances mean?

19   A.    Yes, sir.

20   Q.    And I know this isn't the most comfortable

21  questions to get into, but I'm just going to kind of

22  get right to it.  Did you used to take controlled

23  substances?

24   A.    Yes, I did.

25   Q.    Did you used to abuse controlled

1  substances?

2      A.      Yes, I have.

3      Q.      Were you addicted to controlled

4  substances?

5      A.      Yes, I was.

6      Q.      Let's go back.   When did you first start

7  taking -- if I say drugs, I'll mean controlled

8  substances for our conversation, okay?  When did you

9  first start taking those drugs?

10     A.      I guess on and off around 2009.

11     Q.      Why?

12     A.      I've got -- I had a back injury in high

13  school, and it had progressed, and they started off

14  with some minor muscle relaxers, and then progressed

15  onto controlled substances.

16     Q.      Okay.  And was this a football injury

17  actually?

18     A.      Yes, it was.

19     Q.      So you started out, and you were in pain,

20  you had an injury in your back, you said?

21     A.      Yes.

22     Q.      And so what did you start taking that was

23  a controlled substance?

24     A.      I'd started on hydrocodone.

25     Q.      Now, over time, did you start taking other

1  drugs, too?

2      A.      Yes.

3      Q.      And where would you get those drugs?

4      A.      Primarily at the doctor.

5      Q.      Okay.  Would you also get those drugs from

6  other places, too?

7      A.      Yes.

8      Q.      Where, where would you get them?

9      A.      I would buy 'em off the streets at times.

10     Q.      Over the course of time as you went on

11 from 2009 forward, did you become addicted to those

12 drugs?

13     A.      Yes, I did.

14     Q.      Did you become addicted to drugs like

15 oxycodone?

16     A.      Yes, I was.

17     Q.      Did you feel like, as time went on, that

18 you had to take more and more of them?

19     A.      Yes, yes.

20     Q.      Ultimately, did you feel like they were

21 helping your pain?

22     A.      It got to the point to where it wasn't --

23 it wasn't about the pain anymore.

24     Q.      Now, we're going to get to this at the

25 end, too, but just to get the jury a sense of where

1  you're at now; are you clean now?

2      A.      Today's six months.

3      Q.      Okay.  How did that happen?

4      A.      I had, I had tried to stop on my own, and

5  never actually could.  I had got into some legal

6  issues with selling oxycodone and initially got in

7  drug court here in Laurel County, and it saved my

8  life.

9      Q.      In addition to oxycodone and some of these

10 other drugs, did you, at some point, progress to

11 harder drugs like heroin?

12     A.      Yes.  Fentanyl.

13     Q.      And looking back on that now, does that

14 scare you?

15     A.      Yes.

16     Q.      Why?

17     A.      Doing what I was doing, I should have been

18 dead.

19     Q.      At some point in time after 2009, and

20 after this time period where you became addicted to

21 pills, like you just told us, did you start going to a

22 clinic called TPI?

23     A.      Yes.

24     Q.      And were there doctors there named

25 Dr. Moore and Dr. Gowder?

1      A.      Yes, there was.

2      Q.      Did you see those doctors?

3      A.      Yeah.  I seen Dr. Moore.

4      Q.      Okay.  Now, I don't want to go through a

5  lengthy history.  But if you can just give the jury a

6  sense of -- we've all been to doctors, we've all seen

7  doctors' offices, were these legitimate doctors'

8  offices?

9      A.      From my opinion, no.

10      Q.      Did they prescribe controlled substances

11  to you?

12      A.      Yes, they did.

13      Q.      What kind of quantities?

14      A.      120 oxycodone, 30 milligram.

15      Q.      And how did you find out about that

16  clinic?

17      A.      A buddy of mine, a neighbor of mine lived

18  next to me, I guess roughly the end of 2013, 2014, he

19  had -- he informed me with information that they were

20  taking new patients.

21      Q.      Now, some of us might seek out a doctor

22  out of state because that doctor has some real

23  specialty like at the Mayo Clinic, and they're hoping

24  for the cure for their weird disease, right?  Was that

25  why you went and saw Dr. Gowder and Dr. Moore?

 1    A.      Yes, yes.  Me and him discussed that they
 2 would write quantity and high dosage.
 3    Q.      And so that's what I mean is, were you
 4 going there because you really thought they were going
 5 to cure your back, or because you thought that you
 6 could get your drugs?
 7    A.      Because they would write the drugs.
 8    Q.      Is that because it was hard finding places
 9 in state that would write you drugs?
10    A.      Well, I'd found places in state, but they
11 just wouldn't write that quantity or amount.
12    Q.      There were places available in state, but
13 they just wouldn't give you as much as you wanted?
14    A.      Exactly.
15    Q.      And was that -- as we talked about before,
16 we talked about as much as you wanted, was that
17 important because of how long you had been using drugs
18 at that time?
19    A.      Say that again.
20    Q.      Sure.  You told us about how, as time went
21 on, you kind of had to use more and more of the drugs;
22 you told us that?
23    A.      Yeah, yeah.
24    Q.      And so was finding a source that would
25 write a high volume, a high quantity for you

1  important?

2       A.     Yes, it was.

3       Q.     Now, at some point, where did you fill

4  those prescriptions you got from TPI first?

5       A.     I don't remember the exact first time I

6  filled, but I did fill at Kim's Hometown Pharmacy.

7       Q.     Did you fill some in Tennessee before

8  then?

9       A.     Yes, I did.

10      Q.     And then -- and so that would have been an

11 in-state pharmacy with a Tennessee clinic, that's

12 where TPI was?

13      A.     Yes.

14      Q.     I'm sorry.  I didn't ask you this.  Did

15 TPI stand for Tennessee Pain Institute?

16      A.     Yes.  It was located outside of

17 Chattanooga.

18      Q.     I don't think I asked you that question, I

19 apologize, but you just told us.  Can you tell us

20 again, where is TPI located?

21      A.     It's right outside of Chattanooga,

22 Tennessee and Hixson, Tennessee.

23      Q.     And how long did that take you to get down

24 there?

25      A.     Roughly two, two and a half hours.

1    Q.    Perhaps a dumb question, but to your
2 knowledge as a patient, were there doctors closer than
3 two and two-and-a-half hours?
4    A.    Yes, there was.
5    Q.    At some point, did you begin filling those
6 prescriptions from TPI at Kim's Hometown Pharmacy?
7    A.    Yes, I did.
8    Q.    Where did you hear about Kim's Hometown
9 Pharmacy?
10    A.    A friend of mine, Daniel Arthur.
11    Q.    Who's Daniel Arthur?
12    A.    An acquaintance that I knowed from growing
13 up.
14    Q.    Kind of an uncomfortable question.  But
15 when you were abusing drugs and using drugs, would you
16 sometimes use with other people?
17    A.    Yes, I was.
18    Q.    Would you see other people using as well?
19    A.    Yes.
20    Q.    Was Daniel one of those people who also
21 was using at the same time you were?
22    A.    Yes, he was.
23    Q.    And so did he tell you about Kim's
24 Hometown Pharmacy?
25    A.    Yes, he did.

1      Q.      And what was your understanding about --
2  why were you interested in Kim's Hometown Pharmacy?
3      A.      She would fill in the state, and it was
4  just convenient.
5      Q.      So she would -- you said in-state being --
6      A.      Yeah.  She would fill an out-of-state
7  script.
8      Q.      Was it easy for you to find places that
9  would fill out-of-state prescriptions in Kentucky?
10      A.      No, it wasn't.
11      Q.      Did you also -- did Daniel also go to TPI?
12      A.      Yes, he did.
13      Q.      When you went to TPI, did you see other
14  people from Kentucky there?
15      A.      Yes, I did.
16      Q.      Now, Daniel Arthur told you about this
17  pharmacy.  Did you actually then go to Kim's Hometown
18  Pharmacy to see if you could get your prescription
19  filled there?
20      A.      Yes, I did.
21      Q.      And did you talk to Ms. Jones?
22      A.      Yes.
23      Q.      Now, did you know her before then?
24      A.      No, I did not.
25      Q.      Did she know your family?

1      A.      No, she did not.

2      Q.      Did she know a lot about you or your

3 health condition?

4      A.      No.

5      Q.      Now, to be fair, did she ask you to

6 provide some kind of documentation or referral?

7      A.      Yes.

8      Q.      What did she ask?

9      A.      She wanted the referral that my primary

10 physician had sent me -- had sent to the pain

11 management -- or the pain clinic.

12     Q.      Okay.  So -- and did you bring her that

13 referral?

14     A.      Yes, I did.

15     Q.      Okay.  And so when you gave it to her, did

16 she ask a lot of questions about what was going on

17 with your back?

18     A.      I don't recall a lot of questions.  I do

19 recall her wanting me to fill my other scripts with

20 her.

21     Q.      And as time went on, did you start filling

22 prescriptions there at Kim's Hometown Pharmacy?

23     A.      Yes, I did.

24     Q.      Did she ever say no to any prescriptions?

25     A.      No.

1    Q.    Now, as you went in each month, and I
2 don't want to go month by month, but just to give the
3 jury a sense, when you would go in, did Ms. Jones talk
4 to you a lot?
5    A.    Small talk about how the day was or what
6 was going on, but a lot of times, you know, it was as
7 little busy.  I would -- you know, just sat there or
8 sit in the vehicle.
9    Q.    Did she ask you, Hey, you're taking a lot
10 of oxycodone; is that helping with your back there?
11    A.    No.
12    Q.    Did she ever talk to you and say, Now,
13 oxycodone can be addictive, be careful with this; did
14 she ever say anything like that?
15    A.    No.
16    Q.    Did she ever counsel you about substance
17 abuse, anything like that?
18    A.    No.
19    Q.    Were there times -- I think you told us
20 that she never refused to fill one of your
21 prescriptions, but were there times where she wasn't
22 able to fill them?
23    A.    There were times.  There were times that
24 maybe she didn't have 'em to fill, and it would be the
25 next day.

1    Q.      And how'd that make you feel?

2    A.      Sometimes I would be anxious, you know, I

3 would either -- I would be, you know, maybe not had

4 anything, withdrawing, or maybe get a little anxious.

5 But there wasn't much I could do about it.  I would

6 just, you know, wait out until the next morning or

7 whatever until they came in.

8    Q.      And if you're withdrawing -- well, I guess

9 I should ask you this question:  Would you go to the

10 pharmacy while you were under the influence?

11   A.      Yes, at times.

12   Q.      Did you also go to the pharmacy when you

13 were withdrawing?

14   A.      Yes.

15   Q.      Tell the jury, if they don't know, what

16 that does to you when you're withdrawing?

17   A.      It's like you got a real bad flu, you're

18 deathly ill, you know, you're usually -- I'm -- I

19 would be pouring sweat, you know, real shaky, body

20 aches, tremors.  I mean, you would obviously that --

21 you could obviously see that I'd be sick.

22   Q.      And did you go in that condition to Kim's

23 Hometown Pharmacy?

24   A.      Yes, I have been.

25   Q.      And did she ever ask you anything?

1    A.    No.

2    Q.    Now, did you, did you ever use drugs in or

3  near Kim's Hometown Pharmacy?

4    A.    Yes, I had.

5    Q.    What did you do?

6    A.    I had used intravenous drugs in the

7  parking lot.

8    Q.    Is that also called shooting up?

9    A.    Yes.

10    Q.    You did that at the parking lot of the

11  pharmacy?

12    A.    Yes, I had.

13    Q.    Did you ever ask Ms. Jones if she could

14  fill out-of-state scripts for other people?

15    A.    I recall asking for my mother.

16    Q.    Okay.  And what was Ms. Jones' response to

17  that?

18    A.    There was a response that she couldn't --

19  she wouldn't -- she did fill for her one time, but

20  there was controversy on whether she could -- she

21  couldn't fill for that amount.  I don't know if she

22  was talking about that many people, or if she couldn't

23  fill that many, that many -- that quantity -- that

24  much quantity of pills.

25    Q.    But after you had that conversation with

1  her, did she ever question your prescriptions or

2  refuse to fill them?

3       A.      No.

4       Q.      Did you ever see anybody give any cash to

5  someone in Kim's Hometown Pharmacy's parking lot?

6       A.      Yes.

7       Q.      Tell us about that.

8       A.      Larry Carr had -- I had rode with him up

9  there one morning to give Daniel Arthur money to pay

10 for his scripts.

11      Q.      And who is Mr. Carr?

12      A.      He was the guy that's has raised me since

13 I was three months old.

14      Q.      Do you think of him kind of like your

15 father.

16      A.      Yes.

17      Q.      Okay.  And what was his and Mr. Arthur's

18 relationship with respect to drugs and pharmacies?

19      A.      It was more of a business relationship.

20      Q.      What do you mean by that?

21      A.      He would give Daniel money in return for

22 the OxyContin.

23      Q.      Is that sometimes called sponsoring; are

24 you aware of that term?

25      A.      Yes, it is.

1    Q.    Okay.  And did that happen -- you said
2  that you saw that happened in Kim's Hometown Pharmacy
3  parking lot?

4    A.    Yes.

5    Q.    Now, you had known Daniel, you just told
6  us about that, for how long?

7    A.    I've known Daniel since I was 14, 15 years
8  old.

9    Q.    Were there times where you would be in the
10 pharmacy at the same time as Daniel?

11   A.    Yes.

12   Q.    Okay.  Would you try to hide that you knew
13 each other?

14   A.    No.

15   Q.    Did you talk to each other?

16   A.    Yes.

17   Q.    Did Ms. Jones ever ask you about that or
18 ask you if you knew each other?

19   A.    No, she did not.

20   Q.    Did you see Daniel also filling
21 prescriptions at TPI at Kim's?

22   A.    Yes.

23   Q.    Now, at some point, did you stop going to
24 TPI?

25   A.    Yes, I did.

1    Q.    Did you start going to a clinic in another
2  state?
3    A.    Yes.
4    Q.    Do you know -- why did you stop going to
5  TPI?
6    A.    TPI had, had some legal issues, and they'd
7  sold their records to another clinic in North
8  Carolina.
9    Q.    So they had some issues?
10   A.    Yeah.
11   Q.    Just your understanding what those issues
12 were?
13   A.    There was -- the DEA and ATF had raided
14 them on some controversy of some stuff going on here
15 in southeastern Kentucky linked back to the clinic.
16   Q.    Then there was a transfer, and so you
17 started going to this North Carolina clinic, if I
18 understand you correctly?
19   A.    Yes, it did.
20   Q.    And was that in Murphy, North Carolina?
21   A.    Yes, it was.
22   Q.    Tell us about that clinic.
23   A.    That clinic was about the same.  It was
24 the same as TPI.  I mean, they went off of TPI's
25 records, wrote the same medications, 120 oxycodone, 30

1  milligram, same price they would charge.   It was just

2  a little farther to drive.

3      Q.      Now, when you -- the very first time you

4  went to that Murphy Clinic, did they give you the

5  exact same kinds of prescriptions?

6      A.      No, they did not.

7      Q.      Tell us about that.

8      A.      The first time that I went, I got

9  oxycodone 15 milligram, and they had wrote me a script

10 for morphine and gabapentin.  So I went and got the

11 script.  I ended up not going back the next month.

12          Sometime later they had called me and said

13 that they'd done got rid of that doctor, that they

14 were going to continue to go by TPI's records.  So I

15 went back down there, and they continued.  Then that's

16 when they started going on TPI's records of the -- for

17 the dosage and the amount.

18     Q.      So when you say going by TPI records, does

19 that mean prescribing more drugs in higher dosage?

20     A.      Yeah, than the first time they wrote me,

21 yes.

22     Q.      And is that something you wanted?

23     A.      Yes.  I wanted the higher dosage.

24     Q.      Now, with all that going on, the switch

25 from this clinic that had problems to North Carolina

1  and this business you just told us about not getting

2  enough dosage and more, did Ms. Jones ever ask you any

3  questions about that?

4       A.      No, she did not.

5       Q.      Did you fill your prescriptions from that

6  Murphy Clinic at the pharmacy?

7       A.      Yes.

8       Q.      How far away was the Murphy Clinic?

9       A.      The Murphy Clinic was three,

10 three-and-a-half hours away.

11      Q.      And I think you mentioned this before, but

12 when you were going to TPI and to this Murphy Clinic,

13 how did you pay for that?

14      A.      I had worked a little bit through the

15 summer, spring and summer, and then some student

16 loans.  I'd applied in school and used student loans,

17 and then what little bit of work I had done.

18      Q.      Were you kind of at the point where you

19 were putting all your money towards the drugs?

20      A.      Everything.

21      Q.      And I should ask a better question, too,

22 ask you how you paid for it.  Was it cash?

23      A.      Well, I would load the money onto a

24 re-loadable card.

25      Q.      But these clinics would charge a set

1   price?

2        A.      Oh, yeah, yes.

3        Q.      Do you remember how much?

4        A.      Four-hundred, fifty (450.)

5        Q.      Were you otherwise on Medicaid at the

6   time?

7        A.      Yes, I was.

8        Q.      Was $450 a lot of money to you?

9        A.      Yes.

10       Q.      How would you pay for your prescriptions

11   at the pharmacy?

12       A.      I would pay cash.  And then there was

13   times that, like, Medicaid would cover the scripts.

14       Q.      Did Medicaid -- was your understanding

15   that Medicaid covered it every time?

16       A.      I'm not for sure.  I have no idea.  There

17   was times that I went in the pharmacy, and I paid

18   cash.  And then there's times that my Medicaid would

19   cover it.  I know I went in there and asked a few --

20   several times, and then the times I did ask, I ended

21   up paying cash.

22       Q.      The times you did ask, you --

23       A.      I did pay -- I paid cash.

24       Q.      Okay.  And now do you know what Narcan is?

25       A.      Yes, I do.

1    Q.    Just -- now, you're not a doctor.  I'm not

2    asking you to opine on it.  But just your

3    understanding is, I guess, the first question, did you

4    ever get a prescription for Narcan?

5    A.    Yes, I did.

6    Q.    What was your understanding as a patient

7    as to why you were getting Narcan?

8    A.    Narcan is to bring you out of an overdose.

9    Like, if you're in the middle of an overdose, if it's

10   given to properly, it could bring you out of an

11   overdose.

12   Q.    Did you present a prescription for Narcan

13   to Ms. Jones at Kim's Hometown Pharmacy?

14   A.    Yes, I did.

15   Q.    Did she ever ask you about that?

16   A.    No.

17   Q.    Now, a couple more questions.  Do you --

18   are you stilling oxycodone today?

19   A.    No, I'm not.

20   Q.    And you told us a little bit about how you

21   kicked it; was that difficult?

22   A.    Yes, it was.  It was.

23   Q.    How did oxycodone impact how you acted?

24   A.    I mean, it impacted every aspect of my

25   life.  That's all, that's all -- that's the only thing

1  I got up in the morning to do.  I mean, my life

2  revolved around it.

3       Q.       Interestingly, going back to what you told

4  us at the beginning, you started taking pain medicines

5  because of this back injury?

6       A.       Yes.

7       Q.       How does your back feel now that you've

8  stopped taking the drugs?

9       A.       My back, my back is fine.  I work every

10  day.  I can take some Tylenol or some Naproxen and get

11  up and go to work and sleep good and everything else.

12       Q.       The time period that we talked about when

13  you when filling drugs at Kim's Hometown Pharmacy, was

14  that -- give me a rough time frame.

15       A.       The time frame I started?

16            MR. SMITH:  Yeah.  Well, started using Kim's

17  Hometown Pharmacy.

18       A.       It would have been around the end of 2014,

19  the first of 2015.

20       Q.       Okay.  And did that go through '17 or so?

21       A.       Yes.  It went through '17.

22       Q.       At that point in time, were you already

23  pretty well addicted to drugs?

24       A.       Yes, I was.

25       Q.       Did you feel like those drugs were

1  actually helping you with the legitimate medical

2  problem that was going on with you?

3      A.     No, no.  It got to the point to where I

4  thought the drugs were keeping me from being sick from

5  the withdrawals.

6      Q.     Okay.  Do you still get certain

7  medications filled?

8      A.     Yes.

9      Q.     Would you go back to Kim Jones as a

10 pharmacist?

11     A.     Possibly.

12     Q.     Do you -- do you wish you would have

13 stopped taking those prescriptions earlier in life?

14     A.     Yes, I did, yes, I did.

15     Q.     Now, let's talk about a couple of other

16 things.  Do you have a conviction for a drug offense?

17     A.     Yes, I do.

18     Q.     Okay.  And you told us a little bit about

19 that, I think, earlier.  What was the nature of that

20 charge?

21     A.     Trafficking oxycodone.

22     Q.     Okay.  Now, has anybody, either from my

23 office, including myself, or with the DEA or anyone

24 else, offered you any benefit for testifying here?

25     A.     No, they have not.

1      Q.      Have we asked you to be truthful?

2      A.      Yes.

3      Q.      Have we made any promises or threats to

4  you if you didn't testify?

5      A.      No, you did not.

6      Q.      Last question.  Just kind of reflecting on

7  your experience with this between the doctors you went

8  to see and the pharmacists you went to see, what do

9  you wish had happened?

10     A.      I feel like everybody needs to be held

11  accountable.  I've been held accountable for these

12  actions that I've took on this trafficking oxycodone,

13  and about -- about just about lying, man.  I feel like

14  if, if this action would have been taken long ago, it

15  wouldn't have led to this.

16     Q.      If somebody had refused to give you a

17  prescription or the drugs, might that have helped you?

18     A.      Yes.

19          MR. SMITH:  No further questions, Your Honor.

20  Thank you.

21          THE COURT:  Thank you.  Mr. Pillersdorf.

22                    CROSS-EXAMINATION

23  BY:  MR. PILLERSDORF:

24     Q.      Mr. Swanson, did you actually have a

25  serious back injury at one point?

1    A.    I had a back injury.  I may have blew it
2 out of proportion.
3    Q.    And when you had a back injury, did you
4 see a doctor because you wanted help with your back
5 injury, or did you see a doctor so you could get a
6 prescription sell drugs?
7    A.    I seen a doctor for my back injury.
8    Q.    Okay.  Let me ask you, as I understand it,
9 when you first went to Ms. Jones' pharmacy, you
10 didn't -- you showed up with a prescription, right?
11    A.    No.  I had spoke with her before I even
12 got the script.
13    Q.    Did she indicate that she -- that you
14 needed to bring her something from a local doctor?
15    A.    Yes.
16    Q.    Okay.  Who was the local doctor?
17    A.    The local doctor was -- it was at one
18 point, Dr. Parks, but he retired, and then it was his
19 nurse practitioner, Amy Cobb.
20    Q.    Okay.  Are you familiar -- where was this
21 Dr. Parks at?
22    A.    Dr. Parks was located in Corbin.
23    Q.    In Corbin.  A local doctor, correct?
24    A.    Yes.
25    Q.    He wasn't associated with the pain clinic,

1 right?

2     A.     No, he was snot.

3     Q.     And isn't it true that Ms. Jones made

4 clear to you that before she would give you any

5 medication, that you needed to give her some assurance

6 from a local doctor that this was necessary; isn't

7 that true?

8     A.     Yes, that's true.

9     Q.     Okay.  And you actually also tried to get

10 a prescription for your mother from Ms. Jones,

11 correct?

12     A.     Yes.

13     Q.     And that never happened, did it?

14     A.     She did fill one time for her.

15     Q.     One time.  What was it?

16     A.     It was oxycodone.

17     Q.     Okay.  Did she ever get any more

18 prescriptions?

19     A.     No, she did not.

20     Q.     Why not?

21     A.     Because there was a conflict of either Kim

22 telling me that she couldn't fill for that many -- she

23 couldn't fill that many.  I don't know whether she was

24 talking about that many as far as the quantity of

25 medicine, or if she was talking about customers.

1    Q.    Let me ask you, was that prescription for

2 your mother legitimate?

3    A.    Yes, it was.

4    Q.    Did she really need medication?

5        MR. SMITH:  Objection.

6        THE COURT:  Would you approach.

7        [CONFERENCE AT THE BENCH]

8        MR. SMITH:  My objection would be this calls

9 for expert opinion.  Essentially you're asking a lay

10 witness to opine on whether his mother had a

11 legitimate medical condition that required a

12 prescription.  I think he can testify about his

13 accusations of her and, you know, and pain and things

14 like that.  But whether his mother legitimately needed

15 a prescription, how can this witness testify to that?

16       MR. PILLERSDORF:  I'll rephrase.

17       THE COURT:  Okay.

18       [IN OPEN COURT]

19       THE COURT:  You can continue,

20 Mr. Pillersdorf.

21    Q.    Let me just rephrase.  From your personal

22 observation, did your mother have conditions that

23 appeared to justify her needing medication?

24    A.    As far as I know.

25    Q.    Okay.  Let me ask you, actually, before

1  Ms. Jones prescribed you was more than just her

2  getting you a referral from another doctor.  Did she

3  contact two local pharmacies about you?

4          MR. SMITH:  Objection.

5      A.      Local pharmacies?

6          MR. PILLERSDORF:  Yeah.

7          MR. SMITH:  Objection.

8      A.      I wouldn't be aware --

9          THE COURT:  Well, hold on.  Hold on.

10     Q.      Let me ask -- let me rephrase the

11 question.  Are you familiar with Scott Bishop?

12     A.      A Scott Bishop?

13     Q.      Did you go to other pharmacies in

14 Williamsburg?

15     A.      Did I go to other pharmacies in

16 Williamsburg?  No.

17     Q.      Okay.  And as I understand it, eventually

18 you started getting your prescriptions in North

19 Carolina?

20     A.      Yes, I did.

21     Q.      Okay.  How'd that work out?

22     A.      That was cheaper; it was a cheaper amount.

23     Q.      I didn't hear you.  I'm sorry.

24     A.      The price of the prescriptions were

25 cheaper.

1    Q.    Okay.  Did you have any problems getting

2 the prescriptions filled in North Carolina?

3    A.    No, I did not.

4    Q.    How long did you get these prescriptions

5 in North Carolina?

6    A.    Six, seven months.

7    Q.    Six, seven months?

8    A.    Yeah.

9    Q.    Did, I'm curious, did the pharmacy in

10 North Carolina demand that you get something from a

11 local doctor to justify these prescriptions?

12    A.    No, they did not.

13    MR. PILLERSDORF:  That's all.  Thank you.

14    THE COURT:  Mr. Smith.

15    MR. SMITH:  Just briefly.

16           REDIRECT EXAMINATION

17 BY:  MR. SMITH:

18    Q.    Mr. Swanson, you heard some questions

19 about this pharmacy in North Carolina.  Where was that

20 located?

21    A.    It was located about an hour and 15

22 minutes out on the other side of Murphy, North

23 Carolina.

24    Q.    Was it in North Carolina?

25    A.    It was in North Carolina.

1     Q.     So was this a North Carolina pharmacy
2 filling for a North Carolina doctor?

3     A.     Yes, it was.

4          MR. SMITH:  Let me check my notes real quick,
5 Your Honor.  I think that's all the questions I have.
6 Thank you.

7          THE COURT:  May the witness be finally
8 excused?

9          MR. PILLERSDORF:  Yes, sir -- well, it's up
10 to him.

11          MR. SMITH:  Yes, Your Honor.

12          THE COURT:  Sir, you're finally excused from
13 any further testimony at this trial.  Thank you very
14 much for appearing.

15          THE WITNESS:  Thank you.

16          THE COURT:  Mr. Smith, you can call your next
17 witness.

18          MR. SMITH:  The United States calls Kyle
19 Sizemore.

20          THE COURT:  Mr. Kyle Sizemore will be called
21 for the government.

22          [THE WITNESS KYLE SIZEMORE WAS SWORN]

23          THE COURT:  You know how this works,
24 Mr. Sizemore.  So make sure you adjust that microphone
25 so we can hear you.

THE WITNESS:  Thank you, Your Honor.

MR. SMITH:  Your Honor, just one moment, please.

THE COURT:  Certainly.

[PASSING DOCUMENTS TO WITNESS]

MR. SMITH:  May I proceed, Your Honor?

THE COURT:  You may.

MR. SMITH:  Thank you.

DIRECT EXAMINATION

BY:  MR. SMITH:

Q.     Hello, Mr. Sizemore.  Can you please tell us your full name.

A.     Kyle Sizemore.

Q.     And what do you do?

A.     I'm a diversion investigator with the Drug Enforcement Administration.

Q.     How long have you been with the DEA?

A.     Since about May 2012.

Q.     When you use the word "diversion" in your title, diversion investigator, what does diversion mean?

A.     So diversion would be a controlled substance being diverted from a closed system of distribution in a legal fashion.

Q.     Can you give us a sense of your training

1    in your position.

2        A.      As a diversion investigator, we go through

3    a roughly 12, 13-week academy in Quantico, Virginia.

4    We're instructed on different investigative techniques

5    such as interviewing techniques, drug identification,

6    and how to conduct audits on registrants.

7        Q.      What kind of cases do you typically work

8    on?

9        A.      We'll typically do anything from -- it can

10   be administrative in nature, civil in nature, criminal

11   in nature.  It's essentially anything that involves a

12   registrant.  And a registrant is anybody who has legal

13   authority to handle controlled substances, and those

14   controlled substances being diverted illegally into

15   the illicit market.

16       Q.      Let's talk a little bit about pharmacies,

17   based on your experience.  Most of us know that when

18   you get a prescription, it comes with a little bottle

19   and a label on it, but let's talk about how it gets to

20   that point, and specifically with controlled

21   substances.  Where do most controlled substances get

22   sourced from by pharmacies?

23       A.      So first, you'll have a manufacturer who,

24   who makes the controlled substance, and they supply to

25   a wholesale supplier, which we call a distributor, and

1 a distributor will sell it retail to a retail

2 pharmacy.

3      Q.      And through each of those processes, are

4 those groups or entities or companies, are those

5 required to be registered with the DEA?

6      A.      Yes.

7      Q.      The idea that you track the DEA, you track

8 this from kind of start to finish at the DEA?

9      A.      Yes.

10      Q.      And why, why do you do that?

11      A.      In order to ensure there's accountability

12 for the controlled substances that are being

13 distributed in the United States, and as well as

14 making sure that they stay within the closed system of

15 distribution, and that they're being distributed for

16 legitimate medical needs.

17      Q.      Now, based on your job at the DEA, do you

18 know what a controlled substance is?

19      A.      Yes.

20      Q.      Is oxycodone a controlled substance, for

21 instance?

22      A.      Yes.

23      Q.      Is oxymorphone?

24      A.      Yes.

25      Q.      Is hydrocodone?

1      A.      Yes.

2      Q.      Why are some drugs controlled substances

3  and others aren't?

4      A.      So controlled substances are controlled

5  based on their addictive properties in comparison with

6  their medicinal value.

7      Q.      And who is allowed to distribute

8  controlled substances to an end user like a patient?

9      A.      It would be a pharmacy that is registered

10  with the DEA to do so.

11      Q.      Now, is there any requirement, to your

12  knowledge, that somebody wants to open a pharmacy that

13  they have to distribute controlled substances?

14      A.      No.

15      Q.      If they want to distribute controlled

16  substances, what do they have to get from the DEA to

17  do that?

18      A.      They have to get a registration to do so.

19      Q.      And does part of that registration include

20  abiding by the terms of federal law on controlled

21  substances?

22      A.      Yes.

23      Q.      Is that partially where you came in?

24      A.      Yes.

25      Q.      And are there certain recordkeeping

1  requirements with respect to controlled substances?

2      A.      Yes.

3      Q.      Are there certain requirements as to what

4  you have to do before you can dispense a controlled

5  substance?

6      A.      Yes.

7      Q.      What's one of the initial big requirements

8  under federal law for when you can distribute a

9  controlled substance?

10     A.      There needs to be a prescription that is

11 written by a provider for a legitimate medical need.

12     Q.      So pretty simple, but the idea is, can a

13 pharmacist just hand out controlled substances

14 whenever they feel like it?

15     A.      No.

16     Q.      Now, at some point, did you become

17 involved in looking at Kim's Hometown Pharmacy in

18 Williamsburg, Kentucky?

19     A.      Yes.

20     Q.      Roughly when was that?

21     A.      Around August 2017.

22     Q.      Let's talk about how you got there.  Now,

23 as your work as a diversion investigator, is your job

24 all about enforcing criminal laws and bringing

25 criminal cases?

1      A.      No.

2      Q.      What is it that you do generally with

3   pharmacies?

4      A.      So the DEA is also responsible for

5   regulating registrants, and a pharmacy is a

6   registrant.  So as part of that, the DEA often selects

7   certain registrants to conduct what we call in-depth

8   investigations where we basically are ensuring that

9   those registrants are compliant with federal law.

10      Q.      And in your job, do you sometimes counsel

11   pharmacies?

12      A.      Yes.

13      Q.      Do you try to help them be compliant?

14      A.      Yes.

15      Q.      I guess another way of asking the question

16   I'm asking you is, are you out trying to get everybody

17   in trouble?

18      A.      No.

19      Q.      Now, with that background in mind, you

20   said in August 2017, you started taking a look at

21   Kim's Hometown Pharmacy.  Can you give us a sense of

22   why the audit of that pharmacy might have been of

23   interest?

24      A.      So, again, that was part -- as part of our

25   regulatory responsibilities, we will select certain

1  registrants to do in-depth investigations, and Kim's

2  Pharmacy was one of those that was selected for that

3  year to be completed.

4      Q.     And why did -- why was it selected; why

5  did that pop up on your radar?

6      A.     So oftentimes, we'll look at a variety of

7  factors when trying to identify which pharmacies or

8  which registrants we select because there's quite a

9  number of them; there's too many for us to do all of

10  them.  So in doing that, we look at either whether

11  it's a certain thing about volume or -- in this

12  particular case, there were prescribers that had been

13  targets of DEA where the pharmacy just kept coming up

14  as being a pharmacy that filled for those, so we

15  thought that it was necessary for us to take a look to

16  see if there was anything that, that we needed to go

17  in and check out as far as compliance.

18      Q.     Were there certain doctors whose

19  prescriptions that had been filled at Kim's Hometown

20  Pharmacy that caused you concern?

21      A.     Yes.

22          MR. SMITH:  Let's look at a couple of

23  exhibits.

24          For the witness only, please, can we bring up

25  Exhibit 44A.

1    Q.    Can you see what's in front of you?

2    A.    No.

3        MR. SMITH:  May we have it switched on.

4 Well, Your Honor, if I can, can I use the Elmo and

5 approach over there?

6        THE COURT:  You can, or take a moment and see

7 if we can get our technology working.

8        MR. SMITH:  Could we just switch it back on

9 and off.

10        Now, Mr. Sizemore -- can we call up the Elmo

11 just for the patient -- or the witness, please.

12        THE COURT:  It looks like it's queuing up.

13 You need to turn the light on.  There you go.

14    Q.    In the course of your investigation when

15 you were doing some of this background work, were you

16 familiar with a Dr. George Williams?

17    A.    Yes.

18    Q.    And where did Dr. Williams practice?

19    A.    In Georgia.

20    Q.    I'm going to show something just to the

21 witness, please.  Do you see what I've put in front of

22 you there?

23    A.    Yes, sir.

24    Q.    And what is that?

25    A.    That is an indictment for Dr. George

1  Williams, and a few others.

2      Q.      And when was that filed?

3      A.       January 22, 2013.

4           MR. SMITH:  And, Your Honor, we'd move to

5  admit this certified copy as Exhibit 44A.

6           THE COURT:  Any objection?

7           MR. PILLERSDORF:  No.

8           THE COURT:  Without objection, that will be

9  entered as a government exhibit.  You can publish that

10  as you choose.

11           MR. SMITH:  Okay.  And we've -- just briefly

12  let's show that to the jury, if we can.

13      Q.      Now, in addition to Dr. Williams, were you

14  aware of a Dr. Stokes in Georgia?

15      A.      Yes.

16      Q.      And in the course of your work with DEA,

17  did you obtain and review court records from

18  Dr. Stokes?

19      A.      Yes.

20      Q.      Just for the witness, please, I'm going to

21  show you what's been marked as Exhibit 44B.  What are

22  you looking at there, Mr. Sizemore?

23      A.      Again, that's an indictment for

24  Dr. Stokes.

25      Q.      And where -- what date was that filed?

1   A.      August 6, 2014.

2          MR. SMITH:  Your Honor, we'd move to admit as

3   a certified copy as Exhibit 44B.

4          THE COURT:  Any objection?

5          MR. PILLERSDORF:  No.

6          THE COURT:  Without objection, that, too,

7   will be a government exhibit.  You can publish it as

8   you choose.

9          MR. SMITH:  If we could publish that to the

10  jury, please.

11     Q.      And I think I asked you this, but where

12  did Dr. Stokes practice?

13     A.      Georgia.

14     Q.      Additionally, are you familiar with

15  Dr. Gowder and Dr. Moore?

16     A.      Yes.

17     Q.      Where did they practice?

18     A.      In Tennessee.

19     Q.      What was the name of their clinic?

20     A.      Tennessee Pain Institute.

21         MR. SMITH:  I'm going to show you now just

22  for the witness, please, what's been marked as

23  Government's Exhibit 44C.

24     Q.      Mr. Sizemore, what are you looking at as

25  44C?

1        A.     It's an indictment for Dr. Gowder and

2   Dr. Moore.

3        Q.     And when was that filed?

4        A.     May 25, 2017.

5             MR. SMITH:  And I'd move to admit Exhibit

6   44C, Your Honor.

7             THE COURT:  Any objection?

8             MR. PILLERSDORF:  No.

9             THE COURT:  Again, without objection, that

10  will be a government exhibit.  You may publish it.

11            MR. SMITH:  Can you publish that to the jury.

12  Thank you.

13       Q.     And where was this filed?

14       A.     It was in the Eastern District of

15  Kentucky.

16       Q.     Is that this district?

17       A.     Yes.

18       Q.     So with that background in mind, if

19  Dr. Williams, Dr. Stokes, Drs. Gowder and Moore, based

20  on your initial review and oversight of the pharmacy,

21  did Kim's Hometown Pharmacy fill for those doctors?

22       A.     Yes.

23       Q.     And maybe it's a dumb question, but why

24  did that pique some interest for you as an

25  investigator?

 1      A.      Again, they had been targets of DEA in the

 2  past, and we consider that to be a red flag, something

 3  that we'd like to address to see if we can get a

 4  heads-up.

 5      Q.      Now, what was the first thing you did, or

 6  maybe not the first thing, but after some of this

 7  background information, did you go out to the

 8  pharmacy?

 9      A.      Yes.

10      Q.      Did you go out in August 2017?

11      A.      Yes.

12      Q.      And what did you do when you went out

13  there?

14      A.      So when we go out to the pharmacy, we took

15  a look at her records, talk to some of the employees,

16  and I conducted an audit.

17      Q.      And what is an audit?

18      A.      An audit is a way to check to see if the

19  registrant is accountable for the drugs that are

20  coming in and going out.

21      Q.      And what are you looking for when you do

22  that?

23      A.      Again, we're looking to make sure that the

24  drugs that are ordered, that the pharmacy is

25  accountable for those, and that they, they balance

1  out, kind of like balancing a checkbook.

2     Q.     Is one of the ideas here, putting it in

3  simple terms, are you looking to see whether there are

4  missing drugs?

5     A.     Yes.

6     Q.     Okay.  Did you do that, participate with a

7  team that did that at Kim's Hometown Pharmacy?

8     A.     Yes.

9     Q.     And what were the results of that audit,

10 just generally?  Don't give me specific numbers, but

11 just what was the outcome?

12    A.     There were variances in the audits.

13    Q.     Were there shortages of certain drugs?

14    A.     Yes.

15    Q.     What drugs were short?

16    A.     I believe oxycodone and hydrocodone comes

17 to mind off the top of my head.

18        MR. SMITH:  Just for the witness only,

19 please.

20    Q.     I'm going to show you what's been marked

21 as Government's Exhibit 37.  Can you see that,

22 Mr. Sizemore?

23    A.     I can.

24    Q.     Do you recognize that?

25    A.     Yes.

1      Q.      What is that?

2      A.      That's the results of the audit.

3      Q.      Did you prepare that for the DEA?

4      A.      Yes.

5      Q.      Did you prepare that to reflect the

6  results of this audit that you did?

7      A.      Yes.

8      Q.      Did you do that in the ordinary course of

9  working as an agent for the DEA as a diversion

10  investigator?

11     A.      Yes.

12     Q.      When you do these things, are you doing

13  your best to be true and accurate with your results?

14     A.      Yes.

15          MR. SMITH:  Move to admit Exhibit 37.

16          THE COURT:  Any objection?

17          MR. PILLERSDORF:  No.

18          THE COURT:  Without objection, that, too,

19  will be a government exhibit.  You may publish it.

20     Q.      Now, Mr. Sizemore, when we're looking at

21  this, can you just briefly walk the jury through what

22  we're looking at?

23     A.      So in the first column there on the left,

24  those are the drugs that we -- I decided to audit.

25  And then if you look on the left side of -- the entire

left side of that audit sheet, what you have there is, it's the initial inventory for the pharmacy.

Pharmacies are required to keep at least a physical inventory at least every two years, and so we call that a biannual inventory.  It's a starting point for us to say what you started for at a point in time. At this particular time, the starting point was on December 31, 2015.

So then we'll also look at the drugs that were ordered during the start of that inventory to the date that we came in.  The date that we came in was August 3, 2017, which would be the end of the audit.

So on the left side, what you have, again, is the initial inventory, which is the physical inventory that the pharmacy took at a point in time.  And then you also have that added into what the pharmacy ordered.  So that's what they're accountable for during that period of time, what they had on a certain date, plus what they ordered.

On the right side of the equation you have the drugs that we counted the day -- the inventory that was taken the day of the audit, added in to what was dispensed during that same time frame.  Those numbers should balance out, and they should equal zero, meaning that you were accountable for what you

had when you started out with what you had and what
you ordered, you are accountable for what you
dispensed or what you had in your store that day.

Q.     And I don't want to belabor this too much,
but you we look all the way on the right side here,
there's some numbers, and then there's some
percentages, and those are positive and negative; what
are those talking about?

A.     So the numbers would be whether you
were -- again, it should be a balance of zero, meaning
you were accountable for everything that you were
supposed to be accountable for.  If it's a negative,
that means you had a shortage, meaning there were
unaccountable pills that were missing.  In other
words, it typically means there's some kind of
paperwork issues.

Q.     Now, with respect to oxycodone 30
milligrams, what did you find in that first audit?

A.     That there was a shortage of 859 pills.

Q.     And how about hydrocodone, ten milligram?

A.     That there was a shortage of negative
1,882.

Q.     Now, you're looking at this, and there are
some drugs that are positive; they have positive
numbers, right?

1       A.      Yes.

2       Q.      And it might be fair for thinking this,

3   but is that a good thing necessarily?

4       A.      Not necessarily.  It just means there were

5   some issues with the paperwork.  Because you can't --

6   all that's referring to is that you were accountable

7   for more drugs than you should have been, which is

8   really not possible.

9       Q.      So either way, if you see a significant

10  disparity, either positive or negative, does that

11  cause you a concern when you're doing an audit like

12  this?

13      A.      Yes.

14      Q.      Now, I think you told us that this audit

15  was conducted on August 3, 2017?

16      A.      Yes.

17      Q.      At some point after that point in time,

18  did you make contact with Ms. Jones to discuss the

19  results of the audit?

20      A.      Yes.

21      Q.      And did that, in fact, happen?

22      A.      Yes.

23      Q.      Where did that happen?

24      A.      She came to our office here in London,

25  Kentucky.

1    Q.    And did you demand that she come there on
2  any particular date?
3    A.    No.
4    Q.    And when she came there, did you tell her
5  whether it was voluntary or not?
6    A.    Yes.
7    Q.    Was it -- what did you say to her?
8    A.    We told her that she was free to leave at
9  any time, that she did not have to speak to us if she
10  did not want to.  And then we even left the -- the
11  door open in our conference room in our lobby and let
12  her know that she's free to get up and walk at any
13  time that she'd like to.
14    Q.    At this point in time, you kind of know a
15  little bit about the background of the pharmacy, some
16  of these providers that we've talked about, you've
17  looked at these missing pills potentially from the
18  audit.  What is it that you're hoping to talk to her
19  about; why call her in?
20    A.    Well, we wanted to give her an opportunity
21  to see if she could explain the shortages and the
22  overages, and as well, to discuss with her our view on
23  the out-of-state dispensing, and see what her view on
24  that as well is.
25    Q.    And as we talked about before, is one of

1  your jobs is you try to counsel pharmacists and talk

2  to them about things?

3      A.    Yes.

4      Q.    Now, let's talk through a few specific

5  topics you discussed with Ms. Jones.  Did you talk

6  about something called red flags?

7      A.    Yes.

8      Q.    What are those?

9      A.    So red flags are what we see as

10  indicators, potential diversion.

11      Q.    And why did you discuss those with

12  Ms. Jones?

13      A.    Because we felt that we had seen some red

14  flags in her dispensing history, so we wanted to

15  discuss those with her to ensure that she was aware of

16  those, and to see if there was any education that we

17  would provide that would help her.

18      Q.    Now, when we talk about red flags, I

19  think, is there more than one red flag a pharmacist

20  might look at?

21      A.    Yes.

22      Q.    I don't want to talk here about all the

23  conceivable ones, but let's talk about some of the

24  ones that you discussed with Ms. Jones, okay?  Did you

25  talk with her about out-of-state prescriptions?

1    A.    Yes.

2    Q.    Now, are out-of-state prescriptions, per

3 se, illegal according to the DEA, or anybody else with

4 the government?

5    A.    No.

6    Q.    What is the concern that you talked with

7 her about with respect to out-of-state prescriptions?

8    A.    We talked to her about patients traveling

9 long distances to out-of-state doctors, patients

10 traveling in groups with one another, patients

11 receiving similar addictive combinations, and then --

12 I think that's about it.

13    Q.    Did you -- and what is it about that that

14 would cause you concern as an investigator; why talk

15 about that stuff with Ms. Jones?

16    A.    Again, those are all red flags that

17 through my training and experience that I have seen

18 that have all been indicators of diversion.

19    Q.    Now, did you ask her about prescriptions

20 from doctors in Florida?

21    A.    Yes.

22    Q.    What did she say about that?

23    A.    That she did not fill for doctors in

24 Florida.

25    Q.    Did you ask her about Dr. Williams, the

1    doctor we saw a moment ago?

2         A.    Yes.

3         Q.    And what did she say about that?

4         A.    She did not recall anything about him.

5         Q.    Did you ask her about Dr. Stokes?

6         A.    Yes.

7         Q.    What did she say about that?

8         A.    She remembered seeing the name, but

9    couldn't recall anything in particular.

10        Q.    And we also talked about Dr. Moore and

11   Dr. Gowder, this PTI in Tennessee; did you ask her

12   about that?

13        A.    Yes.

14        Q.    What did she say?

15        A.    She recalled calling the clinic about two

16   of the patients that had came to her pharmacy.

17        Q.    Now, did you also ask her whether she knew

18   of any patients that traveled together to those

19   doctors?

20        A.    Yes.

21        Q.    What did she say?

22        A.    She did not.

23        Q.    Now, why would that be an important thing

24   to think about, about seeing patients traveling

25   together or not?

         A.      Well, again, it's a red flag to us because
what we have found is it is an indicator that there
are patients that are potentially being sponsored by
someone else, and they're traveling at the same time
because their visits and their stuff are being paid
for by another person.

         Q.      Now, did you also ask about a Dr. Brown
from North Carolina?

         A.      Yes.

         Q.      What'd she say about Dr. Brown?

         A.      She said that she did not think that she
had many of his patients.  She also indicated to us
that patients had told her that Dr. Moore's office was
moving to Murphy, North Carolina, and that she had
called Dr. Brown's office and confirmed that they were
receiving Dr. Moore's patients.

         Q.      So at this point in time, did you, the
DEA, try to convey to Ms. Jones that you had some
concerns about that, that this Dr. Moore and
Dr. Gowder, who we saw in the indictment a moment ago,
had patients who were moving to an out-of-state
clinic?

         A.      Yes.

         Q.      And were you trying to counsel her about
that?

1      A.      Yes.

2      Q.      Were you trying to counsel her to be more

3 careful?

4      A.      Yes.

5      Q.      Did you also talk about some of the

6 specific drugs that you saw originating from some of

7 these clinics?

8      A.      Yes.

9      Q.      Did that include a combination of certain

10 drugs?

11      A.      Yes.

12      Q.      Which drugs in particular caught your eye?

13      A.      The combination of oxycodone and

14 oxymorphone.

15      Q.      And are those both Schedule II controlled

16 substances?

17      A.      Yes.

18      Q.      Is oxymorphone a fairly strong controlled

19 substance?

20      A.      From my understanding, yes.

21      Q.      Now, did you talk to her specifically

22 about seeing prescriptions with those combinations?

23      A.      Yes.

24      Q.      And was that in the context of this

25 specific clinic?

1     A.      Yes.

2     Q.      Did Ms. Jones say whether she understood

3  whether she needed to be more careful?

4     A.      Yes.

5     Q.      What did she say?

6     A.      She -- when we went over the things that

7  we felt that she needed to scrutinize more often, she

8  acknowledged that she understood.

9     Q.      Now, in all this, did you say specifically

10 to her Ms. Jones, Don't fill this prescription, or

11 don't fill that prescription?

12    A.      No, we did not.

13    Q.      Why not?

14    A.      Because it is not -- we do not have the

15 professional judgment responsibility as pharmacists to

16 be able to say that because we're not trained as such,

17 so we have to rely on the pharmacist, who has the

18 training and experience and the professional judgment

19 to do so.

20        We just advise 'em what we see are red flags

21 and concerns, and it's up to them to use their

22 professional judgment whether to fill a prescription

23 or not.

24    Q.      Now, it's a little bit of an awkward

25 question, but after you had that interview and that

experience talking to Ms. Jones, did you walk away

from that feeling like you were satisfied and you

didn't need to do anything else with respect to this

pharmacy?

        MR. PILLERSDORF:  May I approach, Your Honor?

        THE COURT:  You may.

        [CONFERENCE AT THE BENCH]

        MR. PILLERSDORF:  Your Honor, we object to

the question.  It sounds like he's asking the witness

to speculate on whether or not he thought my client

was guilty or being truthful or acting suspicious.

His opinion is -- I think the question calls for him

to speculate on --

        THE COURT:  It's not where the government's

heading, so why don't you ...

        MR. SMITH:  So all I'm doing is just kind of

transitioning now.  The idea he spent as a diversion

investigator at this point in time engaging in kind of

more administering oversight.  At this point in time,

the government then opens a criminal investigation.

        So the idea, just like with any other

criminal investigation is you get a 911 call, or you

would interview a witness, why did you open the

investigation?  It's not particularly important, so I

can just move to the next question, just ask about the

1  internal investigation.

2          THE COURT:  Thank you, Mr. Smith.

3          [IN OPEN COURT]

4      Q.    So we're discussing after this

5  interview -- I guess a better way to ask you would be,

6  did you then begin participating in a criminal

7  investigation of Ms. Jones' pharmacy?

8      A.    Yes.

9      Q.    And what kind of things, just at a broad

10  level, did you begin investigating?

11      A.    We began looking at the missing -- trying

12  just to figure out the missing drugs, checking out the

13  out-of-state prescriptions, and there were also

14  allegations of some billing fraud.

15      Q.    And is one of those things you looked at

16  as an investigator, did you look at DEA records, kind

17  of like we just talked about with Williams and Stokes,

18  to look whether there were other doctors that had come

19  on the DEA's radar that were at this pharm -- filling

20  at this pharmacy?

21      A.    Yes.

22          MR. SMITH:  Your Honor, may I return back to

23  counsel table for just a moment to grab something?

24          THE COURT:  You may.

25      Q.    Now, does DEA keep records of registration

1  actions?

2      A.      Yes.  We have a database that tracks all

3  DEA registrants, and if there's any action taken

4  against their registration, it'll be listed in that

5  database.

6      Q.      Now, are there different ways that doctors

7  might lose or give up their registration?

8      A.      Yes.

9      Q.      And is that called surrendering your

10 registration?

11     A.      Yes.

12     Q.      What does surrender for cause mean?

13     A.      Surrender for cause means that it wasn't

14 -- you have, like, a -- if a registrant is closing up

15 shop, that means they went out of business, that's one

16 thing, but a surrender for cause means that there was

17 something that would have caused them to surrender,

18 some kind of action or some type of investigation or

19 something that would have been beyond just retiring

20 and going out of business.

21     Q.      Now, this database, it's generally just

22 trying to keep to tabs on what's going on with

23 everyone's registration; is that fair?

24     A.      Yes.

25     Q.      So did you review information about that

1  with respect to Ms. Jones' pharmacy?

2       A.     Yes.

3            MR. SMITH:  Could we, just for the witness,

4  please, I'm going to show what's been marked as

5  Government's Exhibit 55.

6       Q.     Do you recognize this, Mr. Sizemore?

7       A.     Yes.

8       Q.     What is this?

9       A.     That is a -- it was a spreadsheet that was

10 prepared where I compared doctors that were disp --

11 that had had prescriptions dispensed at Kim's Hometown

12 Pharmacy, and checked their registrations, and

13 accessed them to see if they had any action.

14      Q.     Any idea here if this is just what the DEA

15 records show as far as the status of certain doctors

16 that you've seen filling at -- had been filled at

17 Kim's Hometown Pharmacy?

18      A.     Yes.

19      Q.     Okay.  Now, does the DEA maintain its

20 records accurately based on your experience?

21      A.     Yes.

22      Q.     Does it do this in the ordinary course of

23 its operations as DEA?

24      A.     Yes.

25      Q.     And that's what these records are?

1      A.      Yes.

2          MR. SMITH:  Your Honor, we move to admit

3  Exhibit 55.

4          THE COURT:  Any objection?

5          MR. PILLERSDORF:  No.

6          THE COURT:  Without objection, that, too,

7  will be a government exhibit.  You may publish it.

8      Q.      And just as an example, we talked about

9  Dr. Williams, and so if we go one, two, three, four,

10  five down, what does it say with respect to

11  Dr. Williams?

12      A.      Surrender for cause.

13      Q.      Can you tell the jury what that means.

14      A.      Again, that's the -- the doctor

15  surrendered his DEA registration for a reason, likely,

16  like I said, not simply going out of business or

17  retiring, but there was something that lead to that

18  for a cause pursuant to some kind of action.

19      Q.      And did you pull every single doctor that

20  had a prescription filled at Kim's Hometown Pharmacy

21  from a system, or is this just a selection?

22      A.      It's a selection.

23      Q.      Now, as your investigation progressed in

24  2017, what other kinds of things were you and other

25  investigators doing?

1    A.    We were talking to former employees, maybe

2 trying to talk to some patients, and again, just

3 checking the records and kind of doing like an audit.

4    Q.    Now, going forward in time, based upon

5 your investigation, did that eventually lead to a

6 search warrant?

7    A.    Yes.

8    Q.    When was that search warrant?

9    A.    I believe it was around March 2018.

10    Q.    Were you part of the team that executed

11 the search warrant?

12    A.    Yes.

13    Q.    And did that involve you and other agents

14 physically traveling to locations in Williamsburg to

15 conduct searches?

16    A.    Yes.

17    Q.    Where did investigators go?

18    A.    A portion of the team went to Kim's

19 Hometown Pharmacy, and then a portion went to her

20 personal residence.

21    Q.    What I want to do next, kind of group of

22 questions, is just talk through with you various

23 things that you found at the pharmacy that day.  So I

24 guess the first question I would ask you is, did you

25 find and seize certain items that you believed to be

1  evidence in this case?

2       A.     Yes.

3       Q.     Let's talk about those in different

4  categories.  The first I want to talk to you about is

5  prescriptions.  Were there prescriptions located on

6  site there at Kim's Hometown Pharmacy?

7       A.     Yes.

8       Q.     Did investigators seize certain

9  prescriptions from the pharmacy?

10      A.     Yes.

11      Q.     Okay.  Tell us about which ones were

12  seized and why.

13      A.     We took the Schedule II controlled

14  substances.  And the reason we took those, those are

15  the ones that have -- that are the most highly abused

16  on the streets, and usually what we see being

17  prescribed at out-of-state clinics that are

18  problematic.  So we wanted to take a look at the

19  overall prescriptions from the out-of-state doctors in

20  regards to Schedule II controlled substances.

21      Q.     Okay.  And from there, what did you do

22  with the prescriptions that you seized?

23      A.     We sort of them into two categories, those

24  that were from in-state doctors and those that were

25  from out-of-state doctors.

 1       Q.       And what did you do with the ones that
 2  were from out-of-state doctors?
 3       A.       We transferred those to our DOMEX unit for
 4  further analysis.
 5       Q.       And what's DOMEX?
 6       A.       DOMEX is a unit within DEA that is
 7  comprised of intel analysts that do document analysis
 8  and exploitation.
 9       Q.       Did you, in the course of this, did you
10  review certain prescriptions front and back?
11       A.       Yes.
12            MR. SMITH:  I'd like to show you a couple
13  things real quick.
14            Your Honor, may I return?
15            THE COURT:  You may.
16       Q.       I'll go through with you what's been
17  premarked as Government's Exhibit 2 through 31, okay?
18  Have you previously reviewed these?
19       A.       Yes.
20       Q.       Okay. Just at a high level, can you tell
21  the jury what it is you're about to look at.
22       A.       Is a selection of Schedule II scripts that
23  were filled written by out-of-state doctors.
24       Q.       Now, have you have reviewed each one of
25  these?

1    A.      Yes.

2    Q.      Okay.  And were these, in fact, found at

3  Kim's Hometown Pharmacy?

4    A.      Yes.

5    Q.      Are they in the same condition as when you

6  found them?

7    A.      Yes.

8    Q.      And once these were sent to DOMEX, were

9  they returned to you?

10   A.      Yes.

11   Q.      Have they been in your custody ever since?

12   A.      Yes.

13   Q.      Have you made any alterations to any of

14 them?

15   A.      No.

16       MR. SMITH:  Your Honor, what I propose to do

17 is just move these in together for the sake of time,

18 unless counsel prefer I do it differently.

19       MR. PILLERSDORF:  We don't have any

20 objection.

21       THE COURT:  Without objection, those have

22 been admitted, and you can publish them.

23       MR. SMITH:  Thank you, Your Honor.  And for

24 the record, this is Exhibit 2 through 31, Government's

25 Exhibits 2 through 31.

1     Q.     Let's just take a look first at Government

2  Exhibit 2.  Can you see that?

3     A.     Yes.

4     Q.     What are we looking at here?

5     A.     That is a prescription for oxycodone 30

6  milligram written to patient Freda Tankersley.

7     Q.     Where was it obtained from based on the

8  face of that prescription, what doctor?

9     A.     Dr. Mark Clarkson at the Hope Clinic which

10  is located in Wytheville, Virginia.

11     Q.     And what caught your eye about this about

12  this, for instance?

13     A.     Well, I knew Mark Clarkson and the Hope

14  Clinic to be providers that were targets of DEA, and,

15  again, the distance of Wytheville, Virginia, from

16  Williamsburg, Kentucky.

17     Q.     And if we return for a moment to Exhibit

18  55, remind us what this was?

19     A.     That is the Excel sheet that was created

20  comparing doctors that had prescriptions filled at the

21  pharmacy and then checking their status of the

22  registration in our database.

23     Q.     Okay.  And was Mark Clarkson one of the

24  doctors on this list?

25     A.     Yes.

1    Q.    Look at the back of these prescriptions.
2  Can you tell us what we're looking at there?
3    A.    That is a label that the pharmacy prints
4  off and affixes to the prescription once the
5  prescription is filled.
6    Q.    And so the front of the prescription is
7  filled out by who?
8    A.    That prescriber or their office.
9    Q.    And the back of the prescription, that
10  label, who generates that?
11    A.    Pharmacy staff.
12    Q.    It's hard to see.  Let me see if I can --
13  there is a designation here kind of at the bottom
14  right-hand corner.  Sorry.  I'm making you real
15  nauseous probably.  It says RPH KKJ; what does that
16  mean?
17    A.    To my understanding, that is the initials
18  of the pharmacist that filled the prescription.
19    Q.    So what's RPH mean in the pharmacy world?
20    A.    It's a registered pharmacist.
21    Q.    So what was your understanding based on
22  your investigation of who was KKJ was?
23    A.    Kimberly Jones.
24    Q.    Look at a couple of other prescriptions,
25  if we can.  Can -- while I was doing this, I think one

1  thing I would just like to make clear.  Have you

2  reviewed the indictment in this case?

3      A.     Yes.

4      Q.     And are you aware that there are 30, the

5  first 30 counts related to certain prescriptions?

6      A.     Yes.

7      Q.     Okay.  Are what we just introduced as

8  Exhibit 2 through 31 each of those prescriptions?

9      A.     Yes.

10      Q.     And so, for example, if we move forward to

11  Government's Exhibit 4, what is this?  Sorry.

12      A.     That's a prescription for oxycodone 30

13  prescribed to patient Charles Swanson from Dr. Gary

14  Moore, Tennessee Pain Institute.

15      Q.     Is that another one of those doctors we

16  talked about as being kind of on DEA's radar?

17      A.     Yes.

18      Q.     Now, did you notice as time went on with

19  these prescriptions, meaning when they were from a

20  slightly later day, that the format of the labels on

21  the back were slightly different?

22      A.     Yes.

23      Q.     In the upper right-hand corner, we see a,

24  again, these initials KKJ, what was your understanding

25  of that.

1    A.    That's the pharmacist initials that was
2    responsible for dispensing that --

3    Q.    Okay.

4    A.    -- prescription.

5    Q.    Let's move forward a few.  In the course
6    of your review, we talked about that Murphy North
7    Carolina Clinic; is that right?

8    A.    Yes.

9    Q.    And who was the doctor there that you saw?

10   A.    Dr. Michael Brown.

11   Q.    Did you see prescriptions from Dr. Brown
12   in the batch of prescriptions that you seized?

13   A.    Yes.

14   Q.    So, for instance, we've got -- what are we
15   looking at here?

16   A.    It's a prescription for oxycodone 30
17   milligram written to patient Lena Vanover from
18   Dr. Michael Brown in Murphy, North Carolina.

19   Q.    What drug was that for?

20   A.    Oxycodone 30 milligram.

21   Q.    And if it we look at Exhibit 12, what is
22   that?

23   A.    That is Opana or oxymorphone 20 milligram
24   tablets prescribed to same patient, Lena Vanover from
25   Dr. Michael Brown, Murphy, North Carolina.

1    Q.    And was that on the same date of that
2  prescription we just looked at?
3    A.    I believe so.  Can I check it?
4    Q.    I'll show it to you again.
5    A.    Yes.
6    Q.    And on the back, you'll also see the
7  initials at the top?
8    A.    Yes.
9    Q.    And which initials are on the top?
10    A.    It's the KKJ again.
11    Q.    On those same date, August 31, I'm showing
12  you Exhibit No. 13 for the record, did you also see a
13  prescription for someone else from that same clinic?
14    A.    Yes.
15    Q.    And that prescription is for what?
16    A.    Oxycodone 30 milligram to patient Terri
17  Moore from Dr. Michael Brown.
18    Q.    Now, if we look at Exhibit 14, is there
19  another prescription for Mr. Moore on that date?
20    A.    Yes.  It's for oxymorphone 30 milligram,
21  same date, patient Terri Moore, and Dr. Michael Brown.
22    Q.    And are those dated the same as the
23  prescription we just talked about for Ms. Vanover?
24    A.    Yes.
25    Q.    And are those the same two drug

1  combination we talked about?

2      A.      Yes.

3      Q.      Now, I want it tie this back together.

4  You had this conversation early August with Ms. Jones,

5  did you talk to her about this combination of

6  oxymorphone and oxycodone?

7      A.      Yes.

8      Q.      And when did you have that discussion with

9  her?

10     A.      August 18, 2017, I believe.

11     Q.      When were these prescriptions presented?

12     A.      August 31, 2017.

13     Q.      If we look at the back of the

14  prescription -- one thing I should have asked is there

15  is a date at the top.  What is your understanding of

16  that date?

17     A.      That's the date they were actually filled.

18     Q.      So were these prescriptions filled roughly

19  two weeks after you had that conversation with

20  Ms. Jones?

21     A.      Yes.

22     Q.      Now, going forward, I don't want to walk

23  through each of these, but the various prescriptions

24  that are in the counts in the indictment and that have

25  been introduced as counts 2 to 31, are those of most

1  at the end after that conversation you had in August

2  2017?

3       A.      I believe so.

4       Q.      And if we looked at all the prescriptions

5  that were found, that you looked at for these various

6  patients, for instance, if we looked at all the

7  prescriptions for Mr. Moore we just talked about,

8  would these prescriptions fall at the very beginning

9  of the first time Ms. Jones filled them?

10      A.      No.

11      Q.      Based on your review, were there a lot of

12 prescriptions she had filled beforehand for these

13 individuals?

14      A.      Yes.

15      Q.      Now, I think you already told us this, but

16 just to refresh what you'd said earlier, so these

17 prescriptions and the others, can you just give a

18 sense of how many prescriptions you grabbed just by

19 volume, what did it look like?

20      A.      We filled up two evidence boxes.

21      Q.      And what did you do with those?

22      A.      We split them into two boxes, one for

23 out-of-state and one for in-state.  Sent the

24 out-of-state prescriptions to be analyzed.  Once they

25 got back, then they both have been stored in our

1  evidence room since.

2      Q.     And so that information went to DOMEX, and

3  remind us what is the other information you sent to

4  DOMEX?

5      A.     The out-of-state scripts were sent to

6  DOMEX.

7      Q.     Did you also seize information from the

8  pharmacy's computer system?

9      A.     Yes.

10      Q.     And did you provide that to DOMEX?

11      A.     Yes.  We provided the prescription

12  software information that was seized.

13      Q.     Okay.  Let's talk about a couple other

14  things that you encountered when you executed the

15  search warrant in March 2018.  So to set the stage for

16  that, I had one question about something called

17  KASPER.  Do you know what KASPER is?

18      A.     Yes.

19      Q.     What is KASPER?

20      A.     The prescription drug monitoring program

21  for the state of Kentucky.

22      Q.     What is a prescription drug monitoring

23  program?

24      A.     States utilize them to maintain a database

25  in which they can track all controlled prescriptions

1  that are issued to patients.

2      Q.      And is the idea with the database that

3  doctors or pharmacist can go on and look and see where

4  patients have gotten prescriptions before?

5      A.      Yes.

6      Q.      Is this meant to be a tool to help

7  pharmacists and practitioners?

8      A.      Yes.

9      Q.      And just -- can you give us an example of

10 why a pharmacist would want to see a patient's KASPER.

11     A.      It gives them an opportunity to see what

12 this patient had been prescribed in the past, what

13 doctors they've been to, if they've been to several

14 doctors, or if they've filled multiple prescriptions

15 at multiple pharmacies.

16     Q.      Now, when you executed the search warrant

17 in March 2018, did you encounter anything that

18 referenced KASPER?

19     A.      Yes.

20          MR. SMITH:  First -- and please, just for the

21 witness, show you what's been marked as Exhibit 42.

22     Q.      What is Exhibit 42, Mr. Sizemore?

23     A.      It is a printout of information from

24 KASPER with "KASPER report error correction process"

25 circled.

1      Q.      Where was this found?

2      A.      I believe it was in the pharmacy.

3      Q.      Were you part of the team that executed

4  that search warrant?

5      A.      Yes.

6      Q.      Now, is this -- this is a copy, but is

7  this copy substantially the same form as when it was

8  found that day?

9      A.      Yes.

10          MR. SMITH:  Your Honor, we'd move to admit

11  Government 42.

12          THE COURT:  Any objection?

13          MR. PILLERSDORF:  No.

14          THE COURT:  Without objection, that will be

15  admitted as a government exhibit.  You can publish it

16  as you choose.

17          And within the next ten minutes, if you'd

18  look for a good place to stop, we'll take a break.

19          MR. SMITH:  Absolutely, Your Honor.

20      Q.      One thing about this Exhibit 42, did you

21  notice a date on this printed sheet?

22      A.      Yes.

23      Q.      And where is that date?

24      A.      On the bottom right.

25      Q.      What date was that?

1      A.      It's August 18, 2017.

2      Q.      Is there anything about that date that

3  stands out to you?

4      A.      That's the date that we spoke with

5  Ms. Jones at the DEA office.

6          MR. SMITH:  Additionally, I show you what's

7  been marked as Exhibit 41.  Do you recognize -- I'm

8  sorry.  If we could just show this to the -- thank

9  you.  You're ahead of me.

10     Q.      Can you just tell the jury what it is

11 you're looking at Exhibit 41.

12     A.      It was a handwritten note that was found

13 at the pharmacy that appears to have Ms. Jones' KASPER

14 login information.

15     Q.      And, again, where was this found?

16     A.      At the pharmacy.

17     Q.      And this is a copy, but does this seem to

18 fairly replicate what you found at the pharmacy?

19     A.      Yes.

20     Q.      Have you altered it or changed it in any

21 way?

22     A.      No.

23          MR. SMITH:  Your Honor, we move to admit

24 Exhibit 41.

25          THE COURT:  Any objection?

1        MR. PILLERSDORF:  No.

2        THE COURT:  Without objection, that, too,

3  will be entered as a government exhibit.

4     Q.     And you just told the jury about this.

5  But what is it about this sheet; what are you looking

6  at to conclude that there was KASPER information on

7  it?

8     A.     I'm looking at the -- towards the middle

9  of the page, it is -- it appears to be her login

10  information for KASPER.

11     Q.     Does it say the word "KASPER?"

12     A.     Yes.

13     Q.     And then the other page of this exhibit,

14  is there other information about KASPER?

15     A.     Yes.

16        MR. SMITH:  Your Honor, I think -- if you

17  want to take a break, this might be the time.

18        THE COURT:  Ladies and gentlemen, we'll break

19  for our lunch break at this time.  Remind you of the

20  instructions I gave you before the evening recess.

21  You're not to discuss the case amongst yourself or

22  with anyone else or gather any outside information

23  about the case over the lunch hour.  And, of course,

24  just continue to keep an open mind as we begin with

25  the presentation of the evidence.

1           Why don't we return -- it's approaching

2  12:15.  We'll start at 1:30 this afternoon, give you a

3  little bit over an hour for the lunch break.

4           I don't anticipate a late evening.  We'll go

5  5:00 to 5:30, at the very latest tonight, and then

6  we'll get you out of here.

7           Thanks for your good attention.  At this

8  time, the jury can exit the courtroom.

9           [JURY EXITS COURTROOM]

10          THE COURT:  The witness, of course, is free

11  to step down during the pendency of the break.

12          And we'll stand in recess until 1:30.

13          [RECESS- 12:09 - 1:32 p.m.]

14          [IN OPEN COURT]

15          THE COURT:  We've reconvened in the presence

16  of the jury, which has returned after the lunch break.

17  The witness has retaken the witness stand.

18          Sir, you understand you continue under the

19  oath you previously gave?

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  Mr. Smith.

22          MR. SMITH:  Thank you, Your Honor.

23          We'll try from the podium this time, and see

24  if it works, hopefully.

25      Q.     Mr. Sizemore, before the break, we were

talking about the March 2018 search warrant executed

of Kim's Hometown Pharmacy, and we were talking

through a few items that you found.  So I now want to

orient you towards another category of information.

At some point in your investigation, were you

looking into concerns about what I'll call pill

loaning?

A.      Yes.

Q.      Okay.  And just generally, not specific to

this case, but what would you be investigating with

pill loaning?

A.      It would be loaning controlled substances

to a patient without a valid prescription issue.

Q.      And you told us earlier, I think, that one

of the requirements, one of the basic requirements for

dispensing a controlled substance is having a

prescription in place?

A.      Yes.

Q.      And so is that why you'd be investigating

potential loaning as a problem?

A.      Yes.

Q.      We'll turn back to that in a moment, but

we'll talk about that in context.  But did you find

some things in the search warrant that you felt were

relevant to that part of the investigation?

1    A.    Yes.

2    Q.    Okay.  We'll talk about that in a moment.

3  Did you -- in addition to collecting evidence when you

4  were at the search warrant site, did the DEA do

5  another audit?

6    A.    Yes.

7    Q.    And how did that audit work?

8    A.    Again, we selected similar drugs that we

9  did last time.  We expanded the audit period to

10 include the new closing date, which was the date of

11 the new search warrant, we counted the pills, and then

12 I collected the records, and we did the audit.

13    Q.    So you had previously captured, up until

14 August 2017, and what's the new date that you were

15 then capturing?

16    A.    Well, we expanded from December 2015 to

17 March 2018.

18    Q.    So to capture those new months that had

19 elapsed, is that --

20    A.    Yes, yes.

21    MR. SMITH:  Let's take a look at Exhibit No.

22 38, please, just for the witness.

23    Q    Mr. Sizemore, can you see what's in front

24 of you?

25    A.    Yes.

1      Q.      What is that?

2      A.      That is the audit results.

3      Q.      From which audit?

4      A.      The one that was conducted on the search

5  warrant.

6      Q.      Okay.  Do you recall with the last audit

7  document we looked at, I asked you a few questions

8  including, "Did you prepare this?"

9      A.      Yes, sir.

10     Q.      Did you do this in the course of your work

11 through the DEA?

12     A.      Yes.

13     Q.      Does it accurately reflect your work?

14     A.      Yes.

15         MR. SMITH:  We'd move to admit Exhibit 38.

16         THE COURT:  Is there any objection to that?

17         MR. PILLERSDORF:  No.  No, Your Honor.

18 Sorry.

19         THE COURT:  Without objection, it will be

20 admitted as a government exhibit.  You can publish it.

21         MR. SMITH:  And if you could, please publish

22 that to the jury.  Thank you.

23     Q.      If you could briefly, just walk us through

24 this new audit.  What does this more recent audit

25 show?

1    A.    Again, we selected similar drugs to what
2 we did last time.  We added a few drugs, added a new
3 time frame, and we noticed that there were additional
4 losses in comparison to the previous audit.

5    Q.    And specifically, for instance, with
6 oxycodone 30 milligrams; was that one of the ones we
7 talked about with the first audit?

8    A.    Yes.

9    Q.    Okay.  And how does this compare now?

10    A.    I believe the first one was roughly 869
11 tablets negative, and this one's at negative 884.

12    Q.    And was there one drug in particular that
13 there seems to be more missing?

14    A.    Yes.

15    Q.    Okay.  Now, I don't really want to get
16 bogged down on the numbers, it's not that important.
17 But generally speaking, why were you doing this audit,
18 this second audit?

19    A.    We wanted to ensure that there was no more
20 additional losses from the first audit, since we had
21 already notified her of losses during the first
22 interview.  We wanted to check to see if there were
23 additional losses or if she had figured out where that
24 loss was coming from.

25    Q.    Now, we talked about this pill loaning

business a moment ago, and then we're talking about

these audits with missing pills.  Can you kind of help

us connect the dots there.

    A.      Say that one more time, please.

    Q.      Sure.  It was not a good question.  When

we were talking about pill loaning, you told us about

that earlier.  And now we're talking about these audit

results showing some missing pills.  What's the

relevance of the missing pills in your investigation

about pill loaning?

    A.      The pill loaning, if unaccounted for,

could be -- could lead to losses.  If the pills are

given to a patient where a valid prescription is

issued, then it's not going to be listed in the

dispensing, so those pills will be unaccounted for.

    Q.      Now, just to be fair and be clear, has

anyone from the government ever contended that every

single one of those missing pills is because of the

pill loaning?

    A.      No.

    Q.      And just in full disclosure, were you

involved in a separate investigation involving theft

of drugs from Kim's Hometown Pharmacy?

    A.      Yes.

    Q.      Did that involve a gentleman named Gary

1  McPherson?

2       A.      Yes.

3       Q.      Did Mr. McPherson work at the pharmacy as

4  a relief pharmacist?

5       A.      Yes.

6       Q.      And was he prosecuted and convicted for

7  stealing drugs from that pharmacy?

8       A.      Yes.

9       Q.      And were you involved in those

10 proceedings?

11      A.      Yes.

12      Q.      What was the date at issue for his case?

13 When did -- when was, I guess, we'd refer to when was

14 he caught stealing drugs from the pharmacy?

15      A.      I believe it was May 10, 2018.

16      Q.      So was that after this audit was

17 conducted?

18      A.      Yes.

19      Q.      And where did you get the information

20 about Mr. McPherson?

21      A.      We received several notifications.  The

22 first one came from Kim Jones herself, and then we

23 received notification from the Williamsburg Police

24 Department.

25      Q.      So she reported this loss to you at the

1  DEA?

2      A.      Yes.

3      Q.      Let's now talk about after the audit.  Did

4  you and any other investigators speak with Ms. Jones

5  on the date you executed the search warrant at the

6  pharmacy?

7      A.      Yes.

8      Q.      Who else was there?

9      A.      Special Agent Rob Lepley with Health and

10  Human Services.

11      Q.      And did you and Mr. Lepley talk with

12  Ms. Jones for a period of time?

13      A.      Yes.

14      Q.      Before you did that, did you tell her that

15  the interview was voluntary?

16      A.      Yes.

17      Q.      Did you tell her that she had to speak

18  with you?

19      A.      No.

20      Q.      Okay.  Did you make any threats against

21  her?

22      A.      No.

23      Q.      Did you lock her in a room?

24      A.      No.

25      Q.      Let's talk about a couple different

categories of information.  The first is, I'd like to talk to you about whether you discussed these missing drugs we've been talking about.  Did you discuss those with Ms. Jones?

A.     Yes.

Q.     And specifically the audit results from the first audit?

A.     Yes.

Q.     What did she say about that?

A.     She claimed that the missing pills were due to two former employees of hers, Jeff Holmes and Britany Petrey.

Q.     Now, to be fair, we're asking questions about a conversation you had with Ms. Jones.  Was the -- the responses you got, were they nice and orderly per subject and never changed throughout the interview?

A.     No.

Q.     Can you just give the jury a sense of how the interview kind of went from that perspective.

A.     Again, during the interview, Ms. Jones changed her statement several times, so, you know, initially, she may have said one thing, but then later on in the interview, may have been more forthcoming about it, or may have remembered something else and

1  brought something else up in the middle of the

2  interview.  Like you said, like it wasn't a nice and

3  orderly interview.

4      Q.    So I'm going to ask you questions about

5  what you recall from the conversation, but I want you

6  to just make clear when you can about how these things

7  progressed and kind of put them in order.  But I want

8  to make sure that we're representing this accurately,

9  okay?

10         So, for instance, with this business about

11  investigators asking her about the audit results, and

12  she mentioned this employee, Jeff Holmes, what did she

13  first say about that?

14     A.    She said that she had spoken to other

15  pharmacies that he had worked at, and they were also

16  missing drugs.

17     Q.    And later on in the interview, maybe not

18  right at that exact moment, but later on in the

19  interview, did you ask her which pharmacy she was

20  talking about?

21     A.    Yes.

22     Q.    And what did she say?

23     A.    She believed it to be called Middlesboro

24  Discount Drug in Middlesboro, Kentucky.

25     Q.    Now, based on your knowledge as a

1  pharmacist investigator, a diversion investigator, is

2  there a drug -- a pharmacy by that exact name?

3      A.      I could not find one.

4      Q.      What pharmacy did you find in that town?

5      A.      Family Discount Drug in Middlesboro.

6      Q.      And did you talk with that pharmacy?

7      A.      Yes.

8      Q.      Who's the -- who runs that pharmacy?

9      A.      His name was Scott Marcum.

10     Q.      Does Jeff Holmes work at that pharmacy?

11     A.      Yes.

12     Q.      So based upon your investigation, you

13  believed that was the pharmacy being referenced?

14     A.      Yes.

15     Q.      Okay.  Another thing about these missing

16  drugs, when you're in a pharmacy, including Kim's

17  Hometown Pharmacy, where do you typically see

18  controlled substances stored?

19     A.      Typically, they're stored in a safe or a

20  locked cabinet.

21     Q.      When you were conducting the search

22  warrant at Kim's Hometown Pharmacy -- let me ask one

23  other question.  Why are they typically stored in a

24  safe?

25     A.      For security, and to prevent a large

1  number of access to the controls.

2       Q.      Did you find controlled substances,

3  specifically Schedule II controlled substances,

4  outside the safe at Kim's Hometown Pharmacy?

5       A.      We did.

6       Q.      Specifically, did you find anything in her

7  office?

8       A.      Yes.  There was something found in her

9  office.

10          MR. SMITH:  Okay.  Can we look at Exhibit

11  53B, please, Rhonda, just for the witness, please.

12       Q.      Now, when you executed the search warrant

13  like the one at Kim's Hometown Pharmacy, did someone

14  take pictures of the scene?

15       A.      Yes.

16       Q.      And were pictures taken in this case?

17       A.      Yes.

18       Q.      What are we looking at in the picture

19  shown to you right there?

20       A.      That is a picture of the controlled

21  substances that were found outside the safe.

22       Q.      And what room is this in the pharmacy?

23       A.      It's an office area in the back of the

24  pharmacy.

25       Q.      And were you there that day?

1    A.    Yes.

2    Q.    Does this photograph accurately depict the

3  way that the scene was found?

4    A.    Yes.

5         MR. SMITH:  Your Honor, we'd move to admit

6  Exhibit 53B.

7         THE COURT:  Any objection?

8         MR. PILLERSDORF:  No.

9         THE COURT:  Without objection, that, too,

10  will be a government exhibit.  You can publish it as

11  you choose.

12        MR. SMITH:  Show that to the jury.

13   Q.    It might not be obvious, but can you point

14  to the jury on the screen where the controlled

15  substances are found.

16   A.    It's in the back of the open drawer, a

17  white bottle, stock bottle.

18   Q.    So to find that, you have to pull the

19  drawer all the way out, and that's in the back?

20   A.    Yes.

21        MR. SMITH:  And just for the witness, please,

22  could we look at 53C.

23   Q.    Mr. Sizemore, what is 53C?

24   A.    It's a picture of the bottle in the back

25  of the drawer.

1     Q.     Same questions.  Does this photograph

2  accurately depict the way the pharmacy was found?

3     A.     Yes.

4          MR. SMITH:  Your Honor, we move to admit

5  Exhibit 53C.

6          THE COURT:  Any objection?

7          MR. PILLERSDORF:  No.

8          THE COURT:  Without objection, that, too,

9  will be a government exhibit.

10         MR. SMITH:  Okay.  Can we please publish

11  that.

12    Q.     And can you read what the label says on

13  that bottle?

14    A.     Yes.  It appears to say hydrocodone five

15  milligram/500 milligram.

16    Q.     Now, in the course of your discussion with

17  Ms. Jones on -- in March 2018, did you ask her about

18  this bottle?

19    A.     Yes.

20    Q.     And what did she say about it?

21    A.     She claimed to not be aware the bottle was

22  in the back -- was located there, and so that it must

23  be drugs that were recalled and should have been sent

24  back to the supplier.

25    Q.     Let's next move to -- we talked about pill

1  loaning.  Did investigators ask her questions about

2  pill loaning?

3       A.     Yes.

4       Q.     What did she initially say, to the best of

5  your recollection?

6       A.     Initially, she said that she had never

7  loaned pills.

8       Q.     She said never?

9       A.     Yes.

10      Q.     Now, did she change that answer as the

11 interview went on?

12      A.     Yes.

13      Q.     What did she say next about it?

14      A.     Well, her statements changed several

15 times.  So generally, without being able to put it in

16 exact order, she, she admitted to loaning pills a long

17 time ago, but couldn't recall anybody's name because

18 it was so long ago.

19            And then at one point, she was able to recall

20 some names of some patients that she had loaned to.

21 And then at one point, she admitted to loaning pills

22 if she knew the doctor was going to write a refill or

23 if the prescription was going to fall on a Saturday,

24 and she was not opened on the weekend, so she wanted

25 to provide pills for the patient for the weekend.

1  Q.  Did she tell you how she could know a

2 doctor is going to write a prescription at any point

3 in time?

4  A.  No.

5  Q.  Now, she, at some point, indicated she

6 didn't want to talk about the pill loaning anymore?

7  A.  Yes.

8  Q.  And later in another interview, did she

9 continue talking about it?

10  A.  Yes.

11  Q.  Now, we talked about finding some

12 materials during the search warrant that related to

13 this issue.

14    MR. SMITH:  Could we pull up Exhibit 45,

15 please.  Just for the witness, please.

16  Q.  Do you recognize this, Mr. Sizemore?

17  A.  Yes.

18  Q.  What is it?

19  A.  It's a sticky note that was found at the

20 pharmacy.

21  Q.  Where, where was it found?

22  A.  In the office area of the pharmacy.

23  Q.  You were there on the day of the search

24 warrant?

25  A.  Yes.

1        Q.      Okay.  This is a copy obviously, but does
2    this fairly depict what was on that sticky note?
3        A.      Yes.
4        Q.      Did you or anybody else to your knowledge
5    change that?
6        A.      No.
7            MR. SMITH:  Your Honor, we'd move to admit
8    that exhibit.
9            THE COURT:  Any objection?
10           MR. PILLERSDORF:  (Nod negatively).
11           THE COURT:  Without objection, that, too,
12   will be a government exhibit.  You may publish it.
13           MR. SMITH:  For the record, that's Exhibit
14   45.  Can we please publish that to the jury.
15       Q.      Now, what does this note say?
16       A.      It appears to say Croley, 8 oxy and 6
17   gabapentin.
18       Q.      And what's gabapentin?
19       A.      It's a nerve medication.
20       Q.      Is that sometimes prescribed with pain
21   medication based on what you'd see?
22       A.      Yes.
23       Q.      Like oxycodone?
24       A.      Yes.
25       Q.      Now, did you ask her about this note?

1    A.    Yes.

2    Q.    What did she say?

3    A.    She identified the patient as Croley Ball,

4  and she claimed that Mr. Ball would leave half of his

5  medication there at the pharmacy for her to keep

6  secure because he could not -- because he had been

7  robbed at home once, and it was not secure at his

8  house.

9    Q.    Okay.  So did she say anything else about

10  Mr. Ball?

11    A.    Yes.  She admitted to loaning pills to him

12  on one occasion.  She said that it was on a Friday; he

13  presented with it on a Friday, the prescription was

14  sent to be issued on a Saturday, and she wanted to

15  give him some medication to last the weekend.

16    Q.    So she said that this sticky note was

17  about some fear of robbery, but then she said on other

18  occasions she did loan to Mr. Ball?

19    A.    Yes.

20    Q.    Okay.  Did she say anything else about

21  Mr. Ball?

22    A.    She indicated that we couldn't ask him

23  because he was dead.

24    Q.    Did you ask her a question that elicited

25  that response?

```
 1      A.      I don't recall.

 2           MR. SMITH:  Let's show the witness Exhibit

 3   46, please.

 4      Q.      Do you recognize 46?

 5      A.      Yes.

 6      Q.      And just in general terms, can you explain

 7   what it is.

 8      A.      They're handwritten notes.

 9      Q.      And where were those found?

10      A.      I believe in the office area of the

11   pharmacy.

12      Q.      Does this copy accurately depict what was

13   found at the search warrant that day?

14      A.      Yes.

15           MR. SMITH:  Your Honor, we move to admit

16   Exhibit 46.

17           THE COURT:  Any objection?

18           MR. PILLERSDORF:  No.

19           THE COURT:  Without objection, that, too, is

20   a government exhibit.  You may publish it.

21      Q.      In this crossed-out portion at the top,

22   what does that say?

23      A.      It appears to say Randall Stephens, loaned

24   three Suboxone, four clonazepam.

25      Q.      What's clonazepam?
```

1        A.        It's a benzodiazepine, like Xanax.

2        Q.        Are those sometimes prescribed with pain

3    medications?

4        A.        Yes.

5        Q.        A concern sometimes you investigate

6    actually about that combination of drugs?

7        A.        Yes.

8        Q.        Now, towards the end of the interview --

9    you talked about there's this kind of progression of

10   answers.  Towards the end of the interview, did you

11   speak with her again about loaning drugs?

12       A.        I believe so.

13       Q.        And what did she ultimately about whether

14   she had loaned drugs?

15            I think I may be confusing you.  So earlier,

16   you told us that it went through this progression of

17   initially denying she done it.  And then by the end,

18   you told us -- I'm not asking you a new question.  I

19   apologize.  Just remind us what she said at the end of

20   the interview.

21       A.        So as the interview went on, she appeared

22   to be more forthcoming, and at the end of the

23   interview is when we got into the admissions of

24   admitting to loaning pills if she knew the doctor was

25   going to write a refill, or if the prescription was

1 said to fall on the weekend, and she was not open on a

2 weekend.

3      Q.    So just to be clear, because there's a lot

4 of stuff being said, on that date when you interviewed

5 her, did Ms. Jones admit to you that she had loaned

6 controlled substances to customers without a

7 prescription?

8      A.    Yes.

9      Q.    Let's switch gears.  We talked about

10 out-of-state prescriptions, and we talked about that a

11 bit earlier in your testimony.  Did you ask her about

12 suspicious us out-of-state prescriptions?

13      A.    Yes.

14      Q.    What did she say about that?

15      A.    That she did not fill anything that she

16 felt that was suspicious.

17      Q.    Did you ask her to give you examples of

18 customers that she turned away?

19      A.    Yes.

20      Q.    Okay.  What did she tell you?

21      A.    She gave an example of Charles, last name

22 unknown, who was a patient of Tennessee Pain

23 Institute, TPI.

24      Q.    So how many total examples did she give

25 you?

1       A.      The one.

2       Q.      One more question.  I know healthcare

3   fraud and that world is not your area of expertise,

4   but I want to talk to you a little bit about that part

5   of the investigation.  Are you generally aware that

6   the government was also investigating potential

7   healthcare fraud at the pharmacy?

8       A.      Yes.

9       Q.      And just generally speaking, what was the

10  concern that was being investigated?

11      A.      The concern was that prescriptions were

12  being billed for, not picked up by patients, and

13  placed back in stock and reused, and those claims not

14  being reversed.

15      Q.      Okay.  So those concerns, did

16  investigators discuss that with Ms. Jones during this

17  interview?

18      A.      Yes.

19      Q.      Similarly, I know it's tough to recount

20  exactly like it's a transcript, but to the best you

21  can, to the best of your recollection, what did she

22  initially say about whether prescriptions that hadn't

23  been picked up or billed?

24      A.      Initially, she said that they were all

25  reversed or backed out.

1    Q.     And did you ask her specifically towards
2  the beginning of the interview about -- I should step
3  back.  When you went in the pharmacy and you looked at
4  the stock shelves, did you see any old prescription
5  vials on the shelves and elsewhere?
6    A.     Yes.
7    Q.     And describe what they looked like.
8    A.     They appeared to be prescription vials
9  that had either labels torn off or names and
10 information blacked out.
11   Q.     So did these appear to be vials that had
12 been filled or put a label on at some point, and then
13 either blacked out or torn off?
14   A.     Yes.
15   Q.     So in the course of this interview and the
16 discussion about these billing concerns, did you ask
17 Ms. Jones about whether those blacked-out or torn
18 label vials, whether those drugs had been billed?
19   A.     Yes.
20   Q.     What'd she say?
21   A.     She claimed that they had never been
22 billed for.
23   Q.     Now, similarly, like we talked about, as
24 the interview went on, did her answer change on some
25 of this information?

1      A.      Yes.

2      Q.      For instance, did you ask her -- did she

3   say something different about whether double billing

4   had been occurring?

5      A.      Yes.

6      Q.      What did she say?

7      A.      At one point, she said that if it had

8   happened, it would have been rare.  And at another

9   point, she admitted to doing it on occasion since

10  2008, and had been meaning to back those charges out

11  for the past year.

12     Q.      So, again, I understand you're a human

13  being, but not a robot, but to the best you can

14  remember when you were sitting in that room, did she

15  say, "I've been meaning to back it out for a year?"

16     A.      Yes.

17     Q.      Did she say whether she knew it was wrong

18  or not to bill for drugs that hadn't been picked up?

19     A.      Yes.

20     Q.      What'd she say?

21     A.      That she said that she did know it was

22  wrong, but she was not doing it intentionally.

23     Q.      And then did that answer change as time

24  went on?

25     A.      Yes.

1      Q.      Okay.  We'll talk about that in a moment.
2   Did she say about whether she had trained her
3   employees on how to back out?
4      A.      Yes, yes.
5      Q.      What'd she say?
6      A.      That she had trained the employees.
7      Q.      Now, finally, towards the end of the
8   interview, did you ask her again about those torn or
9   blacked-out labels?
10     A.      Yes.
11     Q.      And what did she say about them then?
12     A.      We had confronted her with some, some of
13  the blacked-out label vials that we found in a
14  hallway, and that she admitted that most of those were
15  billed for and not picked up.
16     Q.      Did she say anything else about it?
17     A.      She said that she knew that she was not
18  supposed to do it, and she should not have allowed it
19  to happen.
20     Q.      But just to be clear, just like I asked
21  about with the loaning, your recollection from that
22  day, did Ms. Jones admit to you that she had failed to
23  back out and kind of kept the money from these
24  prescriptions that never went to customers?
25     A.      Yes.

1      Q.      And did she admit to you that she knew

2 that wasn't the right thing to do?

3      A.      Yes.

4      Q.      Finally, at some point in the summer of

5 2018, did DEA agents arrest Ms. Jones?

6      A.      Yes.

7      Q.      And where did that arrest occur?

8      A.      At her pharmacy.

9      Q.      Okay.  So I want to focus, not on anything

10 not after she was taken into custody, but before she

11 was taken into custody, but did you accompany DEA

12 agents out there?

13     A.      Yes.

14     Q.      Okay.  Did you talk to her while she was

15 in the pharmacy?

16     A.      Yes.

17     Q.      Was she still freely moving around at that

18 point?

19     A.      Yes.

20     Q.      What did you talk to her about?

21     A.      We presented her with a DEA 104, which is

22 a voluntary for surrender form.  We explained it to

23 her, and they gave her the option to voluntarily

24 surrender her DEA number, and it would enter in a

25 surrender for cause status.

1    Q.      And why do you do that?

2    A.      Because we do that whenever we feel like

3  the registrant no longer should have the privilege of

4  a DEA number.

5    Q.      What did she say?

6    A.      She stated that she probably would sign

7  it, but she wanted to talk to her attorney first.

8    Q.      Did she ever end up surrendering that

9  registration?

10    A.      No.

11          MR. SMITH:  Okay.  Mr. Sizemore, I think

12  that's all the questions I have.

13          Thank you, Your Honor.

14          THE COURT:  Thank you.  Mr. Pillersdorf.

15                  CROSS-EXAMINATION

16  BY:  MR. PILLERSDORF:

17    Q.      Mr. Sizemore, I want you to take a look at

18  Government 38; that's the audit, correct?

19    A.      Yes, the second one.

20    Q.      Okay.  Let me ask you.  Is it fair to say

21  that if there are issues of employee theft, that would

22  affect any audit, correct?

23    A.      Yes.

24    Q.      And those weren't really clear when you

25  were being questioned by Mr. Smith, but just so we're

1  absolutely clear, Ms. Jones reported to you that she

2  had issues with three former employees possibly being

3  involved with theft, correct?

4      A.      She reported that she thought that Britany

5  Petrey and Jeff Holmes were responsible for those

6  thefts.  And then as far as Gary McPherson, she

7  reported an actual theft, an incident that occurred.

8      Q.      Now, you've mentioned one of the employees

9  that she -- when Mr. Smith was questioning you, you

10 mentioned one of her employees was a gentleman by the

11 name of Gary McPherson, correct?

12     A.      Yes, sir.

13     Q.      And is it not true that Mr. McPherson was

14 actually prosecuted in this courthouse or maybe in

15 this courtroom for stealing from Ms. Jones' pharmacy?

16     A.      He was prosecuted for a theft that took

17 place on May 10, 2018.

18     Q.      Okay.  He was indicted?

19     A.      Yes, sir.

20     Q.      And in fairness to Mr. McPherson, he

21 denied the allegations, correct?

22     A.      Yes.

23     Q.      And he was subsequently convicted,

24 correct?

25     A.      Yes.

1      Q.      Now, let me ask you a little bit about
2  McPherson, and I want to ask you in the context of
3  this audit.
4        Is it fair to say the allegation against
5  Mr. McPherson that he was stealing drugs and his
6  likely motive was he had a -- did he acknowledge he
7  had a drug problem?
8      A.      He did acknowledge that he had been an
9  addict.
10     Q.      But is it fair to say to this day after
11 Mr. McPherson was indicted, denied the allegations,
12 and convicted, is it fair to say, we don't know to
13 this day exactly what he stole.  What we know is he
14 was convicted, correct?
15     A.      Ms. Jones did provide an audit of her
16 own -- or an inventory of her own that did show losses
17 of certain drugs on the day that -- on May 10, 2018.
18     Q.      That's really not my question.  My
19 question is, as far as the United States -- did you
20 participate in that prosecution?
21     A.      I did.
22     Q.      As far as the United States is concerned,
23 is it fair to say Mr. McPherson was convicted of
24 stealing drugs from her pharmacy, true?
25     A.      Yes.

1    Q.    Is it fair to say we don't know exactly
2 what drugs he stole or the quantity; is that a true
3 statement?

4    A.    The drugs and the quantity that I am aware
5 of are the ones that Ms. Jones provided to me in an
6 audit that she provided that showed a certain amount
7 of drugs and a certain --

8    Q.    Okay.  That's her -- I understand, that's
9 her speculation, correct, or her own investigation?

10   A.    That's an inventory that she said she
11 conducted.

12   Q.    And to make clear, she fully cooperated
13 with that investigation, correct?

14   A.    Yes.

15   Q.    And, in fact, she produced to you -- she
16 pulled videotapes or audiotapes, surveillance tapes,
17 something to that effect; is that true?

18   A.    Yes.

19   Q.    Okay.  And I think those tapes were
20 actually used in the trial of Mr. McPherson, correct?

21   A.    Yes.

22   Q.    But I don't mean to belabor this point,
23 but as far as the United States is concerned, as to
24 the conviction of Mr. McPherson, we don't know exactly
25 the quantity or what type of pills were stolen,

1  correct?

2      A.    And, again, my answer would be that the

3  ones that I am aware of and the quantity is the ones

4  that Ms. Jones provided to me in the inventory.

5      Q.    Now, the -- and in fairness to the other

6  two people mentioned, Ms. Petrey and Mr. Holman; is

7  that his name?

8      A.    Holmes.

9      Q.    Holmes?

10      A.    Yes.

11      Q.    They haven't been charged with any crime,

12  correct?

13      A.    No.

14      Q.    And -- but Ms. Jones, is it fair to say,

15  did express concerns that they may be responsible,

16  correct?

17      A.    She did, yes.

18      Q.    Okay.  And is it fair to say that if you

19  operate a pharmacy in the culture we live in, employee

20  theft is a big issue?

21      A.    I couldn't speculate to operating a

22  pharmacy.

23      Q.    Well, let me talk a little bit about

24  KASPER.  You -- is there any law or regulation that

25  mandates that if you operate a pharmacy, you have to

1  run a KASPER?

2      A.      I believe there is.

3      Q.      That it's mandatory?  On every customer

4  who comes into a pharmacy, is it your testimony you

5  have to run a KASPER?

6      A.      I'm not saying every customer.  I'm not a

7  hundred percent familiar with it, but there is some

8  laws in place in regards to who and when you have to

9  run a KASPER.  I couldn't, I couldn't sit right here

10 and tell you exactly what it is, but there is

11 something in place about who and when you have to run

12 a KASPER.

13     Q.      Yeah, but my question is, do you have to

14 run it on every single customer who comes in your

15 store?

16     A.      I don't know.

17     Q.      Okay.  Do you know how long it takes to

18 run a KASPER?

19     A.      I don't know.

20     Q.      It takes as long as an hour?

21     A.      I don't know.  We have a different access

22 system than what pharmacies and providers do.

23     Q.      Now, the -- I guess before lunch we were

24 talking about these doctors that were indicted in

25 Tennessee and Georgia, correct?

1      A.      Yes.

2      Q.      Okay.  Is there any way to know if

3  Ms. Jones had any idea of those documents?

4      A.      I'm not sure if she did or not, besides

5  the ones that we had told her about during the

6  interview.

7      Q.      Okay.  I mean, did she indicate to you,

8  Oh, I knew they were indicted, and I kept filling

9  their prescriptions anyway?

10      A.      She did not.  She just indicated that in

11  regards to Dr. Moore and Dr. Gowder, their patients

12  had been transferred to the Murphy, North Carolina,

13  clinic.

14      Q.      When you interviewed Ms. Jones, did she

15  indicate to you that she often purchased drugs from

16  other pharmacies?

17      A.      Which interview are we talking about?

18      MR. PILLERSDORF:  Well, let's -- I think it's

19  the interview on 3-20-2018.

20      A.      Purchased from local pharmacies; is that

21  what you're asking?

22      MR. PILLERSDORF:  Yeah.  That she gets pills

23  from other pharmacies.

24      A.      Yeah.

25      Q.      That there was basically a trading market

1  among the pharmacies; did she tell you that?

2      A.     She did indicate that she had purchased

3  drugs from other pharmacies.

4      Q.     Okay.  And did she indicate to you, in

5  fact, that -- I want to get the exact number here --

6  that she was currently in debt to Smith Drug for

7  $20,000 for some pills she had purchased from them?

8      A.     I believe so.

9      Q.     Okay.  How many pharmacies are there in

10 Williamsburg?

11     A.     I'm not a hundred percent sure.

12     Q.     More than one?

13     A.     Yes.

14         MR. PILLERSDORF:  Okay.  Thank you, sir.

15         THE COURT:  Mr. Smith.

16                 REDIRECT EXAMINATION

17 BY:  MR. SMITH:

18     Q.     A couple points, just starting with the

19 last one.  I think you were just asked some questions

20 about Smith Drug; did I hear that right?

21     A.     Yes, sir.

22     Q.     Is Smith Drug a pharmacy?

23     A.     No.  Smith Drug is a wholesale supplier.

24     Q.     Okay.  So if there's some idea that Smith

25 Drug was the source of some mysterious drugs as

1    another pharmacy, that wouldn't be right?

2        A.      No.

3        Q.      Okay.  Now, you were asked questions about

4    these other doctors we talked about, like

5    Dr. Williams; do you remember that?

6        A.      Yes.

7        Q.      And you were also asked, I think, the

8    other doctor we were talking about in Georgia was

9    Dr. Stokes; is that right?

10       A.      Yes.

11       Q.      And we also talked about Dr. Gowder and

12   Dr. Moore?

13       A.      Yes.

14       Q.      And the question, I think, to you was,

15   Well, is there any indication that she knew about

16   them?  And I just want to make sure that this is

17   clear.  Weren't those the doctors that you told her

18   about during your interview?

19       A.      Yes.

20       Q.      In August 2017?

21       A.      Yes.

22       Q.      So I think the next question in fairness

23   was, Well, did she say oh, yeah, yeah, I knew about

24   them, and I kept filling for them afterwards.  Do you

25   remember that question, that you just got that

question?

A.      Oh, yes.

Q.      Okay.  So one question is we looked at that -- the time of the indictment.  After those doctors are indicted, were there any prescriptions for her to fill?

A.      No.

Q.      Now, indeed with respect to Dr. Gowder and Dr. Moore, remind us again what happened to some of those patients.

A.      Those patients crossed over the border into Murphy, North Carolina, and were being seen by Dr. Brown.

Q.      And so at least with those patients, you did tell her that those patients were coming from the clinic that was suspected of wrongdoing?

A.      Yes.  We notified her that Dr. Moore and Dr. Gowder had actually been arrested by DEA.

Q.      Okay.  And despite telling her that, did she continue filling those prescriptions we saw from that Murphy Clinic after that date?

A.      Yes.

Q.      Including some prescriptions just days after that interview?

A.      Yes.

1          MR. SMITH:  Thank you, Your Honor.

2          THE COURT:  May the witness be finally

3    excused?

4          MR. SMITH:  Your Honor, we're going to

5    actually ask that the rule stay in place with him.  I

6    don't think we're going to recall him, but just to be

7    safe, we ask that he be subject to recall later in the

8    case, please.

9          THE COURT:  Mr. Sizemore, you could be

10   subject to recall later in the trial, so you're free

11   to step down and exit the courtroom at this time.

12   Thank you very much for appearing.

13         THE WITNESS:  Thank you, Your Honor.

14         THE COURT:  Mr. Smith, you can call your next

15   witness.

16         MR. SMITH:  Your Honor, we call Jamie

17   Swartwood.

18         THE COURT:  Jamie Swartwood will be called.

19         [THE WITNESS JAMIE SWARTWOOD WAS SWORN]

20         THE COURT:  Make sure you adjust that

21   microphone down and lean in just a little bit so we

22   can hear you.  Are you comfortable?

23         THE WITNESS:  Yes.

24         THE COURT:  Okay.  Mr. Smith.

25         MR. SMITH:  Thank you, Your Honor.

```
 1                     DIRECT EXAMINATION
 2        BY:  MR. SMITH:
 3        Q.      Good afternoon.  Could you tell us your
 4   name, please.
 5        A.      Jamie Swartwood.
 6        Q.      Could you just spell your last name for
 7   the court reporter.
 8        A.      S-W-A-R-T-W-O-O-D.
 9        Q.      Okay.  And where do you work?
10        A.      I work at DOMEX.  It's a division of DEA.
11        Q.      And can you tell the jury what DOMEX is.
12        A.      Okay.  DOMEX is document and exploitation.
13   They take intelligence products and do analysis on it.
14        Q.      So at DOMEX, do you directly go out and
15   investigate drug crimes in the field firsthand based
16   on your position?
17        A.      My position, no.
18        Q.      Okay.  Instead, are -- is information sent
19   to DOMEX?
20        A.      Yes.
21        Q.      And then, give us an idea what you
22   specifically do for DOMEX.
23        A.      I work as a database administrator.  I get
24   products from our digital evidence lab, and I extract
25   data from those computer server images.  It's all
```

1  IT-based.

2      Q.      You're talking about database and

3  computers and things over my head, but is it safe to

4  say, you work a lot on computers?

5      A.      Yes.

6      Q.      And you deal with electronic evidence and

7  getting a piece of electronic evidence out of bigger

8  databases; is that fair?

9      A.      Yes.

10     Q.      Okay.  Did you help out on a case

11  involving Kim's Hometown Pharmacy in Williamsburg,

12  Kentucky?

13     A.      Yes.

14     Q.      And I should have asked this, but where do

15  you physically work?

16     A.      Merrifield, Virginia.

17     Q.      Now, was computer data sent to DOMEX for

18  you and others at DOMEX to work with from Kim's

19  Hometown Pharmacy?

20     A.      Yes.

21     Q.      And did you work with Diversion

22  Investigator Sizemore on that?

23     A.      Yes.

24     Q.      So is Diversion Investigator Sizemore the

25  guy in Kentucky essentially?

1      A.      Yes.

2      Q.      And you're back in Virginia?

3      A.      Yes.

4      Q.      Now, you talked about database work and

5  your ability to work in databases.  In this case, the

6  Kim's Hometown Pharmacy case, did you look at computer

7  data from the computer program that was at the

8  pharmacy?

9      A.      Yes.

10     Q.      Okay.  And were you able to kind of

11 virtually set that data up?

12     A.      Yes.

13     Q.      And just to explain this to everyone so

14 it's clear.  When you're sitting there in Virginia on

15 a case like this, do you have the pharmacy's actual

16 computer sitting there with you?

17     A.      No.  It's a direct mirror image.

18     Q.      Is the idea you can take the data off of a

19 computer, and then set it up at your office, and then

20 work with it there?

21     A.      Yes.

22     Q.      Now, did you -- from that data, kind of

23 setting up that virtual image, are you able to extract

24 information from that computer system?

25     A.      Yes.

1    Q.    For instance, can you run reports?

2    A.    Yes.

3    Q.    And Excel spreadsheets and things like

4    that?

5    A.    Yes.

6    Q.    Did you do that in this case?

7    A.    Yes.

8         MR. SMITH:  I want to talk about some

9    specific things.  Let's look at first what's been

10   marked as Government Exhibit 52.

11        If we can just show this to the witness,

12   please.

13   Q.    Do you recognize what's on the screen in

14   front of you?

15   A.    Yes.

16   Q.    Okay.  And just very general terms, can

17   you tell everybody what we're looking at.

18   A.    It's a controlled substance report from

19   the software that was on that system.

20   Q.    Who generated this report?

21   A.    I did.

22   Q.    Did you generate this from that data we

23   talked about from Kim's Hometown Pharmacy?

24   A.    Yes.

25   Q.    Now, when you're generating this report,

1  do you go in and alter or change the data?

2      A.      No.

3      Q.      You type in your own stuff whenever you

4  feel like it?

5      A.      No.

6      Q.      Okay.  Is this just meant to be a

7  reproduction of the stuff you found on the computer?

8      A.      Right.

9      Q.      Okay.  Put a different way, is this kind

10 of more a sophisticated way of just pressing a print

11 button?

12     A.      Yes.

13     Q.      Okay.  And is that essentially all you did

14 with this?

15     A.      Yes.

16         MR. SMITH:  Your Honor, we move to admit

17 Exhibit 52.

18         THE COURT:  Any objection?  Without

19 objection, that will be a government exhibit.  You may

20 publish it.

21         MR. SMITH:  If we can show that to the jury.

22     Q.      Now, this is a bit of an eyesore, but how

23 long approximately is this spreadsheet?  Is it, like,

24 ten lines or thousands of lines?

25     A.      I would say thousands.

1    Q.    Okay.  And the reason I'm asking is, can

2 you just explain -- it's a quite long report -- can

3 you explain what it is that was extracted; what did

4 you press print on?

5    A.    Okay.  It's a report for patients, the

6 prescribing physician, if they had a controlled

7 substance, this report pulled that, that data from the

8 database, and any of them would come up there.

9    Q.    So is the idea this is a report from the

10 pharmacy's computer system saying this is all the

11 controlled substances that were dispensed by the

12 pharmacy during the date that computer was in service?

13    A.    Yes.

14    Q.    Okay.  And to the best of your knowledge,

15 that captured everything, you didn't edit anything out

16 or remove it?

17    A.    Right.

18    Q.    Okay.  And if we just look at the columns

19 there, for instance, there's a column that says

20 patient.  I don't want to ask you a dumb question, but

21 what does that column show?

22    A.    The patient that got the prescription.

23    Q.    Okay.  There's one that says prescriber;

24 what's that?

25    A.    The prescribing physician.

1      Q.      There's one that says QTYD; what's that?

2      A.      It's the quantity of the drug that was

3  dispensed.

4      Q.      Great.  All right.  Let's move on, if we

5  can, and talk about one other thing.  When you're

6  working with a computer program like the one you were

7  working with this pharmacy, are you also able to look

8  and see what kind of functions that computer can do --

9  or, I mean, I'm sorry, that program can do?

10     A.      Yes.

11     Q.      And so in that case with this computer

12  program, is one of those functions the ability for the

13  user to input notes?

14     A.      Yes.

15     Q.      And as you understand it looking at it,

16  was the point of those note fields, so the user could

17  type in notes about a patient if they needed to?

18     A.      Yes.

19     Q.      And did you look and see whether notes

20  like that did, in fact, exist in this program?

21     A.      Yes.

22     Q.      And from that data, were you able to

23  conduct searches and pull out notes that hit on

24  certain words?

25     A.      Yes.

1    Q.    And did you do that in this case?

2    A.    Yes.

3          MR. SMITH:  Pull up Exhibit No. 39, and,

4    please, just show this to the witness.

5    Q.    Can you tell us what we're looking at.

6    A.    This is a spreadsheet that pulled notes --

7    a report of notes that hit on the key word "loan."

8    Q.    Now, to be fair, do you have any other

9    independent knowledge about this investigation or why

10   somebody was looking for the word loan?

11   A.    No.

12   Q.    Did you essentially just run the search as

13   you were asked, right?

14   A.    As I was asked, right.

15   Q.    Great.  And is this the results that came

16   back when those notes were searched for the word loan?

17   A.    Yes.

18   Q.    And, again, did you, yourself do anything

19   to this data?

20   A.    No.

21   Q.    Did you manipulate it or change any of the

22   words?

23   A.    No.

24   Q.    To the best of your knowledge, does this

25   accurately reflect what was in the system that you

1  could pull up?

2      A.      Yes.

3          MR. SMITH:  Okay.  Your Honor, we move to

4  admit Exhibit 39.

5          THE COURT:  Any objection?

6          MR. PILLERSDORF:  (Nod negatively).

7          THE COURT:  Without objection, that, too,

8  will be a government exhibit.  You may publish it.

9          MR. SMITH:  If we could show it to the jury,

10  please.

11      Q.      Now, if we look at -- there's a field

12  there called note text.  I think that's somewhat

13  self-explanatory, but can you just explain that to the

14  jury what that field shows.

15      A.      That would have been the text that would

16  have been the note field in the software, that was

17  input into the software.

18      Q.      So if somebody typed a note into the

19  computer, the idea is that column in that spreadsheet

20  now contains that text from ...

21      A.      Yes.

22      Q.      Okay.  One other thing, just to make sure

23  we understand.  Do you see there's tabs in the

24  spreadsheet at the bottom there?

25      A.      Yes.

1    Q.      And the first tab is called patient note.
2  What's the other one called?

3    A.      RX note.

4    Q.      Do you have an understanding based on
5  working with the system a little bit as to what the
6  difference between those two were?

7    A.      The patient note was based off of the
8  patient itself.  There was notes added to the patient
9  record as a patient in that software.  RX note was
10 notes added to specify prescription.

11   Q.      So there might be a note on a specific
12 prescription that existed, but if there wasn't a note,
13 maybe because there was no prescription, that would be
14 in the patient note field, that first half?

15   A.      Yes.

16          MR. SMITH:  Your Honor, that's all the
17 questions.  Thank you very much.

18          THE COURT:  Thank you.

19          MR. PILLERSDORF:  No questions.

20          THE COURT:  May the witness be finally
21 excused?

22          MR. SMITH:  Yes, Your Honor.  Thank you.

23          MR. PILLERSDORF:  Yes.

24          THE COURT:  You can be finally excused from
25 any further testimony at this trial.  Thank you very

1   much for appearing.

2         And, Mr. Smith, you can call your next

3   witness.

4         MR. SMITH:  Your Honor, I'm going to butcher

5   this name, but the government calls Manar

6   Jean-Jacques.

7         THE COURT:  Mr. Jean Jacques will be called.

8         [THE WITNESS MANAR JEAN-JACQUES WAS SWORN]

9         THE COURT:  Pull that microphone right up.

10  That chair's not going to move, but the microphone

11  does, so -- there you go.

12        THE WITNESS:  Okay.

13        THE COURT:  Are you comfortable?

14        THE WITNESS:  Yes.

15        THE COURT:  Mr. Smith.

16        MR. SMITH:  Thank you, Your Honor.

17                   DIRECT EXAMINATION

18     BY:  MR. SMITH:

19     Q.    Good afternoon.  Can you tell us your

20  name, please.

21     A.    Manar Jean-Jacques.

22     Q.    Where do you work?

23     A.    I work in Merrifield at the DOMEX office.

24     Q.    Is DOMEX part of DEA?

25     A.    Yes, it is.

1      Q.      And what's your job title there?

2      A.      Senior investigative analyst.

3      Q.      And in your own words, can you just tell

4  the jury what DOMEX is.

5      A.      At DOMEX, we take evidence that is seized

6  by the DEA, and we put it into a workable format.

7      Q.      And does DOMEX do analysis and review of

8  that evidence?

9      A.      Yes.

10     Q.      Do you do a lot on computers and

11 spreadsheets, that kind of thing?

12     A.      Yes.

13     Q.      At some point, were you asked to work on

14 an investigation of Kim's Hometown Pharmacy in

15 Williamsburg, Kentucky?

16     A.      Yes.

17     Q.      Did some of that work involve creating

18 summary work of prescriptions seized from the

19 pharmacy?

20     A.      Yes.

21     Q.      So let's talk about just kind of

22 mechanically how that happened.  Did you receive a

23 shipment of -- or DOMEX receive prescriptions from

24 Kentucky that were seized?

25     A.      Yes.

1    Q.    Okay.  And then were those in electronic

2 formats scanned in and put in electronic format?

3    A.    Correct, yes.

4    Q.    And then using those scanned versions, did

5 you and others at DOMEX do something with it?

6    A.    Yes.  We entered all the information on

7 the prescriptions into an Excel spreadsheet.

8    Q.    And we'll take a look at that in a moment,

9 but can you just give the jury a sense of why you

10 would go to the trouble of doing that?

11    A.    Basically instead of having piles of

12 prescriptions on a desk, putting everything into an

13 Excel sheet, puts everything into one place where you

14 can see all the information together.

15        MR. SMITH:  Let's look at, just for the

16 witness, please, Government's Exhibit 32.

17    Q.    Do you recognize Exhibit 32?

18    A.    Yes.

19    Q.    Can you tell us just in general terms what

20 that is.

21    A.    It is a list of all the information we

22 found on the prescriptions to include patients' names,

23 doctors' names, and the drugs that were prescribed and

24 the quantity, et cetera.

25    Q.    Now, the information that's entered into

1 this field, where did you get that?

2      A.      Off of the prescriptions we received in

3 file format.

4      Q.      So is the idea you looked at the front of

5 the prescription and the back of the prescription and

6 put that in a spreadsheet?

7      A.      Yes.

8      Q.      Did you independently type in information

9 or change anything on those prescriptions?

10      A.      No.

11      Q.      With the idea of, you meant to replicate

12 in summary form what would just be spread out in a

13 bunch of pieces of paper otherwise?

14      A.      Yes.

15      Q.      Okay.  Does this Exhibit 32 fairly and

16 accurately -- it's an electronic file copy; is that a

17 fair copy of what you produced?

18      A.      Yes.

19           MR SMITH:  Your Honor, we'd move to admit

20 Exhibit 32.

21           THE COURT:  Any objection?

22           MR. PILLERSDORF:  No.

23           THE COURT:  Without objection, that will be a

24 government exhibit, and you may publish it.

25      Q.      Now, we're going to reference back to this

1  bigger spreadsheet, but is this spreadsheet quite

2  long?

3       A.      It is.

4       Q.      Does it have many, many prescriptions

5  entered into it?

6       A.      Yes, thousands.

7       Q.      Okay.  So from this larger spreadsheet --

8  I guess I should ask one more question.  Are all the

9  controlled substances from the pharmacy entered into

10 the spreadsheet?

11      A.      It is a list of the controlled Schedule

12 IIs.

13      Q.      Okay.  And is it in state or out of state?

14      A.      Out of state.

15      Q.      So is this a summary of all of the

16 out-of-state Schedule II controlled substances?

17      A.      Yes, correct.

18      Q.      From this broader summary, did DOMEX work

19 to create shorter summaries?

20      A.      Yes.

21      Q.      And let's take a look at some of those.

22 First, were you given a list of 14 patients to run

23 summaries for?

24      A.      Yes.

25              MR. SMITH:  Okay.  Let's bring up -- this is

1  Exhibit 33A through N, so let's start with 33A,

2  Rhonda.  And if we can show this just to the witness.

3      Q.      Okay.  What is 33A?

4          MR. SMITH:  And, Rhonda, if you can kind of

5  page through it, so she can see it.

6      A.      It is a list of out-of-state controlled

7  Schedule II prescriptions that were filled by Curtis

8  Croley.

9      Q.      Now, did you do this same the for the

10  following patients, Curtis Croley?

11      A.      Yes.

12      Q.      Kenneth Hicks?

13      A.      Yes.

14      Q.      Melvin Jones?

15      A.      Yes.

16      Q.      Leslie Meadows?

17      A.      Yes.

18      Q.      Terri Moore?

19      A.      Yes.

20      Q.      Freda Tankerlsey?

21      A.      Yes.

22      Q.      Lena Vanover?

23      A.      Yes.

24      Q.      Byron Woolum?

25      A.      Yes.

1    Q.      Don Woolum?

2    A.      Yes.

3    Q.      Donald Woolum?

4    A.      Yes.

5    Q.      Diana Woolum?

6    A.      Yes.

7    Q.      Charles Swanson?

8    A.      Yes.

9    Q.      Daniel Arthur?

10   A.      Yes.

11   Q.      And Logan Tankersley?

12   A.      Yes.

13   Q.      So have you reviewed what has been marked

14   as Exhibits 33A through 33N previously?

15   A.      I have.

16   Q.      Are each of those fair copies of the work

17   you did?

18   A.      Yes.

19   Q.      Did you do anything to alter or change

20   those?

21   A.      No.

22          MR. SMITH:  Your Honor, just for the sake of

23   time, I'd ask to move all those in together, unless

24   defense counsel has objection.

25          THE COURT:  Any objection?

1          MR. PILLERSDORF:  No, no.

2          THE COURT:  Without objection, those, too,

3    will be government exhibits.  You may publish them as

4    you choose.

5          Q.     Okay.  And so if we just look at that

6    first one, that Curtis Croley, just to get a sense of

7    what we're looking at this page here.  There's a field

8    that says Dr. Name; what does that show?

9          A.     The name of the prescribing physician.

10         Q.     Start out with an easy question.  What is

11   the date written and date field show?

12         A.     The date written is the date on the

13   prescription received from the doctor.  The date

14   filled is the date it was filled at the pharmacy.

15         Q.     Okay.  And those are, I notice, oftentimes

16   different dates.  Do you know why if a customer gets a

17   prescription on Monday, and they fill it on Tuesday,

18   would the dates be different?

19         A.     Yes.

20         Q.     And so is the date filled the date that

21   the prescription -- on the back of the prescription

22   that's listed by the pharmacy?

23         A.     Yes.

24         Q.     In fact, did you see labels printed out

25   and put on each of those prescriptions?

1       A.      Yes, uh-huh (affirmatively).

2       Q.      And then there's a Dr. Name and Dr. State;

3  where is that taken from?

4       A.      The prescription.

5       Q.      And so if you'll just scroll through here

6  with Mr. Croley, and it starts -- just go to 2012.  We

7  see a long list of the doctor, and -- I'm sorry,

8  doctors in Atlanta, Georgia, for instance.  Do you

9  take that from a series of prescriptions that said

10  Atlanta on the front?

11      A.      Yes.

12      Q.      And then a series of prescriptions of

13  Dr. Stokes in Roswell, Georgia?

14      A.      Yes.

15      Q.      Keep going.  And then after Dr. Stokes, we

16  go to another doctor in Georgia?

17      A.      Yes.

18      Q.      The idea here is this is just a listing

19  out of all those paper prescriptions, it's just in an

20  easier format to review?

21      A.      Right.

22      Q.      All right.  Let's move to another topic,

23  which is, did you also do summaries for certain things

24  that stood out from an investigative standpoint?

25      A.      Yes.

1      Q.      And specifically, did you look and run any
2  reports for patients that appeared to travel together
3  or around the same times?
4      A.      Yes.
5      Q.      Okay.  Let's look at how you did that.
6          MR SMITH:  If we look at Exhibit 34, please,
7  and let's pull up 34A first, just for the witness.
8      Q.      Now, again, tell us what's in front of you
9  right there.
10     A.      I've identified customers living on
11 Mustang Road, and they received prescriptions on the
12 same day from doctors that were out of state.
13     Q.      Now, to be fair, do you know anything else
14 about the other investigation as to who any of these
15 patients are?
16     A.      No.
17     Q.      Do you have any idea where Mustang Road
18 is?
19     A.      No.
20     Q.      Were you just looking at the data itself?
21     A.      Yes.
22     Q.      Now, with respect to 34A, is that data
23 taken from that bigger, longer spreadsheet we talked
24 about in Exhibit 32?
25     A.      Yes.

1    Q.     And the idea was you just pulled out

2  certain data, and this one is about customers that all

3  lived on the same street?

4    A.     Right.

5    Q.     Did you try to replicate everything fairly

6  and accurately to the best of your ability?

7    A.     Yes.

8        MR. SMITH:  We move to admit Exhibit 34A,

9  Your Honor.

10        THE COURT:  Any objection?  Without

11  objection, that, too, will be a government exhibit,

12  and you may publish it.

13        MR. SMITH:  What I'd like to do now -- can

14  you show it to this jury, please.

15    Q.     Just walk us through a little bit about

16  what your analysis showed with respect to Mustang

17  Road.

18    A.     For example, on January 6, there are three

19  different customers on Mustang Road who received

20  oxycodone prescriptions from doctors in Florida.

21        The next month, there are the same three

22  customers living on Mustang Road that received

23  oxycodone prescriptions from doctors in Georgia.

24        A few months later, there are two customers

25  living on Mustang Road that received oxy prescription

1  from doctors in Florida.

2        MR. SMITH:  Could we just scroll through this

3  a bit, Rhonda.

4     Q.    Did you see that pattern continue as you

5  looked through this data?

6     A.    Yes.

7     Q.    Did there a appear to be groups based on

8  the data that were filling prescriptions in the same

9  out-of-state locations or similar out-of-state

10 locations around the same time?

11    A.    Yes.

12    Q.    And they were all coming back to fill at

13 Kim's Hometown Pharmacy?

14    A.    Yes.

15    Q.    And they all appeared to have lived on

16 this Mustang Road?

17    A.    Yes.

18    Q.    And based on your review of the data, was

19 this just, like, a one or two time thing?

20    A.    No, it's a period of a few years.

21    Q.    Is that virtually month after month for

22 those several years?

23    A.    Yes.

24        MR. SMITH:  Let's look at Exhibit 34B,

25 please.   And just show that to the witness.   Thank

1  you.

2      Q.      Can you please tell us what 34B is.

3      A.      It is -- I've identified prescriptions

4  received by Terri Moore and Lena Vanover on the same

5  day from the same doctor out of state over a period of

6  time.

7      Q.      And, again, is this created from that

8  larger summary that we talked about as Exhibit 32?

9      A.      Yes.

10     Q.      Did you do your best to accurately depict

11 the data from that broader data set?

12     A.      Yes.

13     Q.      Now, I notice there's a couple of notes

14 written on the right-hand side.  Was that just a

15 helpful aid from what you thought appropriate?

16     A.      Yes.

17     Q.      But those notes on the side, to be fair,

18 were not written on the prescription?

19     A.      Right.

20     Q.      In your view, is that just to make sure it

21 was more accurate, more easy to understand?

22     A.      Yes.

23         MR. SMITH:  I move to admit Exhibit 34B.

24         THE COURT:  Any objection?

25         MR. PILLERSDORF:  No.

1          THE COURT:  Without objection, that, too,

2  will be a government exhibit, and you may publish it.

3      Q.      Similar to the last question we just

4  talked about, if we can show that to the jury, can you

5  just walk through what your analysis showed for this

6  group of patients?

7      A.      It shows Terri Moore and Lena Vanover

8  receiving oxy prescriptions on the same day from Drs.

9  Gary Moore and Timothy Gowder in Tennessee.

10     Q.      And if we move forward, does that trend

11 continue?

12     A.      Yes.

13     Q.      Based on this review of the data, do you

14 frequently see it as these two individuals getting

15 fairly nearly the same prescriptions on the same day?

16     A.      Yes.

17     Q.      From the same doctors?

18     A.      Yes.

19     Q.      And they were refilled at the pharmacy?

20     A.      Yes.

21     Q.      Now, there's an RX number there in the

22 middle; why did you include those?

23     A.      Because the RX number is generated at a

24 pharmacy, like, it comes out sequential.  So when you

25 see two RX numbers that are close in number, that

1  means they were filled about the same time of the day.

2      Q.      And it might be one or two or even ten off

3  because there may be some other prescriptions at the

4  same time.  But is that something you take note of

5  when they're within a hundred or so?

6      A.      Yes.

7          MR. SMITH:  Okay.  Let's look at Exhibit 34C,

8  just for the witness, please.

9      Q.      What is Exhibit 34C?

10     A.      This displays prescriptions received by

11 Curtis Croley and either one or more of the Woolums,

12 again, receiving them -- receiving prescriptions from

13 out-of-state doctors on the same day.

14     Q.      The same questions I asked you about.  Did

15 you try to fairly and accurately capture the data from

16 that broader data set?

17     A.      Yes.

18         MR. SMITH:  Your Honor, we move to admit

19 Exhibit 34C.

20         THE COURT:  Any objection?  Without

21 objection, that, too, is a government exhibit, and you

22 may publish it.

23     Q.      Similarly, like we talked about with the

24 other evidence, can you tell the jury what you noticed

25 in this data set.

1     A.      I noticed a trend over a long period of

2  time of Curtis Croley and one or more of the Woolums

3  traveling out of state to receive prescriptions on the

4  same days from the same doctor.

5          MR. SMITH:  Scroll through.

6     Q.      If you look at the doctors on the

7  right-hand side of this data, even if the patients

8  don't fill on exactly the same dates, does there seem

9  to be a trend where they're kind of consistently

10  moving from one doctor to another?

11     A.      Yes.

12     Q.      So you can see at the bottom here, they

13  were at Dr. Stokes' for several months?

14          MR. SMITH:  In that next page, Rhonda.

15     Q.      And then where do they move from there?

16     A.      Yeah, then they go to Florida for a period

17  of time, and then back to Georgia.

18     Q.      Does that continue on?

19     A.      Yes.

20     Q.      Now, if you scroll back up, I notice that

21  there are a couple of prescription numbers in red

22  there.

23     A.      Uh-huh (affirmatively).

24     Q.      What were you showing us there?

25     A.      That the prescriptions were filled at the

1  same time of day at the pharmacy because the RX

2  numbers are very close together.  So even though they

3  received prescriptions from two different states, they

4  still filled them at the same time at the pharmacy.

5       Q.     And, again, like I've asked you before,

6  was this just, like, a one month or two month thing

7  that you saw on the data?

8       A.     No.

9       Q.     Was it just one individual?

10      A.     No.

11             MR. SMITH:  Let's next look at Exhibit 34D.

12  And just for the witness, please.

13      Q.     Can you tell the jury what 34D is.

14      A.     It is a list of prescriptions that I've

15  identified as it's Logan Tankersley's prescriptions.

16  And when he traveled out of state to receive

17  prescriptions, these are people who also received

18  prescriptions from the same out-of-state doctor on the

19  same days.

20      Q.     And generally speaking, were you looking

21  at one patient, then seeing on those days, did other

22  people from Kentucky also fill either at that doctor

23  or in the same area?

24      A.     Yes.

25      Q.     Okay.  And based on your analysis, were

1  you able to pull data showing that that happened?

2       A.      Yes.

3       Q.      Is that what Exhibit 34D is?

4       A.      Yes.

5       Q.      Did you try to be accurate with that data?

6       A.      Yes.

7            MR. SMITH:  We move to admit Exhibit 34D.

8            THE COURT:  Any objection?

9            MR. PILLERSDORF:  No.

10           THE COURT:  Without objection, that, too, is

11  a government exhibit, and you may publish it.

12           MR. SMITH:  If we can publish this to the

13  jury.

14      Q.      If you can just walk us through, and

15  again, the progression we see here, do you see the

16  doctor location on the left is FL, Florida?

17      A.      Yes.

18      Q.      And so we have Mr. Tankersley there kind

19  of in the middle.  And just explain to us what it is

20  we're looking at.

21      A.      So in every subject, that's kind of

22  highlighted in a different color, you'll see Logan

23  Tankersley's name, and the other names in that

24  grouping also received prescriptions from the same

25  doctor in Florida, for example, on the same day.  And

1 you'll see, like, the similar names continue to appear

2 around Logan Tankersley's prescriptions.

3          MR. SMITH:  Okay.  Go to the next page.

4    A.     And then --

5    Q.     Florida, tell us what you see.

6    A.     I see the same group of names start moving

7 to visiting the same doctor in Georgia.

8    Q.     Now, do you see a lot of the same names we

9 saw on that first Exhibit 34A, the Mustang Road

10 customers?

11   A.     Yes.

12   Q.     But is this broader than that?

13   A.     Yes, it is.

14   Q.     And is what you were looking for with

15 Mr. Tankersley, just looking -- when he was filling

16 prescriptions, did he seem to be alone very often?

17   A.     No.

18   Q.     And did there seem to be some pattern that

19 you saw from the data as time moved on of groups kind

20 of moving from location to location?

21   A.     Yes.

22          MR. SMITH:  Finally, let's take a look at

23 34E.  And just for the witness, please.

24   Q.     What is Exhibit 34E?

25   A.     I've identified here prescriptions for

1 Charles Swanson and Daniel Arthur.  They received

2 prescriptions on or about the same day from the same

3 clinic over a period of time.

4     Q.    Now, I should have asked you this at the

5 outset, I think I kind of did, but just to be clear,

6 do you know independently to your knowledge, anything

7 about Charles Swanson or Daniel Arthur?

8     A.    No.

9     Q.    Were you asked to look at certain things

10 just to see if certain patterns emerged from the data?

11     A.    Yes.

12     Q.    And that's all you did?

13     A.    Correct.

14     Q.    Okay.  With this Exhibit 34E, did you try

15 to accurately capture the data from that broader

16 summary?

17     A.    Yes.

18     MR. SMITH:  Your Honor, we move to admit

19 Exhibit 34E.

20     THE COURT:  Any objection?  Without

21 objection, that, too, is a government exhibit.  You

22 may publish it.

23     MR. SMITH:  And if the jury can take a look

24 at this.  You can scroll down.

25     Q.    Just to be clear, as we look at this, did

1   you see Mr. Arthur or Mr. Swanson's prescriptions from

2   a provider in Tennessee?

3      A.    Yes.

4      Q.    And at some point, did those switch to a

5   different location?

6      A.    Yes.

7      Q.    And were -- did they fill their

8   prescriptions on the exact same day every time?

9      A.    No.

10      Q.    Did you notice a group of data where it

11   seems like it was pretty regular?

12      A.    Yes.

13      Q.    And is that what you tried to show with

14   this exhibit?

15      A.    Yes.

16      MR. SMITH:  Okay.  Let's turn to one more set

17   of exhibits, if we can.  Rhonda, let's bring up 36A

18   just for the witness.

19      Q.    And while we're doing that, I'll ask you a

20   couple of questions.  In addition to looking at

21   specific patients, which is that first group of

22   summaries we looked at, and then certain groups, did

23   you also run summaries from that bigger set of data

24   just focusing either on doctor location or the doctor

25   themselves?

1      A.      Yes.

2      Q.      And, again, is the general idea here,

3  rather than looking through this massive spreadsheet

4  trying to group things together just so it could be

5  seen easier?

6      A.      Yes.

7      Q.      Okay.  Did you do that -- first of all, I

8  guess, let's look at 36A.  What's 36A?

9      A.      This is a list of controlled Schedule II

10  prescriptions all from Florida doctors.

11      Q.      Okay.  And did you capture this from that

12  data that we talked about as Exhibit 32?

13      A.      Yes.

14      Q.      Did you try to be accurate when were you

15  doing that?

16      A.      Yes.

17          MR. SMITH:  Your Honor, can we move in

18  Exhibit 36A, please?

19          THE COURT:  Any objection?  Again, without

20  objection, that will be a government exhibit.  You may

21  publish it.

22          MR. SMITH:  If we could show that to the

23  jury.

24      Q.      So if you look at this, this starts in

25  early 2010; is that correct?

1    A.    Yes.

2    Q.    Let's just walk through what we're looking

3  at.  Can you just explain to the jury the various

4  columns of what they're showing here?

5    A.    Sure.  The RX number's the prescription

6  number on the pharmacy label.  The patient's name, the

7  patient's city and state of residence, the date

8  written for the prescription, the date it was filled

9  at the pharmacy, the pharmacist's initials, the drug

10 that was prescribed, and the dosage and the quantity

11 of drug.  And then the doctor's name, and the doctor's

12 city and state, and also how much was paid at the

13 pharmacy.

14   Q.    Okay.  So if we're looking at this, and

15 we'll just look at the first group, the doctor seems

16 to be in Opa-locka, Florida, and Boca Raton, Florida.

17        Does that show between roughly January 4 and

18 roughly January 5 or 6, that all those patients got

19 prescriptions down in Florida?

20   A.    Yes.

21   Q.    And they all brought those into Kim's

22 Hometown Pharmacy?

23   A.    Yes.

24   Q.    And they all got prescriptions on those

25 dates?

1      A.      Yes.

2      Q.      What were those typically for?

3      A.      Oxycodone.

4      Q.      Were these typically just for, like, ten

5  or 20 oxycodone pills?

6      A.      No, 120, 180, 210 per prescription.

7      Q.      Now, if we go on from there, does this

8  show all of those Schedule II controlled prescriptions

9  that were seized from Florida doctors?

10     A.      Yes.

11     Q.      And I misspoke, but were seized from the

12  pharmacy, but written by Florida doctors?

13     A.      Correct.

14         MR. SMITH:  Let's look at Exhibit 36B, if we

15  can, for the witness.

16     Q.      And what are we looking at as Exhibit 36B?

17     A.      This is a list of all of the controlled

18  Schedule II drugs prescriptions that were written by

19  Dr. George Williams.

20     Q.      And, again, did you just pull that out of

21  that bigger data set?

22     A.      Yes.

23     Q.      Did you try to be accurate when you did

24  that?

25     A.      Yes.

1          MR. SMITH:  Your Honor, we move to admit 36B.

2          THE COURT:  Any objection?

3          MR. PILLERSDORF:  No.

4          THE COURT:  Without objection, that, too,

5   will be a government exhibit, and you may publish it.

6       Q.      And generally speaking, when we're looking

7   at this, does this show on each of the left-hand side

8   each of the customers that was written on the

9   prescription?

10      A.      Yes.

11      Q.      And it's just the list of all the Kim's

12  Hometown Pharmacy customers or patients that filled

13  Dr. George Williams' scripts?

14      A.      Yes.

15      Q.      Okay.  One question I've been meaning to

16  ask.  On the right hand, we typically have cash/cost

17  and insurance/co-pay on the right-hand side of these

18  is summaries; is that right?

19      A.      Yes.

20      Q.      Where did you get that information?

21      A.      Off of the pharmacy label.

22      Q.      Does that generally show how much,

23  according to the pharmacy label at least, was charged

24  for these prescriptions?

25      A.      Yes.  Where that number comes from, I

1  don't know, but that's what was on the pharmacy label.

2      Q.      Fair enough.  Okay.  Let's look at -- did

3  you do a similar kind of analysis for Dr. Gowder and

4  Dr. Moore together?

5      A.      Yes.

6          MR. SMITH:  Can we pull that up.  That's

7  Exhibit 36C just for the witness, please.

8      Q.      What's Exhibit 36C -- oh, I'm sorry.  I

9  had the -- I skipped one.  I apologize.  36C; what is

10 36C?

11     A.      This is a list of controlled Schedule II

12 prescriptions written by Dr. Oscar Stokes.

13     Q.      Okay.  We'll get to the Gowder one in a

14 moment, I apologize.  Getting out of order there.  Is

15 Dr. Stokes another Georgia doctor?

16     A.      Yes.

17     Q.      And just like you did before, did you pull

18 out just the prescriptions from that doctor?

19     A.      Yes.

20     Q.      Do you try to do that accurately?

21     A.      Yes.

22          MR. SMITH:  Your Honor, I move to admit

23 Exhibit 36C.

24          THE COURT:  Any objection?  Again, without

25 objection, it will be admitted as a government

1  exhibit, and you may publish it.

2      Q.      Let me show that to the jury.  Again, does

3  this show the same information?  I don't want to

4  belabor it, but just give the jury a sense of what's

5  in there.

6      A.      Yes.

7      Q.      Now, as I asked you a moment ago, did you

8  also do a similar summary for Dr. Gowder and Dr. Moore

9  of Tennessee?

10     A.      Yes.

11             MR. SMITH:  Can we pull up Exhibit 36D.

12     Q.      And what is 36D?

13     A.      It's a list of the prescriptions written

14 by Dr. Timothy Gowder and Dr. Gary Moore.

15     Q.      And this is created from that broader

16 summary?

17     A.      Yes.

18     Q.      Did you try to be accurate with that?

19     A.      Yes.

20             MR. SMITH:  Move to admit Exhibit 36D, Your

21 Honor.

22             THE COURT:  Any objection?  Okay.  Without

23 objection, that, too, will be a government exhibit,

24 and you may publish it.

25             MR. SMITH:  Thank you.  Let me show that to

the jury.  And if we can go all the way to the bottom

of this exhibit.

Q.      Does this show all the Schedule II

prescriptions from Gowder and Moore?

A.      Yes.

Q.      Okay.  And there's some totals at the

bottom.  Generally speaking, is we put those in each

one of these spreadsheets?

A.      Yes.

Q.      And is the idea you just used the machine

to count up how many entries there were for each

doctor?

A.      Yes.

Q.      So for this one, how many records did you

have of Schedule II controlled prescriptions filled

for Drs. Gowder and Moore?

A.      792 prescriptions.

Q.      How many pills did that add up to, just

Schedule II controlled substances?

A.      75,384.

Q.      Okay.  The last two spreadsheets I wanted

to ask you, did you also then look at a Dr. Brown in

North Carolina?

A.      Yes.

Q.      Did you pull those out as well?

1    A.      Yes.

2    Q.      And actually, did you split those between

3  two different time frames?

4    A.      Yes.

5         MR. SMITH:  So the first one, can we pull out

6  Exhibits 36E, please, and just show this to the

7  witness.

8    Q.      Do you recognize this?

9    A.      Yes.

10    Q.      What is it?

11    A.      It's a list of prescriptions written by

12  Dr. Michael Brown for the first time frame.

13    Q.      And where is Dr. Brown?

14    A.      In North Carolina.

15    Q.      Now, looking at those dates written, do

16  those kind of start after the Gowder's left off your

17  bigger spreadsheet?

18    A.      Uh-huh (affirmatively).

19    Q.      Did you try to be accurate in creating

20  this summary?

21    A.      Yes.

22         MR. SMITH:  Your Honor, we move to admit 36E.

23         THE COURT:  Any objection?

24         MR. SMITH:  And then if you --

25         THE COURT:  Hold on just a minute.  Any

1  objection, counsel?

2  　　　　MR. PILLERSDORF:  I'm sorry, Judge?

3  　　　　THE COURT:  Any objection?

4  　　　　MR. PILLERSDORF:  No, Your Honor.

5  　　　　THE COURT:  Okay.  Without objection, it,

6  too, will be a government exhibit, and you can publish

7  it.

8  　　　　MR. SMITH:  If we can go to the bottom of --

9  one page up.  Sorry.

10 　　Q.　　Now, based on this, when was the kind of

11 the late date you stopped with for this summary?

12 　　A.　　August 15, 2017.

13 　　　　MR. SMITH:  All right.  And if we can bring

14 up 36F, please.

15 　　Q.　　And based upon your involvement in the

16 investigation, are you generally aware that that's

17 roughly the time period when a search warrant was

18 executed at Kim's Hometown Pharmacy?

19 　　A.　　Yes.

20 　　Q.　　I'm sorry.  An audit was conducted of

21 Kim's Hometown Pharmacy in 2017?

22 　　A.　　Yes.

23 　　Q.　　Okay.  So did you then from that date

24 forward then, pull out the data from there through the

25 time of the search warrant?

1      A.      Yes.

2      Q.      Okay.  And can we look at 36F together,

3  and tell us what this is.

4      A.      This is a list of prescriptions that were

5  filled that were written by Dr. Michael Brown after --

6  from August 22, 2017, forward.

7      Q.      Okay.  And that's through the date that

8  the information was obtained, any prescriptions in

9  hand at the time they were seized; is that fair?

10     A.      Yes.

11     Q.      Okay.  Did you try to be accurate in

12  capturing this information?

13     A.      Yes.

14          MR. SMITH:  Your Honor, we move to admit

15  Exhibit 36F, please.

16          THE COURT:  Any objection?

17          MR. PILLERSDORF:  No.

18          THE COURT:  Without objection, that will be a

19  government exhibit, and you may publish it.

20          MR. SMITH:  Your Honor, that is all the

21  questions I have for this witness.  Thank you.

22          THE COURT:  Thank you.  Mr. Pillersdorf?

23          MR. PILLERSDORF:  No questions.

24          THE COURT:  May the witness be finally

25  excused?

1           MR. SMITH:  Yes, Your Honor.

2           THE COURT:  Ma'am, you can be finally excused

3   from any further testimony at this trial.  Thank you

4   very much for appearing.

5           THE WITNESS:  Thank you.

6           THE COURT:  Mr. Smith, you can call your next

7   witness.

8           MR. SMITH:  Your Honor, could we approach on

9   scheduling?

10          THE COURT:  You certainly may.

11          MR. SMITH:  Thanks.

12          [CONFERENCE AT THE BENCH]

13          MR. SMITH:  So I have a longer witness and

14  then a short witness.  Unfortunately, the short

15  witness is going to go last, and I just wanted to see

16  if she's here.  I was thinking -- I just didn't know

17  when you wanted to take a mid-afternoon break, after

18  starting the long witness.

19          THE COURT:  So we haven't gone but an hour

20  and a half yet, so I typically would go another 15 or

21  20 minutes.  But we can take a break now.  It's just

22  up to you.

23          MR. SMITH:  Okay.  Let's do that.  Then we'll

24  finish out through for the rest of the afternoon, if

25  that's okay.

1           THE COURT:  Okay.

2           MR. SMITH:  Thank you, Your Honor.

3           [IN OPEN COURT]

4           THE COURT:  Ladies and gentlemen, let's go

5   ahead and take a break at this time.  And remind you

6   of those instructions that I've given to you

7   previously.  Of course, it's important that you

8   continue to follow those.  We'll take about 15

9   minutes.

10      And at this time, the jury can exit the

11  courtroom.

12          [JURY EXITS COURTROOM]

13          THE COURT:  Okay.  The jury's exited the

14  courtroom.

15          Mr. Smith, do you think you'll get done with

16  your two witnesses this afternoon?

17          MR. SMITH:  I think so; I think we'll be good

18  by 5:00.

19          THE COURT:  Okay.  Well, we'll stand in

20  recess for 15 minutes.

21          [RECESS - 2:51 - 3:09 p.m.]

22          [IN OPEN COURT]

23          THE COURT:  We've reconvened in the presence

24  of the jury.  And, Mr. Smith, you can call your next

25  witness.

1          MR. SMITH:  Thank you, Your Honor.  The
2    United States calls Diana Woolum.
3          THE COURT:  Diana Woolum will be called.
4          [THE WITNESS DIANA WOOLUM WAS SWORN]
5          THE COURT:  Ma'am, pull that microphone right
6    up so that we can hear you.  Thank you.  Are you
7    comfortable?
8          THE WITNESS:  Yes.
9          THE COURT:  Mr. Smith.
10          MR. SMITH:  Thank you, Your Honor.
11                    DIRECT EXAMINATION
12      BY:  MR. SMITH:
13      Q.     Good afternoon.  Could you tell us your
14    name, please.
15      A.     Diana Woolum.
16      Q.     And, Ms. Woolum, what, what town do you
17    live in?  Don't tell us the street, but just tell us
18    what town you live in.
19      A.     Knox.
20      Q.     And is that here in Kentucky?
21      A.     Yes.
22      Q.     Okay.  Ms. Woolum, do you work?
23      A.     No.  I'm retired.
24      Q.     Okay.  What did you used to do?
25      A.     When I retired, I was working as a cashier

1  at Wal-Mart.

2      Q.      Okay.  So this won't be the most fun

3  conversation to have, but I appreciate you bearing

4  with me.  What I want to talk to you about, to start

5  out with is what we called controlled substances.  If

6  I use that word we call, say, drugs or controlled

7  substances, will you know what I'm talking about?

8      A.      Yes.

9      Q.      Do you previously take any controlled

10 substances?  Did you previously take any controlled

11 substances in your life?

12     A.      Yes.

13     Q.      Okay.  What kind?

14     A.      I took oxycodone.

15     Q.      And we're going to get into specifics in a

16 moment, but just to kind of get the jurors an

17 orientation.  At some point in time, did you become

18 addicted to oxycodone?

19     A.      Yes, I did.

20     Q.      Now, sitting here today, have you stopped

21 taking oxycodone?

22     A.      Yes, I have.

23     Q.      Has life been better since you stopped

24 taking it?  Has life been better since you stopped

25 taking oxycodone?

1        A.        Yes.

2        Q.        This microphone's too far away from me.  I

3   apologize.  I'll try to talk into it.  Let's go back

4   to when you first started taking oxycodone, okay?

5        A.        Okay.

6        Q.        Approximately when was that?

7        A.        Around 2011, 2012, somewhere around there.

8        Q.        All right.  And what was going on with

9   your health to start out with that caused you to want

10  to take a painkiller?

11       A.        I was having back problems, I had breast

12  cancer, and when I had it removed, I got nerve damage,

13  and that's really unbearable.

14       Q.        So initially, when you first started

15  taking it, did you feel like you needed pain medicine

16  to help you?

17       A.        Yes, I did.

18       Q.        And did you get some pain medication from

19  your cancer doctor to start out with?

20       A.        Not the cancer doctor, no.

21       Q.        Okay.  How about another doctor here in

22  Kentucky?

23       A.        I got some from my family doctor.

24       Q.        And who is that?

25       A.        Dr. Mohan.

1    Q.    So did Dr. Mohan proscribe you controlled
2  substances for a little while?
3    A.    For a little while.
4    Q.    At some point, did you ask him to give you
5  something stronger?
6    A.    He said -- I asked, but he said that I
7  would need to go to a pain clinic.
8    Q.    And so at a certain point in time, did you
9  start going down to Georgia to get pain medication?
10   A.    Yes.
11   Q.    And I won't ask you to recall to specific
12  dates, but over the course of time after that, after
13  you started going to Georgia, did you start going to
14  multiple clinics; did you go from one clinic to the
15  next?
16   A.    I would go to one until they closed, and
17  then I'd go to another, yeah.
18   Q.    Okay.  And then, if that clinic closed,
19  and you went to another, did you keep seeking out a
20  new pain clinic?
21   A.    Yes.
22   Q.    And tell me about -- how did you find out
23  about where that next pain clinic might be?
24   A.    You would -- you would hear people talk,
25  and they would tell you where the next one was at.

1      Q.      It's a kind of a word-of-mouth thing?

2      A.      Uh-huh (affirmatively).

3      Q.      Now, as time went on, and you were going

4  from clinic to clinic in Georgia -- you strike me as

5  an intelligent person -- did it occur to you why those

6  clinics might be shutting down?

7      A.      Yeah.

8      Q.      Okay.  What was your thought at the time?

9      A.      I knew why they got shut down, you know.

10      Q.      And why was that?

11      A.      They got raided.  And, I mean, you would

12  hear it.  You could see it on the Internet.

13      Q.      Okay.  But did you keep going to the next

14  clinic?

15      A.      Uh-huh (affirmatively).

16      Q.      At a certain point in time, you felt like

17  these clinics were maybe doing something wrong; did it

18  kind of start dawning on you that maybe this thing had

19  gotten out of control?

20      A.      Yeah.

21      Q.      Now, was that a hard thing to stop?

22      A.      Yeah, it was hard.

23      Q.      So for a period of time when you're going

24  from clinic to clinic, did you feel like you were

25  addicted during that time period?

1          MR. PILLERSDORF:  Judge, I object to the

2 leading.

3          THE COURT:  Yes.  I will sustain that.  Just

4 be careful about the leading, counsel.

5          MR. SMITH:  Okay.

6     Q.     I won't repeat it.  Did you feel like you

7 were addicted?

8     A.     Yeah.  But I told myself that I wasn't.

9     Q.     Okay.  Tell me about that.

10     A.     Well, I didn't want to think I was

11 addicted because I had had a brother that was, so I

12 told myself I wasn't.

13     Q.     Did you, did you go see a Dr. Stokes in

14 Georgia?

15     A.     Yeah.  I remember the name, yeah.

16     Q.     Let's put that a different way.  If I ask

17 you right now to tell me every doctor you'd been to in

18 Georgia, could you do that?

19     A.     No.

20     Q.     Okay.  Was there more than one?

21     A.     Yes.

22     Q.     More than five?

23     A.     Yes.

24     Q.     Now, at a certain point in time, did you

25 fill your prescriptions at Kim's Hometown Pharmacy in

1  Williamsburg?

2      A.      Yes.

3      Q.      Do you remember how you found out about

4  that pharmacy?

5      A.      Yes.  My ex-husband told me about the

6  pharmacy 'cause he said that that's where I could get

7  'em filled at.

8      Q.      And what do you mean get them filled at?

9      A.      Well, I didn't -- he said that that's

10 where I could get 'em filled because she would fill

11 from out of state.  That's where I found out about

12 Kim's.

13     Q.      And was getting your prescription filled

14 out of state something that you discussed with people

15 because you couldn't get it filled anywhere else?

16     A.      Well, I hadn't -- when I found out -- I

17 hadn't been anywhere yet when I found out.

18     Q.      Now, when you would go to these

19 out-of-state clinics down in Georgia, would they

20 charge you cash or insurance?

21     A.      Either, but -- yeah, either.

22     Q.      Okay.  So when you had to pay cash, can

23 you give the jurors a sense of how much you would have

24 to pay when you did that?

25     A.      Anywhere from $250 to $350.

1    Q.    Okay.  And when you came back to the

2 clinic, how did you pay?  I mean -- I'm sorry.  When

3 you came back to the pharmacy, how would you pay for

4 your drugs?

5    A.    My, my insurance.

6    Q.    And what was your insurance?

7    A.    Medicaid and Medicare.

8    Q.    So you were on Medicaid?

9    A.    Uh-huh (affirmatively).

10    Q.    Now, when you were on Medicaid, and you

11 said at times you had to pay cash at these

12 out-of-state clinics, did you always have the money

13 yourself to pay for that?

14    A.    Yes.

15    Q.    Did you sometimes borrow money from

16 others?

17    A.    Sometimes.  But when I first started, I

18 was working.

19    Q.    And then as time goes -- went on, did you

20 sometimes have to borrow money?

21    A.    Sometimes, yeah.

22    Q.    And is the money, the cost of going to

23 these clinics one of the things that became tough on

24 you?

25    A.    Yes.

1      Q.      When you went to the pharmacy, to Kim's
2  Hometown Pharmacy, did anyone counsel you about
3  substance abuse addiction?
4      A.      Not that I remember, no.
5      Q.      Do you remember anybody at the pharmacy
6  refusing to fill your prescriptions?
7      A.      No.
8      Q.      A couple of questions about where you were
9  living and these Georgia clinics.  When you first
10 started going down to Georgia, were you still living
11 in Kentucky?
12     A.      Yes.
13     Q.      And we can look at one in a moment, but if
14 I look at those prescriptions, particularly later on,
15 and I see that there's a Georgia address for you on
16 the front, where did that address come from?
17     A.      You said at the beginning?
18         MR. SMITH:  Well, either.  Just tell us what
19 you remember about any of that.
20     A.      At the beginning, I still lived here, so I
21 guess that's where it come from.
22     Q.      Were there certain doctors in Georgia that
23 you needed to get a Georgia ID to be able to see the
24 doctor?
25     A.      Later on, yes.

1    Q.    And did you actually physically move to
2  Georgia for a period of time?
3    A.    Yes.
4    Q.    And was that to be closer to his clinics?
5    A.    Yes.
6    Q.    When you think back on that now, what do
7  you think about that?
8    A.    It was stupid.
9    Q.    Why?
10   A.    I should have never done it.  We, we -- it
11 was too expensive.  We didn't like it there, so we
12 only stayed a little while, and we come back.
13   Q.    Now, I don't know that you would have ever
14 seen it, but on the pharmacy when they filled your
15 prescription on the back, they put a label on there
16 with information, and I don't think you would have
17 seen that because you would have already given them.
18 But I'm just curious, when it said a Georgia address
19 on the front but a Kentucky address on the back, do
20 you have any idea why there would be two different
21 addresses for you?
22   A.    No.
23   Q.    Did you ever try to trick anybody at Kim's
24 Hometown Pharmacy?
25   A.    No.

1    Q.    Did you ever try to lie to them into

2 giving you your prescriptions?

3    A.    No.

4    Q.    Who is Don Woolum?

5    A.    That's my husband.

6    Q.    Who is Donald Woolum?

7    A.    It's my stepson.

8    Q.    And then Byron Woolum?

9    A.    That's my brother-in-law.

10    Q.    And do you know of a Curtis Croley?

11    A.    He's a family friend.

12    Q.    So those people I just listed to you,

13 which is Don, Donald, Byron, Curtis, are all those

14 people you know?

15    A.    Uh-huh (affirmatively).

16    Q.    Do those people live here in Kentucky?

17    A.    Curtis doesn't.

18    Q.    Okay.  Where does Curtis live?

19    A.    He lives in Tennessee.

20    Q.    Do you know whether Curtis was filling his

21 prescriptions in Tennessee or up at -- in Kentucky?

22    A.    I don't know.

23    Q.    Okay.  Do you recall generally seeing some

24 of these people at the same places, at the same

25 out-of-state clinics that you went to on occasion?

1    A.    I never saw Stephen -- or Donald.  I never

2 saw Byron.  I didn't usually see Don, but at the end,

3 at the end of it, we started going to the same place

4 and at the same time.

5    Q.    Now, even if you didn't go on the exact

6 same days, were you kind of generally aware that these

7 other people in your family or people that you knew

8 were also going down to Georgia?

9    A.    I was aware of it, but I never saw 'em.

10    Q.    Now, let's fast-forward to the future.

11 Was there a certain point where you stopped filling at

12 Kim's Hometown Pharmacy?

13    A.    Not until the end.

14    Q.    Well, that's what I mean, is --

15    A.    Yeah.

16    Q.    When was that approximately?

17    A.    Oh.  It's been close to a year ago.

18    Q.    Okay.  And what happened to you after

19 that?

20    A.    I quit going.

21    Q.    Quit going where?

22    A.    To Georgia.

23    Q.    And how's life been from been point

24 forward?

25    A.    It was rough at the beginning, but it's

1  better now.

2      Q.      Okay.  Now, what do you take now if you

3  have any pain?

4      A.      The doctor gives me Neurontin for the

5  nerve pain, a small, you know, a low dosage.  But

6  other than that, I only take something like Tylenol

7  for a headache because I have migraines and things

8  like that.  But other than that, I don't take

9  anything.

10     Q.      And how have you been feeling since you've

11 just been taking Tylenol when needed?

12     A.      Now I feel good.

13         MR. SMITH:  Your Honor, that's all the

14 questions I have.  Thank you.

15         THE COURT:  Mr. Pillersdorf.

16                 CROSS-EXAMINATION

17 BY:  MR. PILLERSDORF:

18     Q.      Ms. Moore, I represent Kim Jones.

19     A.      Uh-huh (affirmatively).

20     Q.      Do you ever -- did you visit her pharmacy?

21     A.      Yes.

22     Q.      Okay.  Do you recognize Ms. Jones today?

23     A.      Yes.

24     Q.      Okay.  Ms. Jones knew your medical

25 history, didn't she?

1       A.      I assume so, yeah.

2       Q.      Okay.  You indicated you had back

3  problems?

4       A.      Uh-huh (affirmatively).

5       Q.      Is that a yes?

6       A.      Yes.  I'm sorry.

7       Q.      Okay.  That's okay.  I understand.  How

8  significant were your back problems?

9       A.      My back problems were really bad.

10       Q.      Were they painful?

11       A.      Yes.

12       Q.      In the average day, did your back bother

13  you for ten seconds, ten minutes, or ten hours, or all

14  day?

15       A.      Usually all day.

16       Q.      Did you ever have a doctor ask you this

17  question:  On a one to ten, how bad's your pain?  Did

18  any of your doctors ever asked you that question?

19       A.      Yes.

20       Q.      What would you be saying back then?

21       A.      Well, it depended on how bad it was

22  hurting that day.

23       Q.      What was it like?  Were there days where

24  it was all tens, or days where it was ones; how would

25  you describe it?

1      A.      There was days when it was maybe seven or

2   eight.  There was days when it was four or five.

3      Q.      Okay.  You also had breast cancer, ma'am?

4      A.      Yes.

5      Q.      Okay.  Did you -- that -- that's a big

6   deal, isn't it?

7      A.      Yes, it is.

8      Q.      How long did you battle breast cancer?

9      A.      I didn't battle breast cancer long.  I had

10  my breast removed, and I have passed the five years,

11  and I'm cancer free now.

12     Q.      Did the breast -- was the breast cancer

13  ordeal you went through, was that painful?

14     A.      Yes.

15     Q.      Okay.  And you indicated -- your voice

16  dropped off a little bit when Mr. Smith was

17  questioning you.  You indicated you had back problems

18  and breast cancer.  Did you indicate you had some

19  other physical problems?

20     A.      I don't understand.

21     Q.      Okay.  Let me rephrase it.  You indicated

22  you had back problems and breast cancer that, I guess,

23  caused you to seek pain medication; is that true?

24     A.      Yes.

25     Q.      Okay.  Did you have some other physical

1  problems?

2      A.      Well, the lower part of my back, I was

3  in -- I was rear-ended in a car accident, and that

4  caused my lower back.  And then when I had the breast

5  cancer, I got nerve damage from that.

6      Q.      Okay.  Was that painful, the lower back

7  pain?

8      A.      Yes.

9      Q.      Was that as bad as the back problems you

10 previously had, or worse?

11     A.      I don't understand.  Because the lower

12 back problems is the pain that I have.

13     Q.      Okay.  I understand.  When you went to

14 these pain clinics, was your goal to get pills that

15 you could sell, or was your goal --

16     A.      Oh, no.  No, no, unh-unh.

17     Q.      Okay.  Was your goal to get some relief?

18     A.      Relief.

19     Q.      Okay.  I noticed you're very candid and

20 honest about telling us about your breast cancer and

21 your back problems.  Ms. Jones knew that, didn't she?

22          MR. SMITH:  Objection.

23     A.      I don't know.

24          THE COURT:  Well, just a moment, ma'am.  Just

25 a moment.  Would you approach.

1      Q.      Did you -- do you recall, you telling
2 Ms. Jones or maybe someone else that -- let me ask
3 you.  When you went to her pharmacy, would Ms. Jones
4 typically wait on you or perhaps Ms. Bingham or one of
5 the other staff; do you remember?
6      A.      There was different ones waited on me.
7      Q.      Okay.  Do you remember whether you were
8 keeping it a secret why you needed these pills, or
9 would you tell people, My back's bad, I'm -- I've got
10 these cancer issues?
11      A.      I don't remember.  I don't remember.
12      Q.      Okay.  Well, what I'm trying to figure
13 out, Ms. Moore -- and you may not remember this --
14 what I'm trying to figure out is, did the people at
15 the Kim's pharmacy, were they aware of the --
16           MR. SMITH:  Objection.
17           THE COURT:  Would you approach.
18           MR. PILLERSDORF:  Okay.
19           [CONFERENCE AT THE BENCH]
20           THE COURT:  State your objection.
21           MR. SMITH:  It's a foundational objection.
22 This witness can't talk about what Kim Jones knew, and
23 the previous question in this one was asking other
24 people at the pharmacy were aware of something.  She
25 can't talk about what other people were aware of.

1          MR. PILLERSDORF:  Well, if she knows.

2          MR. SMITH:  How can one human being know what

3     another human's aware of?

4          MR. PILLERSDORF:  I could -- I'll rephrase

5     it.  It could be causally related.

6          THE COURT:  I think it's fair.  I mean,

7     you're not asking her to read their minds.  This is

8     based on conversations, and you need to lay the

9     foundation for that.

10         MR. PILLERSDORF:  Yeah.

11         [IN OPEN COURT]

12         THE COURT:  You can continue,

13    Mr. Pillersdorf.

14         Q.    Ma'am, at some point, if you know, did you

15    tell Ms. Jones the name of your -- the doctor who was

16    treating you for your conditions back then, or anyone

17    at the pharmacy?

18         A.    Well, she filled my medication, so I

19    assume she knew my doctor's name.  I don't remember

20    tellin' her.

21         Q.    Do you know, if you know, do you know

22    whether or not the -- Ms. Jones or someone at the

23    clinic actually called Dr., is it Mohan?  I'm having

24    trouble with his name.

25         A.    Mohan.

1    Q.    Mohan.  Do you know if someone actually at
2  the clinic affirmatively called Dr. Mohan to, I guess
3  inquire about your health condition; do you know if
4  that happened or not?

5    A.    No, I don't know.

6    Q.    Let me ask you, ma'am, were you keeping it
7  a secret that you had these health problems, or would
8  you likely have told the people at the clinic, I've
9  got terrible back pain; would you have told them that?

10   A.    Yes, I would have told them.

11   Q.    Okay.  Thank you, ma'am.  I'm sorry, one
12  follow-up.

13         THE COURT:  Sure.

14   Q.    This may be obvious.  When you told them
15  that, was that true?

16   A.    Yes, it was true.

17         MR. PILLERSDORF:  Thank you, ma'am.

18         THE COURT:  Mr. Smith.

19                   REDIRECT EXAMINATION

20  BY:  MR. SMITH:

21   Q.    Ms. Woolum, we talked a lot about this
22  pain, and I think you and I've discussed that a moment
23  ago about.  Was the back pain from a car accident?

24   A.    Yes.  The lower back pain was from the car
25  accident.

1    Q.    Okay.  And then you had the issues with
2  your cancer, correct?
3    A.    Uh-huh (affirmatively).  Yes.
4    Q.    Okay.  Remind me, when did all of that
5  happen?
6    A.    The car accident was in 2000, and the
7  other was -- the cancer was in, I think, 2011.
8    Q.    And remind me, how long did you continue
9  filling prescriptions at Kim's Hometown Pharmacy; when
10 was the last time?
11   A.    Was in 2017, I think, '16.
12   Q.    Did you tell us it was last year?
13   A.    About a year ago, somewhere around a year
14 ago.  I can't remember the exact date.
15   Q.    But it was many years after your car
16 accident is all I'm asking?
17   A.    Yes.
18   Q.    And you told us that once you stopped
19 taking the medication, all this pain you had described
20 earlier on, you say you no longer have?
21   A.    Oh, I still have it.
22   Q.    But you have a way of dealing with it
23 without oxycodone?
24   A.    Yes, I do.
25   Q.    And you feel better now?

1    A.     Yes.  I feel a lot better.

2         MR. SMITH:  Thank you, Your Honor.

3         THE COURT:  May the witness be finally

4    excused?

5         MR. SMITH:  Yes, Your Honor.

6         THE COURT:  Ma'am, you're finally excused

7    from any further testimony at this trial.  Thank you

8    very much for appearing.

9         THE WITNESS:  Thank you.

10        THE COURT:  You can step down.  And,

11   Mr. Smith, you can call your next witness.

12        MR. SMITH:  Your Honor, the United States

13   calls Taylor Carr.

14        THE COURT:  Mr. Taylor Carr.

15        [THE WITNESS TAYLOR CARR WAS SWORN]

16        THE COURT:  Are you comfortable, sir?

17        THE WITNESS:  Yes, just nervous.

18        THE COURT:  It's okay, it's okay to be

19   nervous.  Mr. Smith.

20        MR. SMITH:  Thank you, Your Honor.

21                 DIRECT EXAMINATION

22   BY:  MR. SMITH:

23   Q.    Could you please tell us your name.

24   A.     Taylor Carr.

25   Q.    Mr. Carr, where are you from?

```
 1        A.      I'm from Williamsburg.

 2        Q.      Just to be clear, is that Williamsburg,

 3   Kentucky?

 4        A.      Yes, sir.

 5        Q.      Okay.  What do you do now?

 6        A.      I'm a pharmacy student at the University

 7   of Kentucky.

 8        Q.      What year are you in at pharmacy school?

 9        A.      This is my first year.

10        Q.      Did you previously work at a place called

11   Kim's Hometown Pharmacy?

12        A.      Yes, sir.

13        Q.      And what did you do at Kim's Hometown

14   Pharmacy?

15        A.      I was a technician.

16        Q.      What years did you work at Kim's Hometown

17   Pharmacy?

18        A.      I started in 2016, and then I left in

19   2018.

20        Q.      Who is the owner of that pharmacy?

21        A.      It was Kim Jones.

22        Q.      Who did you report to as being in charge

23   at the pharmacy?

24        A.      Kim Jones.

25        Q.      Let's talk about a couple things.  First
```

1  is, how did you end up getting a job at Kim's Hometown

2  Pharmacy?

3      A.     I knew I wanted to go into pharmacy

4  school, and so I was looking around Williamsburg for a

5  job, and I stopped in and asked Kim if they were

6  hiring, and she said that we would give it a try.

7      Q.     And were you thinking about pharmacy

8  school at that point in time?

9      A.     Yes, sir.

10      Q.     And so how did that relate to you looking

11  for work?

12      A.     Because I had heard from previous people

13  that had went to pharmacy school that, like,

14  experience was valued if you had worked in a pharmacy.

15      Q.     Were you hoping that you could get some

16  experience, and that might help you get into pharmacy

17  school?

18      A.     Yes, sir, yeah.

19      Q.     So let's now focus on just in general

20  stuff when you worked in the pharmacy, okay?  As a

21  pharmacy tech, what was your role in filling

22  prescriptions at the pharmacy?  Tell us how that

23  worked.

24      A.     So just in general, someone would bring a

25  prescription to the pharmacy, or it would be sent

1  electronically, and the technician, me, would type it

2  into the system, and then go get the medicine and

3  count it, bottle it, and then set it up for the

4  pharmacist to look at.

5      Q.      Ultimately, did you, as a tech, have the

6  authority to dispense a controlled substance or any

7  medicine just completely on your own?

8      A.      No.

9      Q.      Okay.  What did you have to do?

10      A.      The pharmacist that was working had to

11  look at it before it was dispensed to the patient.

12      Q.      When you started working at Kim's Hometown

13  Pharmacy, did you receive any formal training on

14  controlled substances?

15      A.      Not that I remember.

16      Q.      Did you receive any formal training on how

17  to bill or back out bills from the pharmacy computer

18  system?

19      A.      Not that I remember.

20      Q.      Did anybody at the pharmacy ever talk to

21  you about the dangers of controlled substances?

22      A.      I don't remember that, no.

23      Q.      Now, just asking you this as kind of a

24  human being who worked and lived in that area during

25  that time period, I'm not asking you to give me an

expert opinion here, or anything like that.  But just as a human being was working at a pharmacy, were you generally aware that controlled substances were abused sometimes by people?

A.     Yes, sir.

Q.     Were you aware that they're addictive?

A.     Yes, sir.

Q.     Were you aware that people sometimes try to get controlled substances from pharmacies because of that?

A.     Yes, sir.

Q.     Had you gone to pharmacy school yet?

A.     No, sir.  I was still in undergraduate at the University of the Cumberlands.

Q.     Okay.  And, again, not asking for a broader opinion, but just in your personal experience. You're now in pharmacy school, and you've completed how much?

A.     I'm in the middle of my second sem -- well, the second semester just started.

Q.     So all this stuff about controlled substances I just asked you, do you feel like you have a better understanding now that you've started pharmacy school?

A.     Yes, sir.  We had a law course the first

1 semester.

2     Q.     Let's talk about controlled substances and

3 things you saw when you worked at that pharmacy.  Was

4 there anything about when you were working there all

5 the way through to the end where you felt

6 uncomfortable about controlled substances?

7     A.     Maybe.

8     Q.     That's fair.  Let's ask some specific

9 questions.  Did the pharmacy seemed to fill

10 out-of-state prescriptions, based on your

11 observations?

12     A.     Yes, sir.

13     Q.     Was that a rare thing?

14     A.     I would say it was, like, like, monthly or

15 every couple months.  I'm not for sure.

16     Q.     Meaning a patient would come in every

17 month or every couple months?

18     A.     Yeah, yeah.  I'm sorry.  Yeah, yeah.

19     Q.     Did you see people come in with

20 out-of-state prescriptions fairly frequently?

21     A.     Just like I said, like, every month, they

22 would come.

23     Q.     Is there anything -- thinking back on it

24 now, does anything stand out to you about what you

25 remember about those prescriptions?

1      A.      They would -- they were from, like, a

2  doctor in another state, and they were for controlled

3  substances.  And sometimes the people that were

4  getting them filled would come, like, together.

5      Q.      When you think of patients that fill the

6  these out-of-state controlled substance prescriptions,

7  are there any that stand out in your memory?

8      A.      I can remember a few.

9      Q.      Okay.  Do you remember a patient named

10 Terri Moore?

11     A.      Yes, sir.

12     Q.      Do you remember a patient named Lena

13 Vanover?

14     A.      Yes, sir.

15     Q.      Why do you remember them?

16     A.      They were the -- some that came in

17 together with prescriptions from another state for

18 controlled substances.

19     Q.      Okay.  And so did you see a lot of

20 different patients filling a lot of different

21 prescriptions at the pharmacy while you worked there?

22     A.      Just, like, in general?

23          MR. SMITH:  Yeah.

24     A.      Yeah, I think so.

25     Q.      So of all those patients, why do you

1  remember Terri Moore and Lena Vanover?

2      A.      I guess just because they were from out of

3  state, and they were getting ...

4      Q.      Now, the best of your recollection of

5  watching them walk in, did they walk in using a walker

6  or wheelchair?

7      A.      Not that I remember, no.

8      Q.      Did they ever come in and at least orally

9  express being in pain to you or wincing or anything

10 like that?

11     A.      Not that I remember, no.

12     Q.      Okay.  Did they seem capable of walking on

13 their own two feet?

14     A.      Yes, sir.

15     Q.      Switch gears a little bit.  When you

16 worked at the pharmacy, was there a computer?

17     A.      Yes, sir.

18     Q.      And talk to us a little bit about what

19 that computer was used for.

20     A.      So there were a few computers.  One of

21 them was, like, I guess, like, the main computer where

22 that most of the new prescriptions were typed in

23 there.  And there was another one that was also used

24 for refilling, and if you needed to look at a

25 patient's list of medications or something.  And then

1    there were -- there was one or two more that was set

2    up for ordering every day.

3        Q.      Now, we talk about controlled substances

4    and controlled substance prescriptions.  Were you

5    aware back then, just as a pharmacy tech, whether or

6    not somebody needed to have a prescription before they

7    got a controlled substance?

8        A.      Yes, sir.

9        Q.      Okay.  What did you understand?

10       A.      It was my understanding that the patient

11   went to the doctor and got a prescription for anything

12   that wasn't, like, available to be outside in the

13   pharmacy.

14       Q.      And did you understand that the patient

15   had to have a prescription in hand before they could

16   get a controlled substance?

17       A.      Yes, sir.

18       Q.      You've been to pharmacy school now for

19   about a semester; do you think you have a clearer

20   understanding of that?

21       A.      Yes, sir.

22       Q.      Is there any doubt in your mind about

23   that?

24       A.      No.  I'm positive now.

25       Q.      Let me ask you this question directly,

1 okay?  Were there times that you saw Ms. Jones give

2 customers controlled substances before they had a

3 prescription?

4       A.     Yes, sir.

5       Q.     Tell us about that.

6       A.     It would -- if a patient had run out of

7 their medication, they could get a medication -- get

8 the medication before they brought their prescription

9 in.  And then when the prescription was brought in, it

10 was, like, taken back out of it, what had been given

11 when they were out.

12      Q.     So when they were initially provided the

13 medication, did you ever hear that referred to as

14 loaning?

15      A.     Like when the prescription came?

16           MR. SMITH:  Well, before then, before they

17 had the prescription.

18      A.     Yes, sir.

19      Q.     Okay.  And was a note made in the

20 pharmacy's computer system when that occurred

21 sometimes?

22      A.     Yes, sir.

23      Q.     Now, do you know for sure that a note was

24 made every single time that happened?

25      A.     No, sir, I don't.

1     Q.     Okay.  You're telling us about this

2 experience about seeing prescriptions, drugs, being

3 given -- controlled substances being given to patients

4 before they had a prescription.  Did that happen more

5 than once?

6     A.     Yes, sir.

7     Q.     Now, can you sit here today and tell me

8 exactly how many times you saw that happen?

9     A.     No, sir.  I only worked part time.

10     Q.     Okay.  But just working part time and for

11 a limited period of time at the pharmacy, did you

12 still see this happen frequently enough that you

13 remember it?

14     A.     Yes, sir.

15     Q.     Is there any doubt in your mind that that

16 happened?

17     A.     No, sir.

18     Q.     Now, again, kind of putting yourself in

19 that situation as a pharmacy tech and just a person

20 who lives in the area and has reasonable common sense,

21 at the time, was there anything about that that gave

22 you concern?

23     A.     I mean, maybe, but I -- like you said, I

24 hadn't been to pharmacy school, and this was my first

25 pharmacy job, so I was -- just assumed that ...

1      Q.      Okay.  Well, what about now?

2      A.      Now, yes, I realize that you can't do

3  that.

4      Q.      Well, just, again, kind of drawing from

5  your life's experience, if somebody walks in, and they

6  ran out a few days earlier, let's say, of their

7  hydrocodone, what's the big deal about giving them a

8  new one?

9      A.      Now I know that it's a controlled

10  substance, and you're not allowed to dispense a

11  controlled substance like that.  You have to be extra

12  careful with them.  And there are specific laws about

13  that deal with, like, the monitoring of controlled

14  substances.

15      Q.      But even then, back then as a pharmacy

16  tech, if somebody ran out of their medication early,

17  did you have any concerns about what might have

18  happened to that medicine?

19      A.      I can't remember any specific instances

20  where I was worried.

21          MR. SMITH:  Okay.  Now, let's take a look, if

22  we can real quick, just for the witness real quick,

23  bring up -- go to Exhibit 39.

24          Oh, it's unplugged.  Give us a moment, Your

25  Honor.  I apologize.

1          THE COURT:  No problem.

2      Q.      Now, Mr. Carr, stepping back a moment from

3  what you just told us, you talked about there was a

4  computer at the pharmacy; did you tell us that?

5      A.      Yes, sir.

6      Q.      Okay.  And we talked about notes; do you

7  remember that?

8      A.      Yes, sir.

9      Q.      Okay.  Tell us when a loan was made of a

10  controlled substance, or of another drug, where was

11  that information entered into the computer?

12     A.      Under the patient's profile in, like, a

13  notes section.

14     Q.      Okay.  And did you have occasion to see

15  those from time to time?

16     A.      Yes, sir.

17     Q.      Okay.

18          MR. SMITH:  If I look at -- if we can show

19  Exhibit 39.

20     Q.      If you look at the column titled note

21  text; do you see the text in there?

22     A.      Yes, sir.

23     Q.      Now, I don't expect you to remember those

24  specific entries, but the question I have for you is,

25  do those notes look familiar like the ones we had

1  talked about?

2      A.      Yes, sir.

3      Q.      Did those look like the kind of notes that

4  were entered when this pill loaning occurred?

5      A.      Yes, sir.

6          MR. SMITH:  And if we can show that to the

7  jury.  This has already been admitted, Your Honor.

8      Q.      So, for instance, one of the notes there

9  in row 14, I think, says "loaned 12 hydro 7.5."  What

10 would your understanding of that have been working at

11 the pharmacy?

12     A.      You said 14?

13     Q.      Yes.  The text is, "loaned 12 hydro 7.5;"

14 do you see that?

15     A.      Yes, sir.

16     Q.      What was your understanding of that?

17     A.      That the patient, that whenever this note

18 was made, received 12 hydrocodone tablets.

19     Q.      Now, if a patient came in, let's say a

20 patient came in later -- and we can take that down

21 now -- and brought in a prescription for hydrocodone,

22 what would the pharmacy then do?

23     A.      After one of the notes had been made?

24     Q.      So the loaning happens, the note is

25 entered, and then the prescription's actually

1    obtained, and they bring that into the pharmacy to get

2    the rest of their drugs, what happened then?

3        A.      The prescription was typed in and counted,

4    except the amount that they had been loaned, like, the

5    12 that you showed would be subtracted out of their

6    prescription amount that they received that day.

7        Q.      And would the label still read the full

8    prescription amount?

9        A.      I think so, yes.

10       Q.      So it wouldn't have been obvious from that

11   label amount or the label that a loaning had occurred?

12       A.      No, sir.

13       Q.      And then what would happen to the note

14   once that it was dispensed?

15       A.      Delete it.  It was to be deleted.

16       Q.      And you can delete notes out of that

17   patient profile, that field we just saw?

18       A.      Yes, sir.

19       Q.      Let's switch gears again and talk about

20   how the pharmacy billed for drugs that came in the

21   door, okay?

22       A.      Okay.

23       Q.      Talk us through a little bit about your

24   understanding about how drugs were billed.

25       A.      So, as I said, whenever they were typed

1  into the computer system, and a label came out of the

2  label printer that you would put on the bottle, I

3  understood then that they would be billed before the

4  label would come off of the printer.  Does that make

5  sense?

6      Q.      So when the information was entered into

7  the computer, did it generate a label?

8      A.      Yes, sir.

9      Q.      And at that same time, was the bill

10  submitted to the insurer?

11      A.      That was my understanding.

12      Q.      Okay.  And was it your understanding that

13  the -- I guess, which insurers did you understand the

14  pharmacy to be billing to?

15      A.      All of them.

16      Q.      Okay.  List some for us, if you could.

17      A.      WellCare, Coventry.  Sorry.  I'm --

18      Q.      That's okay.

19      A.      -- I'm drawing a blank.

20      Q.      Did some of those include Medicare and

21  Medicaid drug plans?

22      A.      I know that now, yes.

23      Q.      Okay.  So when that prescription's first

24  entered into the machine, and we have the label and

25  the bill's submitted, talk to us again about what

1  happens to the label.

2      A.      The label, use the label to find the

3  medicine on the stock shelf, and then you count it and

4  put it in the bottle for the patient, and you put the

5  label on it, and, then, like, we said before, the

6  pharmacist looks at it.

7      Q.      Now, does that sometimes happen, that

8  process for refill prescriptions?

9      A.      Yes, sir.

10      Q.      Can you tell the jury about how about

11  worked.

12      A.      So for refills, you just went into the

13  computer and hit refill, and then went through the

14  steps that the screen prompted.  And then the label

15  would come off just like normal, and then you would do

16  the same process.

17      Q.      Each month, did the pharmacy do anything,

18  or it may be more frequently than each month, but at

19  some period, did the pharmacy do anything with respect

20  to refills?

21      A.      There was a reminder thing that would tell

22  you when patients' refills were coming up.  Is that

23  what you're asking?

24      Q.      Did -- yeah.  Was there a process by which

25  refills were kind of regularly run at the pharmacy?

1    A.      Yes, sir.

2    Q.      Now, were prescriptions always picked up

3  from the pharmacy?

4    A.      No, sir.

5    Q.      What did you see that gave you that

6  impression?

7    A.      Sometimes they would be in the basket for

8  a long time, and the patient not pick them up.

9    Q.      And every so often at the pharmacy, were

10 there times that employees then restocked those

11 medications?

12   A.      Yes, sir.

13   Q.      Did you help do that?

14   A.      Yes, sir.

15   Q.      Was it your understanding that those were

16 being backed out, those charges were being backed out?

17   A.      I didn't do it, but I don't -- I can't say

18 if anyone else did.

19   Q.      Did you ever see anyone else back out the

20 charges?

21   A.      Not that I remember.

22   Q.      Did you ever talk to anybody else about

23 backing out charges?

24   A.      Not that I remember.

25   Q.      Now, were there times that you knew the

1  prescription was being billed for, and was being

2  restocked, and you tried to back out the charges?

3       A.      I did do that before, yes.

4       Q.      Okay.  And why did you do that?

5       A.      It was after I kind of realized what was

6  going on, and I felt like I should do it.

7       Q.      Okay.  You just said, "I kind of realized

8  what was going on?"

9       A.      Yeah.

10      Q.      Okay.  Tell the jury what was going on.

11      A.      It was after all of the -- all of it

12  started.

13      Q.      Okay.  And what is it that you realized

14  was going on, is my question?

15      A.      Whenever the investigation, I guess,

16  started.

17      Q.      Now, I understand that.  What I was asking

18  you is, you realized what was going on with billing at

19  the pharmacy, I think that's what you just told us.

20      A.      Oh, yeah.  I'm sorry.

21      Q.      Okay.  So at that point, you told us that

22  you then backed some stuff out?

23      A.      Yes, sir.

24      Q.      Why did you do that?

25      A.      Because those prescriptions weren't picked

1  up and given to the patient.

2       Q.      So?

3       A.      They -- it's -- they were already paid

4  for.  Is that what you're asking?

5       Q.      Did you personally back those out

6  believing that that was the right thing to do?

7       A.      I did a few times, yes.

8       Q.      Okay.  Did anybody else at the pharmacy

9  ever tell you how to back something out?

10      A.      Not explicitly.

11      Q.      Did Ms. Jones ever sit down and train you

12  on how to fill -- back out prescriptions?

13      A.      Not that I remember.

14      Q.      Now, when the refills were run, and you

15  went through and did this process of running the

16  refills every so often at the pharmacy, who did that?

17      A.      In terms of the computer?

18          MR. SMITH:  Yeah.

19      A.      Just the technicians.

20      Q.      Okay.  And who told them to do that,

21  though; why would you do that?

22      A.      I, I guess the pharmacist.

23      Q.      Do you remember Ms. Jones saying that this

24  is something we should do every so often?

25      A.      Yes.

1      Q.      Okay.  Did Ms. Jones direct you, you,

2  being pharmacy employees, to run these refills?

3      A.      Yes.

4      Q.      Okay.  So those refills got run, and those

5  prescriptions got generated.  Was there ever a similar

6  command where she sat down at a meeting or something

7  and said, Hey, guys, anything that doesn't get picked

8  up, let's back those out; did that meeting ever occur?

9      A.      No, sir.

10     Q.      Did she ever sit down with you and say,

11 Hey, Taylor, those things are getting put back on the

12 shelf.  Let's make sure we back those billings out?

13     A.      No, sir.  I don't remember that.

14     Q.      Do you remember anybody at the pharmacy

15 ever telling you about that?

16     A.      Not that I remember.

17     Q.      Do you remember anybody at the pharmacy

18 ever doing that?

19     A.      Not that I remember.  But like I said, I

20 wasn't there all the time.

21     Q.      Fair enough.  Now, at times, would you see

22 prescription bottles with torn labels or blacked-out

23 labels sitting on the pharmacy shelf?

24     A.      Yes, sir, I did.

25     Q.      Okay.  What was your understanding of how

1  those got there?

2      A.      The process that we've been talking about

3  with being put back to stock.

4      Q.      Okay.  And so if that bottle's put back in

5  stock, was it -- what would then happen to that

6  bottle?

7      A.      The medication would be used for the next

8  time.

9      Q.      And when that was used the next time, do

10  you remember any directive from Ms. Jones of, Hey,

11  this has already been billed, so let's not bill it the

12  next time, I don't want to double-dip here?

13      A.      I don't remember that, no.

14      Q.      Was it your understanding that when that

15  next prescription was run, you felt that that would be

16  billed as well?

17      A.      Yes, sir.

18      Q.      Was this just like a like bottle or two

19  bottle thing?

20      A.      No, sir.

21      Q.      Now, I told you that investigators looked

22  at the trash at Kim's Hometown Pharmacy and found

23  certain discarded labels or boxes that had been billed

24  to insurers.  How would those boxes have gotten there,

25  based on your understanding of how the pharmacy

1  operated?

2      A.      Kind of like we said, they would have been

3  used again, and then that bottle would have been

4  thrown away.

5      Q.      Okay.  A few more questions.  We talked

6  about a couple things, including controlled substance

7  prescriptions, out-of-state prescriptions, talked

8  about loaning controlled substances, and then these

9  billings.

10         I guess what I want to know from you just

11  personally as you reflect on your time there and think

12  back about it, what do you think about that stuff?

13         MR. PILLERSDORF:  May we approach the bench,

14  Your Honor?

15         THE COURT:  You may.

16         [CONFERENCE AT THE BENCH]

17         MR. PILLERSDORF:  Your Honor, I would object

18  to this.  What's going on here is Mr. Smith is very

19  elegantly getting this witness to say, Gee, what I've

20  learned at pharmacy school is wrong when I worked

21  there.  He's really an unqualified expert witness,

22  basically describing a standard of care without

23  leaving pharmacy school.  And --

24         THE COURT:  Well, he's asked for an opinion.

25         MR. SMITH:  I'm not asking for his opinion,

certainly not an expert opinion, maybe a lay opinion,
I suppose.  But I think with any crime, if somebody --
say they're participating in a bank robbery, and they
go around and do bank robberies for a period of time,
and then they have some time to reflect on it, I don't
think you need to be an expert to reflect on, you
know, as I think back on this, this stuff made me
uncomfortable, and this stuff is odd, and here's why.
I think witnesses can talk about their life
experiences that way without delving into being an
expert.

THE COURT:  Well, I think I'll sustain the
objection.  I think you can rephrase the question.
And the question, the way it was asked, seemed to ask
well, you know, I thought there was criminal activity
going on, and I thought there was violations of the
law.  But I do think it's probably fair to say, you
know, was this -- is this process consistent with what
you learned in pharmacy school?

MR. SMITH:  I'm sorry.  Can you say that one
more time.

THE COURT:  I think you can say is this
process consistent with what you learned in pharmacy
school, you went to pharmacy school, and, you know,
ask this.

1          MR. SMITH:  Okay.

2          THE COURT:  Is this consistent, or does this

3     conflict with anything you learned?  I would think

4     that's the question.  And ask if whether this witness

5     would view the instructions as it relates to opinion

6     versus fact?

7          MR. SMITH:  I wouldn't object to giving that

8     instruction to being safe.

9          THE COURT:  Would you object to that

10    instruction, is that mixed instruction,

11    Mr. Pillersdorf, in which we say, you know, on the

12    facts, you know, you consider credibility.  But on

13    opinions, you don't have to take his opinion, you have

14    to consider his credibility.

15         MR. PILLERSDORF:  We would object, Judge.

16    This is an interesting way of getting an expert

17    opinion in.

18         THE COURT:  Well, it's not -- it's akin in

19    some ways, I think, to law enforcement officers.

20    They're asked the question, you know, based on finding

21    a one liter bottle of Drano and some pipe, and, you

22    know, is that consistent with your experience that

23    they're precursors to a meth lab?  We will allow that

24    in without qualifying them as an expert.

25         I think you do have to lay a foundation in

terms of experience or education here to ask any

question about something is counter to what he's been

taught.  And I'm not going to sustain the objection to

the extent that it's this, you know -- and you may not

be asking this, but the broad improper question is

this healthcare fraud, or is this, you know, illegal

distribution based on your training and experience.

I'm not going to allow that, but --

MR. SMITH:  Okay.  I think all I'm trying to

get at is I think this witness would say that based on

things he saw there now, that are now very

uncomfortable about his experience there, just like

anybody who might have been --

MR. PILLERSDORF:  Hasn't that already been

asked and answered?

THE COURT:  Well, that's not an objection.  I

mean, you could ask him did he leave.  I mean --

MR. SMITH:  Yeah, and I was going to get to

that.  Maybe that's the way I'll do that.  I'll just

ask him why he left.

THE COURT:  Why did you leave?  Yeah.

MR. SMITH:  Is that fair?

MR. PILLERSDORF:  Thank you, Your Honor.

MR. SMITH:  Okay.  I'll probably just do

that. Thank you, Your Honor.

1                [IN OPEN COURT]

2                THE COURT:  You can continue, Mr. Smith.

3        Q.      Sir, let me just ask you a question this

4   way.  At some point, did you leave Kim's Hometown

5   Pharmacy?

6        A.      Yes, sir.

7        Q.      Can you tell us why.

8        A.      I had been accepted into pharmacy school

9   at UK, and I wanted to get a different setting

10  experience, so I started to shadow at the hospital in

11  Corbin.

12       Q.      Was there something about your time and

13  experience there where you wanted to get away from the

14  pharmacy?

15       A.      I mean, maybe.

16       Q.      Why maybe?

17       A.      Just because I wanted to go to pharmacy

18  school.

19       Q.      Was there anything about your experience

20  in how you felt about working there and things were

21  going on that caused you to leave?

22       A.      That may have played a factor, but it

23  wasn't my explicit reason.

24       Q.      I mean, that's not what you expressly told

25  somebody?

1    A.    No.  I -- and I did shadow at the hospital

2  some.

3    Q.    One question people might have in

4  listening to your testimony is you've talked about

5  seeing pill loaning or seeing out-of-state

6  prescriptions that we've talked about and these other

7  billing irregularities.  So you worked there for how

8  long?

9    A.    Around two years.

10    Q.    Well, why didn't you report any of that

11  stuff?  Why didn't you call the police or somebody

12  else?

13    A.    Like I said, at the time, it was my first

14  pharmacy job, and I'd only been behind the pharmacy

15  counter, like, maybe two times before that to shadow

16  another pharmacist, and so I just assumed that that

17  was how that they did things.  That was their

18  pharmacy, and that's how they did things.

19    Q.    Do you still feel that way?

20    A.    No, sir.

21    MR. SMITH:  Your Honor, that's all the

22  questions I have.

23    THE COURT:  Mr. Pillersdorf.

24                   CROSS-EXAMINATION

25    BY:  MR. PILLERSDORF:

```
 1       Q.      Mr. Carr, I understand you were part time.
 2  While you were there, there were a number of full-time
 3  employees, correct?
 4       A.      Yes, sir.
 5       Q.      Okay.  Do you remember their names?
 6       A.      Yes, sir.
 7       Q.      What were their names?
 8       A.      There was Amanda and Judy and Marty.
 9       Q.      Okay.  Judy and Marty, are their last name
10  Douglas?
11       A.      Yes, sir.
12       Q.      They are husband and wife, correct?
13       A.      Yes, sir.
14       Q.      They've worked in pharmacies for many,
15  many years, haven't they?
16       A.      That's my understanding, yes.
17       Q.      Okay.  And you know Kim, Ms. Jones,
18  correct?
19       A.      Yes, sir.
20       Q.      You're a native of Williamsburg or Whitley
21  County?
22       A.      Yes, I am.
23       Q.      Did it appear to you working there that
24  Ms. Jones or these other, employees they knew their
25  customers pretty well, right?
```

1      A.      That was my understanding, yes.

2      Q.      I mean, if somebody walked in the

3  pharmacy, the odds were, either Ms. Jones or the

4  Douglases or Amanda, they knew these people, correct?

5      A.      Yes, sir, they did.

6      Q.      Okay.  And when these people came in with

7  out-of-state prescriptions, is it fair to say either

8  Ms. Jones or the other employees knew these people's

9  histories?

10     A.      They did know them, yes.

11     Q.      Okay.  There was a witness in here a

12  minute ago named Ms. Woolum, I think Diana Woolum.

13  Are you familiar with her?

14     A.      She was -- she came to the pharmacy while

15  I worked there.

16     Q.      I'm curious, did you know her why she

17  needed these prescriptions, did you know the history

18  of her health problems?

19     A.      No, sir, I did not.

20     Q.      Okay.  Did it appear that the others in

21  the pharmacy knew them?

22          MR. SMITH:  Objection.

23     Q.      Based upon your personal observations?

24     A.      Can you repeat the question, please?

25     Q.      What I'm trying to get at is, is it fair

1  to say most of the people who went into this pharmacy
2  were known by the staff?
3       A.      Yes, sir.
4       Q.      Okay.  Did you ever know Ms. Jones to ever
5  tell somebody, "I'm not going to give you a
6  prescription?"
7       A.      I have seen that before, yes.
8       Q.      Okay.  Why wouldn't she give them a
9  prescription?
10      A.      I can, just off the top of my head for, if
11  for weren't, like, a customer there, she'd refused
12  customers before.
13      Q.      Okay.  Well, you're a student, so let's --
14  all right.  I realize you're in pharmacy school, but,
15  you know, that person's got a prescription, some
16  doctor wrote a prescription, and she won't give it to
17  'em?  Did you ever ask her why not?
18      A.      It was just my understanding that because
19  they weren't already a patient.
20      Q.      Okay.  Now, you were talking a little bit
21  about that occasionally they would loan people pills,
22  correct?
23      A.      Yes, sir.
24      Q.      Okay.  And let's be clear:  The people who
25  would get those advance on pills or loans on pills,

1  they already had prescriptions, correct?

2       A.      As far as I know, yes.

3       Q.      And I just want to be clear, it wasn't

4  like somebody just came off the street and said, Give

5  me ten oxycodone, I have no prescription; that

6  wouldn't happen, would it?

7       A.      I don't recall ever seeing that happen.

8       Q.      Okay.  So basically the people who'd be

9  loaning pills were people who had existing

10 prescriptions, correct?

11      A.      As far as I knew; that's my understanding.

12      Q.      And based on your personal knowledge

13 working there, either Ms. Jones or these other

14 people -- well, these other staff members knew these

15 people, correct?

16      A.      Yes.

17      Q.      Okay.  Now, I've mentioned to you that

18 Mr. and Mrs. Douglas, I want to be clear, they -- I

19 think I may have already asked you, they had worked at

20 pharmacies for a long time, correct?

21      A.      That's my understanding, yes.

22      Q.      Okay.  And the same with Ms. Bingham?

23      A.      She worked there as long as they were

24 open, if I'm correct.

25           MR. PILLERSDORF:  Okay.  Thank you, sir.

1          THE COURT:  Thank you.  Mr. Smith?

2          MR. SMITH:  Thank you.  Can we approach on

3    one thing?

4          THE COURT:  You may.

5          [CONFERENCE AT THE BENCH]

6          MR. SMITH:  Following on our last

7    conversation we had about his experience in pharmacy

8    school and opinion versus not opinion, I just heard

9    defense counsel say, Well, you're in pharmacy school,

10   and asking essentially talk about his experience based

11   on seeing that prescription, and then he said there's

12   a doctor that wrote that prescription.  I think the

13   door's been opened for me to now ask questions about,

14   Okay.  You're in pharmacy school.  What do you think

15   about this stuff?  I think that's a fair response.

16         MR. PILLERSDORF:  Yeah, but that really went

17   to the loaning issue, that they weren't just giving

18   away pills.

19         THE COURT:  What was the question?

20         MR. SMITH:  Something to the effect that,

21   Okay, you're in pharmacy school, and you saw the

22   prescription, the doctor wrote the prescription.

23         THE COURT:  Honestly, I just don't think that

24   opens the door.  I mean, I think you could -- you

25   could ask maybe about that specific topic.

1     "Okay.  Well, you're a student, so let's --
2 all right.  I realize you're in pharmacy school, but,
3 you know, that person's got a prescription, some
4 doctor wrote a prescription, and she won't give it to
5 'em?  Did you ever ask her why not?"
6     So if you want to ask him questions about
7 prescriptions and pharmacy school, I think that'd be
8 okay.  It doesn't open the door.
9     MR. SMITH:  So just so I'm clear, what topic
10 is it that I can ask him about at this time?
11     THE COURT:  Well, the topic of the questions.
12     MR. SMITH:  Was that loaning, as he said it?
13 Did you say that was loaning?  What was the topic?
14     THE COURT:  Well, you're a student, so
15 let's -- all right.  I realize you're in pharmacy
16 school, but, you know, that person's got a
17 prescription, some doctor wrote a prescription, and
18 she won't give it to 'em?  Did you ever ask her why
19 not?"
20     MR. SMITH:  Okay.  So can I ask him --
21     THE COURT:  "Which is my understanding
22 because they weren't a patient.  Okay."
23     MR. SMITH:  So can I ask him, You're in
24 pharmacy school, what did you learn about
25 prescriptions from doctors for controlled substances?

1              THE COURT:  Well, I think you can.  I

2      don't know why you'd ask just a open-ended tutorial

3      question.  You could ask a specific question related

4      to the facts of this case.

5              MR. SMITH:  I mean, defense counsel used that

6      word for a reason.  He's saying pharmacy school for a

7      reason.  I don't want to enlarge it, but I just want

8      to make sure I'm clear on kind of what the scope is.

9              To me, the way I heard it was the suggestion

10     that you're in pharmacy school, so there's nothing

11     wrong with filling the prescription because the doctor

12     wrote it.  I think that's a fair --

13             THE COURT:  Yeah.  Well, you can ask your

14     question whether or not -- you can ask the question

15     about that.  Is that consistent with your training in

16     pharmacy school?

17             MR. SMITH:  Well, so can I say, "You're in

18     pharmacy school.  Is it enough just for a doctor

19     written a prescription?

20             THE COURT:  Sure.

21             MR. SMITH:  Okay.  fair enough.  Thank you,

22     Your Honor.

23             [IN OPEN COURT]

24             THE COURT:  Mr. Smith, you can continue.  You

25     can continue.

```
 1                    REDIRECT EXAMINATION
 2      BY:  MR. SMITH:
 3      Q.      Okay.  Mr. Carr, a couple quick questions.
 4  You were asked a question as referenced to you being
 5  in pharmacy school, and there was a question about,
 6  Well, a doctor writes a prescription, and that's
 7  brought to the pharmacy.
 8          So you're in pharmacy school.  Is it enough
 9  for a doctor to just write a prescription?
10      A.      No, sir.
11      Q.      Is there any doubt about that in your
12  mind?
13      A.      Not from what I've been taught since I've
14  been in pharmacy school.
15      Q.      Now, there was one other thing, and I
16  think there was some confusion about the wording, and
17  so I just want to make sure we're on the same page.
18          You were asked about this pill loaning and
19  whether these people already had prescriptions.  When
20  you talked about that, you said yes.  When you meant
21  that, when you said that, were you saying that this
22  person had a prescription previously with the
23  pharmacy?
24      A.      That's -- yeah, that's what I meant, is
25  that they were a customer, and they had had that
```

1   prescription filled.

2       Q.    But when you say "that prescription," you

3   mean that drug generally, not that specific monthly

4   prescription?

5       A.    Yes, sir.  I'm sorry.

6       Q.    Okay.  So when the loaning occurred, did

7   that occur before there was a new monthly

8   prescription?

9       A.    Yes, sir.

10      Q.    Because otherwise, would it be loaning?

11      A.    I don't, I don't understand the question

12  there.

13      Q.    Well, meaning if you were just filling a

14  prescription there, and had a prescription in place,

15  and they were just filling it, you wouldn't be

16  loaning, would you?

17      A.    No.

18      Q.    So the idea is, there's a gap between when

19  a prescription was filled for the first one, and when

20  the next one might come to that customer?

21      A.    Yes, sir.

22      Q.    Now, based on your experience working at

23  the pharmacy, is it always a guarantee that the

24  customer is going to get that next prescription?

25      A.    I would say no.

1           MR. SMITH:  Your Honor, that's all the
2   questions I have.
3           THE COURT:  Thank you.  May the witness be
4   finally excused?
5           MR. PILLERSDORF:  Yes, Your Honor.
6           MR. SMITH:  Yes, Your Honor.
7           THE COURT:  Sir, you're finally excused from
8   any further testimony at this trial.  Thank you very
9   much for appearing today.
10          THE WITNESS:  Thank you, sir.
11          THE COURT:  Thank you.  Mr. Smith, you can
12  call your next witness.
13          MR. SMITH:  Your Honor, can I have a moment
14  to check out in the hallway?
15          THE COURT:  You certainly may.
16          MR. SMITH:  Your Honor, can we approach?  I
17  apologize.
18          THE COURT:  You certainly may.
19          [CONFERENCE AT THE BENCH]
20          MR. SMITH:  So we have another witness that's
21  coming up from D.C. that I talked with, and as far as
22  we know, they're here in London and is supposed to be
23  here.
24          THE COURT:  Okay.
25          MR. SMITH:  Ms. York went down to check if

1  she's downstairs.  If she's not here, I don't have

2  another witness in the building, and I couldn't

3  probably get them here before five.  The good news is

4  we're running ahead of schedule.

5          THE COURT:  I think we're making good time.

6  The way I kind of determine how we're doing is you've

7  proposed about 17 hours and 45 minutes of testimony,

8  and you've covered five hours and 15 minutes.  I don't

9  actually keep actual -- it doesn't matter to me how

10  long you actually take.  I'm just trying to figure out

11  how far into the total time we've gotten, so that's a

12  pretty good day today.  And then we have about

13  12-and-a-half more hours.  We'll have a good day

14  tomorrow and a good day on Friday.  You might get done

15  actually -- it'll be close, but you might get to be

16  done by the end of the week, even if we were to leave

17  a little bit earlier today, so ...

18          MR. SMITH:  And especially since we're going

19  Monday.  I think we should be good.

20          THE COURT:  Okay.  Well, I'll let them go a

21  little early, particularly with the weather, I think

22  it's good idea to do that.

23          [IN OPEN COURT]

24          THE COURT:  Ladies and gentlemen, rather that

25  keep you waiting, we're going to go ahead and release

1 you for the evening recess, and particularly with the

2 weather, I'm going to make sure everybody can get home

3 during daylight.  And I'd just remind you of those

4 instructions.  I always repeat them at the evening

5 recess, and we want you to realize that it's very

6 important that you not start to talk about the case

7 amongst each other or with anybody else.

8          One of the things that happens as you start

9 to get to know each other, the temptation to just want

10 to discuss what you're all engaged in grows.  Resist

11 that temptation.  Don't gather any kind of outside

12 information over the evening recess.  Be careful about

13 the use of technology for either purposes, and, of

14 course, continue to keep an open mind.

15          I do want to tell you about some scheduling

16 matters so you can plan your own personal affairs

17 around them.  We will start just a little bit earlier

18 tomorrow, at 9 a.m., but you should be done by

19 mid-day, at 12:30.  In fact, we won't break for a

20 lunch break.  We're going to release you, and you'll

21 have the afternoon available tomorrow, and we'll only

22 have a half a day.  And then we do anticipate a full

23 day on Friday.

24          And then on Monday of next week -- we do

25 anticipate this case will go into next week for a few

1 days.  Right now we anticipate you having Monday

2 morning off, and we having you here ready to begin an

3 afternoon session about 1:00.

4       We don't anticipate an unusually late

5 evening; it will be just be a half-day.  And so

6 particularly in trials that go over a week, because of

7 other commitments, we can also provide you some time

8 as you try to maintain work and family matters and

9 that type of thing, give you a few times during the

10 week in which we're able to do that.

11       So safe travels as you're going home tonight.

12 Try to stay warm.  I've got at least one juror with

13 gloves on, so it is cold, and we recognize that.  I

14 want you to be safe.  And have a good evening.

15       At this time, the jury can exit the

16 courtroom.

17       [JURY EXITS COURTROOM]

18       THE COURT:  Okay.  You can be seated.  Just a

19 reminder, we're going to start at 9 a.m. in the

20 morning, instead of 9:30, and we'll try to get started

21 as close -- I think the weather will be cold, but I

22 don't think we'll have the same problems with snow and

23 ice that we had this morning, so we'll try to start

24 right at 9 a.m., and should be able to get a pretty

25 good amount of testimony in tomorrow.

1           I do have the commitment at the law school

2    tomorrow afternoon, but have a full day on Friday, so

3    for your planning purposes.  And then we've reclaimed

4    a half a day, thank you, Mr. Pillersdorf, on Monday.

5           I'm watching the calendar.  I have another

6    law school commitment, a different commitment other

7    than my class, on Tuesday afternoon next week.  I

8    think it's probably likely that I'll try to reschedule

9    that, but I am watching that.  I'll try to keep you

10   abreast of it.  I'm just trying to keep you in the

11   loop on possible scheduling matters.  But then the

12   remainder of the week is, with the exception of

13   Thursday again, in the afternoon, should be fine.  So

14   we'll keep moving forward.  We should have contiguous

15   days.  We may alter the schedule just a little bit.

16          Mr. Smith, anything I can address for the

17   government before we recess for the evening?

18          MR. SMITH:  No, Your Honor.  The only thing

19   that occurs to me to ask at the outset of the trial,

20   we will ask the Court to take judicial notice that

21   Whitley County is in the Eastern District of Kentucky.

22   I've submitted that in our proposed jury instructions,

23   but just in case, I make that request on behalf of the

24   government.

25          THE COURT:  Okay.  Any objection,

1  Mr. Pillersdorf?

2          MR. PILLERSDORF:  It is near Tennessee,

3  Judge, but not --

4          THE COURT:  I don't think that's a fact in

5  issue.  Okay.  We'll make sure that's included.

6          Anything I can address for you,

7  Mr. Pillersdorf?

8          MR. PILLERSDORF:  No, Your Honor.

9          THE COURT:  All right.  Everybody have a good

10  evening, get some rest.

11          We'll stand in recess 'til 9:30 tomorrow --

12  I'm sorry, 9:00 tomorrow.

13          [RECESS - 4:20 p.m.]

14                      * * * * *

15          I, SANDRA L. WILDER, RMR, CRR, certify that

16  the foregoing is a correct transcript from the record

17  of proceedings in the above-entitled matter.

18

19  /s/ Sandra L. Wilder RMR, CRR      Date of Certification:
    Official Court Reporter            September 9, 2019

20

21

22

23

24

25